UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STEINHORST ASSOCIATES,                          )
                                                )
                            Plaintiff,          )
                                                )
            v.                                  )        Civil Action No. 07-813 (HHK)
                                                )
ALPHONSO JACKSON, in his capacity as            )
Secretary of the United States Department of    )
Housing And Urban Development,                  )
                                                )
                                                )
                                                )
                            Defendant.          )
_____     )

**MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION**

**INTRODUCTION**

The Plaintiff, Steinhorst Associates, is the owner of Steinhorst Square

Apartments.  Steinhorst Square Apartments ("Steinhorst Square") is a 100-unit low-

income, elderly apartment project that since 1981 has been covered by a project-based

Housing Assistance Payments ("HAP") Contract, pursuant to Section 8 of the United

States Housing Act of 1937, 42 U.S.C. § 1437(f) ("Section 8"), between Plaintiff and the

Municipal Housing Authority of the City of Utica, New York ("Housing Authority").  In

accordance with the HAP Contracts between Plaintiff and the Housing Authority, the

Housing Authority has made housing assistance payments to Plaintiff for the benefit of

the low-income tenants who live at Steinhorst Square.  The amount of the housing

assistance payments is the difference, for each unit occupied by a low-income tenant,

between the Contract Rents specified in the HAP Contract and the amount of rent each tenant is required by law to pay.  The source of the housing assistance payments received by Plaintiff from the Housing Authority is the Department of Housing and Urban Development ("HUD") pursuant to the Annual Contributions Contract, NY-0669, ACC List Number NY 80-734 (September 29, 1980), between HUD and the Housing Authority.

When the original HAP Contract between Plaintiff and the Housing Authority expired in 2001, it was renewed for five more years in accordance with the provisions of the Multifamily Assisted Housing Reform and Affordability Act of 1997 ("MAHRA"), 42 U.S.C. § 1437f note.  More specifically, the original HAP Contract was split into two contracts and renewed under Section 524(b)(1) of MAHRA on the basis that Steinhorst Square is what HUD terms an exception project pursuant to 514(h) of MAHRA.

When the renewal contracts expired in 2006, Plaintiff sought to renew them again, in accordance with Section 524(c)(1) of MAHRA on the basis of the "Initial Renewal" of the HAP Contract for Steinhorst Square pursuant to Section 524(b)(1) of MAHRA as an exception project.  To date, HUD has refused to approve the renewal of Plaintiff's HAP Contracts under Section 524(c)(1) of MAHRA,[1] because HUD contends that the original justification for Steinhorst Square's designation as an exception project pursuant to Section 514(h) of MAHRA no longer exists.  In effect, HUD contends that Steinhorst Square's renewal status must be determined as if the requested renewal is the "Initial Renewal" of Plaintiff's HAP Contracts.  Without application of the exception provisions of Section 514(h), HUD could determine that the rest of Section 514 of MAHRA applies.

---

[1] Although Plaintiff's HAP Contracts are between Plaintiff and the Housing Authority, HUD must approve any renewal of the contracts.

This could cause a reduction in the project's Contract Rents and a restructuring of the project's mortgage loan.

Because of the disagreement between Plaintiff and HUD, no housing assistance payments have been made by the Housing Authority on behalf of the Steinhorst Square tenants since January 2007. This has reduced the money available to Plaintiff to meet its financial obligations, including the payment of its mortgage loan.

To make its mortgage loan payments in February, March and April, Plaintiff borrowed money and spent almost all of the cash that was available to it. However, Plaintiff has been unable to make its May mortgage loan payment, which was due May 1. Therefore, Plaintiff is in default of its mortgage loan. If Plaintiff does not cure its default by May 31, its loan will be subject to foreclosure. A foreclosure will result in the loss of Steinhorst Square, a multi-million dollar asset. Accordingly, Plaintiff is seeking a preliminary injunction ordering the resumption of annual contributions by HUD to the Housing Authority and, accordingly, the resumption of Plaintiff's housing assistance payments, retroactive to February 2007, for the duration of this action.

## FACTS

Plaintiff is a New York limited partnership that was formed for the purpose of developing and owning Steinhorst Square Apartments. Slavet Affidavit ("Aff"), ¶ 3.[2] Steinhorst Square is a 100-unit multifamily rental housing project located in Utica, New York. *Id*., ¶ 2. Steinhorst Square was developed in two stages. The first stage was the construction of sixty units built under HUD's Section 8 New Construction Program. The second stage was the rehabilitation of forty units under HUD's Section 8 Substantial Rehabilitation Program.

---

[2] A copy of the "Affidavit of Gerald Slavet" is attached as Exhibit 1.

Financing for the mortgage loan on Steinhorst Square was provided by Mortgage Revenue Bonds issued in 1980 by the Utica Senior Citizen Housing Corporation, a New York not-for-profit corporation acting as a public housing agency and an instrumentality of the Housing Authority. Slavet Aff., ¶ 4.   The terms of the mortgage loan are specified in a Mortgage Note that is insured by HUD under Section 221(d)(4) of the National Housing Act, 12 U.S.C. § 715l(d)(4). *Id.*

In 1996, the Utica Senior Citizen Housing Corporation refunded the Mortgage Revenue Bonds it had issued in 1980 with a new issue of Mortgage Revenue Bonds.  In connection with the 1996 bond refunding, the Steinhorst Square Mortgage Note was amended to prohibit prepayment of the Steinhorst Square mortgage loan before April 15, 2006.  Prepayment of the loan between April 15, 2006 and April 15, 2008 will incur a prepayment penalty.

After the construction and rehabilitation of Steinhorst Square, Plaintiff entered into a project-based Section 8 HAP Contract with the Housing Authority.  Ninety-nine of the units at Steinhorst Square were covered by the original HAP Contract.[3] Salvet Aff., ¶ 5.

Although it was one document, there were two stages to the original HAP Contract between Plaintiff and the Housing Authority.  Stage 1 was effective on September 7, 1981 and expired on September 6, 2001.  Stage 2 was effective on November 12, 1981 and expired on November 11, 2001.

---

[3] The other unit is occupied by an on-site manager.

When both stages of Plaintiff's original HAP Contract expired in 2001, Plaintiff requested that the "Initial Renewal"[4] of the Contract be processed under Option Four of HUD's Section 8 Renewal Guide ("Renewal Guide").[5]  Option Four is available to an exception project and permits renewal of a HAP Contract with new Contract Rents at the lesser of the Contract Rents in effect when the HAP Contract expires, as adjusted by an operating cost adjustment factor[6], or Contract Rents established on a budget basis. Renewal Guide, Chapter 6.  An exception project is a project that is not an "Eligible Multifamily Project", as defined in Section 512(2) of MAHRA, or that is exempt from the rent reduction and mortgage restructuring requirements of Section 514 of MAHRA under Section 514(h).  Renewal Guide, section 6-1A.

HUD approved the request to renew Plaintiff's original HAP Contract under Option Four, because HUD determined that Steinhorst Square was an exception project. HUD's determination that Steinhorst Square was an exception project was made on the basis that the financing for Steinhorst Square was provided by an instrumentality of a unit of local government and a mortgage restructuring would conflict with the prohibition on prepaying the Steinhorst Square mortgage loan before April 15, 2006 imposed in connection with the 1996 bond refunding.[7]  Accordingly, a new HAP Contract for each stage was executed in November 2001.  Slavet Aff., ¶ 6.  The Stage 1 Contract was

---

[4] "Initial Renewal" is defined as, "The first renewal of a project's contract or stage that is processed under the rules established by MAHRA is considered the initial renewal of the contract."  Renewal Guide, Section 2-1A.

[5] The Renewal Guide provides comprehensive guidance by HUD on the renewal of expiring Section 8 project-based HAP Contracts.  A complete copy of the Guide can be found at www.hudclips.org.

[6] An operating cost adjustment factor is "A factor that is established by HUD, which may not be negative, that is applied to the existing contract rent (less the portion of the rent that is paid for debt service)." Renewal Guide, Glossary of Terms.

[7]  This is one of the exemptions specified in Section 514(h) of MAHRA.

effective September 7, 2001 and the Stage 2 Contract was effective November 12, 2001. Each contract was for a term of five years.  *Id.*

Several months before the expiration of Plaintiff's 2001 Renewal HAP Contracts, HUD told MB Management Company, the management agent for Steinhorst Square, that Steinhorst Square would not automatically be considered an exception project when Plaintiff's two HAP Contracts expired later that year.  Instead, HUD informed MB that HUD would make a determination, when the Plaintiff's 2001 Renewal HAP Contracts expired, whether Steinhorst Square was still exempt from the rent reduction and mortgage restructuring requirements of Section 514 of MAHRA.

HUD confirmed its position in writing on August 8, 2006 in a letter from Theodore Toon, HUD's Deputy Assistant Secretary for the Office of Affordable Housing Preservation, to Plaintiff's counsel.  In his letter, Mr. Toon stated, "… Steinhorst Apartments' eligibility will be determined at the expiration of the current contract without reference or consideration given to any prior determination of exemption under Section 514(h) at the expiration of a previous contract."  *See* Ex. 2.

On November 30, 2006, MB Management Company ("MB") requested in writing that HUD approve the renewal of both the Stage 1 and Stage 2 Renewal HAP Contracts for a term of 20 years under Option Four retroactive to their expiration dates.  Slavet Aff., ¶ 7.  HUD denied MB's request on January 17, 2007 in a letter to MB from Camille Seweryniak, the HUD Project Manager for Steinhorst Square.  In her letter, Ms. Seweryniak stated that HUD had "determined that the property is not eligible for Option 4."  Accordingly, Ms. Seweryniak directed that the renewal request be resubmitted under one of the other Options specified in the Renewal Guide.  *See* Ex. 3.

Although both of Plaintiff's Renewal HAP Contracts expired in 2006, Plaintiff received housing assistance payments through January 2007.  Plaintiff has not received any payments since then.  Slavet Aff., ¶ 11.

The tenants who live at Steinhorst Square are required to pay 30% of their monthly adjusted gross income as rent.  Plaintiff receives approximately $19,500, on a monthly basis, from the tenants.  Slavet Aff., ¶ 12.

Under the expired HAP Contracts, Plaintiff was receiving approximately $67,000 in housing assistance payments from the Housing Authority monthly.[8] Slavet Aff., ¶ 11.  However, Plaintiff needs approximately $74,142 to meet its monthly financial obligations, including $37,740 to make its monthly mortgage loan payment. Slavet Aff., ¶ 13.  Therefore, without the housing assistance payments, Plaintiff has a monthly shortfall of approximately $54,600. *Id.*

Although Plaintiff was able to meet some of its financial obligations for February, March and April, including the payment of its mortgage loan, Plaintiff was unable to make its May mortgage loan payment.  Slavet Aff., ¶16.  Therefore, Plaintiff is, under the terms of the Mortgage securing the mortgage loan, in default of its mortgage loan. *Id.*  If Plaintiff does not cure its default by May 31, the holder of the Mortgage will be able to foreclose on the Mortgage.  Foreclosure will result in the loss of Plaintiff's primary asset, Steinhorst Square, and the destruction of its business. *Id.*, ¶ 17.

---

[8]  The amounts of rent paid by the tenants and housing assistance payments made by the Housing Authority on behalf of the tenants fluctuate based on the number of vacancies and any change in a tenant's adjusted gross income.

# ARGUMENT

In addition to the inherent equitable power of a court, a preliminary injunction is expressly authorized in connection with a challenge of agency action under the Administrative Procedure Act. Specifically, "To prevent irreparable injury", a reviewing court "may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705.

A preliminary injunction "is preventative, or protective; it seeks to maintain the status quo pending a final determination on the merits of the suit." *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 844 (D.C. Cir. 1977). In federal courts, "the bases for injunctive relief are irreparable injury and inadequacy of legal remedies." *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 542 (1987). However, "[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted).

To succeed on a motion for a preliminary injunction, a plaintiff must demonstrate (1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable harm if the injunction is not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be served by the injunction. *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995) (citation omitted). No one factor is determinative. Rather, "These factors interrelate on a sliding scale and must be balanced against each other." *Fund for Animals v. Norton*, 281

F. Supp.2d 209, 219 (D.D.C. 2003) (*quoting Serono Laboratories, Inc. v. Shalala*, 158

F.3d 1313, 1318 (D.C. Cir. 1998)).  "If the arguments for one factor are particularly

strong, an injunction may issue even if the arguments in other areas are rather weak."

*City Fed*, 58 F.3d at 747.

## I.    PLAINTIFF WILL SUFFER IRREPARABLE HARM UNLESS AN INJUNCTION IS GRANTED

Although the concept of irreparable harm does not readily lend itself to definition,

federal courts have developed several well known principles to guide them in

determining whether this requirement has been met.  *Wis. Gas Co. v. Fed. Energy*

*Regulatory Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985).  Any alleged injury must be

certain and great; it must be actual, not theoretical.  *Id.*  Moreover, a party seeking

injunctive relief must show that the alleged injury is of such imminence that there is a

clear and present need for the relief to prevent irreparable harm.  *Id.*

Ordinarily, economic loss, by itself, does not constitute irreparable harm.  *Id.*

However, the destruction of a person's business does satisfy the irreparable harm

requirement.  *See Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d.

841, 843 (D.C. Cir. 1977) (finding that destruction of a party's business constituted

irreparable harm).  *Cf. DRG Funding Corp. v. Secretary of Housing and Urban Dev.*,

U.S. Dist. LEXIS (D.D.C. 1998) (holding that where failure to grant a preliminary

injunction would lead to bankruptcy, harm to the party would be "immediate and

irreparable").

Plaintiff's average monthly financial obligations are approximately $74,142.

Slavet Aff., ¶13. This amount consists of (1) average monthly operating expenses, based

on Plaintiff's 2006 expenses, of $36,402 and (2) a monthly mortgage loan payment of $37,740 for principal, interest and required escrows. *Id.*

The average monthly amount of rent received by Plaintiff from the tenants at Steinhorst Square is approximately $19,500. Slavet Aff., ¶12. The average monthly amount of housing assistance payments received by Plaintiff, before HUD stopped making the payments, was approximately $67,000. *Id.,* ¶11. Accordingly, the total average monthly amount of rent received by Plaintiff, before HUD stopped making the housing assistance payments, was $86,500.

Now that Plaintiff is no longer receiving housing assistance payments, Plaintiff has a monthly financial shortfall of approximately $54,600. Slavet Aff., ¶13. As a result, Plaintiff has been unable to meet its financial obligations for the months of February, March and April, except for the payment of Plaintiff's mortgage loan.

To make its February, March and April mortgage loan payments, Plaintiff used rent received from the tenants, money that was available from project operations in previous years and a loan obtained by Plaintiff. Slavet Aff., ¶14. However, Plaintiff was not able to make its May mortgage loan payment which was due May 1. *Id.*, ¶15.

As noted above, Plaintiff's mortgage loan is secured by a Mortgage insured by HUD. Under the terms of the Mortgage, Plaintiff is in default of the loan for failure to make its May payment. Slavet Aff., ¶16

If Plaintiff's default is not cured by May 31, Plaintiff's mortgagee, PNC Bank, Ohio (PNC)[9] may foreclose on the loan. Slavet Aff., ¶16. In the alternative, PNC may, in accordance with the insurance provided by HUD, assign the loan to HUD in return for the

---

[9] PNC is the successor to Chase Manhattan Bank, Plaintiff's original mortgagee.

insurance benefits to which it is entitled upon an assignment of the mortgage loan to HUD.  In this event, HUD, as the holder of the mortgage loan, would be entitled to foreclose on Plaintiff's mortgage loan. *Id.*  In either case, Plaintiff will lose, through foreclosure, its primary asset, Steinhorst Square Apartments.[10] *Id.,* ¶17

Plaintiff was formed for the purpose of acquiring, developing, holding, managing, maintaining and operating Steinhorst Square. Slavet Aff., ¶3.  Moreover, Plaintiff is forbidden by its Limited Partnership Agreement from engaging in any other business. *Id.* Therefore, the loss of Steinhorst Square will result in the termination and destruction of Plaintiff's business.  The irreparable harm to Plaintiff is patent.  Moreover, the potential injury to Plaintiff is of such imminence that there is a clear and present need for a preliminary injunction to prevent this irreparable harm.  Clearly, in accordance with *WMATA* and *DRG,* Plaintiff has satisfied the irreparable harm requirement.

## II.    PLAINTIFF IS LIKELY TO PREVAIL ON THE MERITS

On November 30, 2006, Plaintiff, through its management agent, requested that HUD approve the renewal of its two Renewal HAP Contracts with the Housing Authority as an exception project under Option Four[11] as set out in Chapter Six of the Renewal Guide.  At that time, for a "Subsequent Renewal,"[12] an exception project renewed under Option Four had its new Contract Rents established by multiplying the Contract Rents in effect when the HAP Contract expired by an operating cost adjustment factor, unless the

---

[10] Steinhorst Square Apartments has an approximate value of $6.2 million. Slavet Aff., ¶ 17.

[11] HUD revised Option Four on December 12, 2006.  This revision, which was effective April 19, 2007, is not applicable to Plaintiff's November 30, 2006 request to renew its HAP Contracts.  A copy of Chapter Six of the Renewal Guide (Option Four), as in effect before the December 12, 2006 revision, is attached as Exhibit 4.

[12] "Subsequent Renewal" is defined as, "The renewal of an expiring contract that was initially renewed under 524 of MAHRA."  Renewal Guide, Glossary of Terms.

owner requested that the Contract Rents be established on a budget basis and HUD approved the request. However, HUD denied Plaintiff's renewal request. Rather, HUD asserted that Plaintiff is not eligible to renew its HAP Contracts under Option Four and must, instead, choose a different option.

MAHRA established a new framework for the renewal of all Section 8 project-based HAP Contracts. In general, Sections 515 and 524 of MAHRA authorize the renewal of all expiring Section 8 project-based HAP contracts.

Section 515 of MAHRA provides the basic authority for the "Initial Renewal" of a project-based Section 8 HAP Contract if the project is an "Eligible Multifamily Housing Project." Section 512(2) of MAHRA defines the term "Eligible Multifamily Housing Project" as a project that (1) has rents on an average per unit basis that exceed the rent of comparable projects in the same market area, (2) is covered by a contract for project-based assistance under the New Construction or Substantial Rehabilitation Programs under Section 8(b)(2) of the United States Housing Act of 1937 or one of the other HUD programs specified in Section 512(2), and (3) is financed by a mortgage insured or held by HUD under the National Housing Act, 12 U.S.C. § 1701 *et seq*.

Project-based HAP Contracts authorized for renewal under Section 515 of MAHRA are processed in accordance with Section 514 of MAHRA. Section 514 of MAHRA requires that for an "Initial Renewal," an "Eligible Multifamily Housing Project" will have its Contract Rents reduced in accordance with a mortgage restructuring and rental assistance sufficiency plan for the project. In addition, the project will have its mortgage loan restructured, if necessary, to enable the project to meet its financial obligations at the reduced Contract Rents.

However, a project that is not an "Eligible Multifamily Housing Project", or that is exempt from the rent reduction and mortgage restructuring requirements of Section 514 under Section 514(h) of MAHRA, is entitled to have its "Initial Renewal" processed under Section 524(b)(1) of MAHRA.  Section 524(b)(1) states that any HAP Contract renewed under Section 524(b)(1) will have its new Contract Rents set at the lesser of the Contract Rents in effect when the HAP contract expires, as adjusted by an operating cost adjustment factor, or Contract Rents established on a budget basis.

Section 524(c) of  MAHRA specifies how the Contract Rents of a project that had an "Initial Renewal" of its HAP Contract processed under Section 524(b)(1) are to be adjusted after the Initial Renewal.  Specifically, Section 524(c) states,

**(c) Rent adjustments after renewal of contract.—**

**(1) Required.**—After the initial renewal of a contract for assistance under section 8 of the United States Housing Act of 1937 pursuant to subsection (a), (b)(1), or (e)(2) [subsec. (a), (b)(1), or (e) of this section], the Secretary shall annually adjust the rents using an operating cost adjustment factor established by the Secretary (which shall not result in a negative adjustment) or, upon the request of the owner and subject to approval of the Secretary, on a budget basis.  In the case of projects with contracts renewed pursuant to subsection (a) or pursuant to subsection (e)(2) at rent levels equal to comparable market rents for the market area, at the expiration of each 5-year period, the Secretary shall compare existing rents with comparable market rents for the market area and may make any adjustments in the rent necessary to maintain the contract rents at a level not greater than comparable market rents or to increase rents to comparable market rents.

**(2) Discretionary.**—In addition to review and adjustment required under paragraph (1), in the case of projects with contracts renewed pursuant to subsection (a) or pursuant to subsection (e)(2) at rent levels equal to comparable market rents for the market area, the Secretary may, at the discretion of the Secretary but only once within each 5-year period referred to in paragraph (1), conduct a comparison of rents for a project and adjust the rents accordingly to maintain the contract rents at a level not greater than comparable market rents or to increase rents to comparable market rents.

In the January 17, 2007 letter from Camille Seweryniak, HUD's Project Manager

for Steinhorst Square, to MB Management Company, HUD denied Plaintiff's request to

renew its HAP Contracts under Option Four.  In her letter, Ms. Seweryniak stated,

> This is in response to your letter of November 30, 2006 in which you request Stages 1 and 2 of the above referenced Section 8 HAP Contract be renewed under Option Four for twenty (20) years.
>
> Option Four is for owners whose properties are defined as 'exempt properties' by statute, the property must fit into one of the categories which allows the rent to be renewed above market.
>
> However, as per Theodore Toon's letter of August 8, 2006, OAHP (Office of Affordable Housing Preservation) has determined that the property is not eligible for Option 4.
>
> Therefore, your Section 8 renewal package is being returned to you.  You must select another Option and submit your request and the required worksheets to this Office within 15 days of this letter.  Ex. 3.

The August 8, 2006 letter referred to by Ms. Seweryniak was a response from

Theodore Toon, HUD's Deputy Assistant Secretary for the Office of Affordable Housing

Preservation to Plaintiff's attorney who had written to HUD regarding the issue of

whether Plaintiff was entitled to renew its HAP Contracts under Option Four as an

exception project.  In his letter, Mr. Toon stated,

> After careful review, the Office of Affordable Housing Preservation believes the issue raised in your July 12, 2006 letter has been addressed in the Regulations that were published on January 12, 2006.  The new 24 C.F.R. 401.100(a) [13] discusses projects that are eligible for a Restructuring Plan under part 401, and provides that eligibility is determined by the status of a project on the earlier of: (1) the termination or expiration date of the project-based assistance contract, which includes a contract renewed under Section 524 of MAHRA; or (2) the date of the owner's request to HUD for a Restructuring plan.  The point that eligibility is determined at contract renewal is also made in the Preamble to the Regulations at Page 2119 of the Federal Register, which states:

---

[13] This provision is found at 24 C.F.R. § 401.100(b), not 24 C.F.R. § 401.100(a) as stated in Mr. Toon's letter.

'The rule now provides that once a project has been renewed under section 524 of MAHRA, it will be renewed at the owner's request under any renewal option for which the project is eligible, <u>except that if it is eligible for a restructuring plan under Section 401.100, HUD or the PAE will determine whether a renewal with or without a restructuring plan is necessary</u> [emphasis added].'

These new regulatory provisions are more definitive and carry more weight than the provisions of the Section 8 Contract Renewal Guide cited in your letter. Ex. 2.

As noted in Mr. Toon's letter, HUD has based its denial of Plaintiff's request to renew its HAP Contracts under Option Four on 24 C.F.R. § 401.100(b).  A similar provision is found at 24 C.F.R. § 402.6 which states that the "Subsequent Renewal" of a HAP Contract that was initially renewed under Section 524 of MAHRA will be renewed under any option for which the Project is eligible except for projects that are eligible for a Restructuring Plan under § 401.100 ("HUD or a PAE will determine whether renewal with a Restructuring Plan, or without a Restructuring Plan under this part, is necessary.").  However, these two regulatory provisions are contrary to Section 524(c)(1) of MAHRA.  Therefore, they are invalid.

In its Complaint, Plaintiff has challenged, under the Administrative Procedure Act, HUD's refusal to renew Plaintiff's HAP Contracts pursuant to Option Four.  "Under the Administrative Procedure Act, courts must set aside agency action found to be 'arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law.'" *Indep. Petroleum Ass'n of America v. Armstrong*, 91 F. Supp.2d 117, 124 (D.D.C. 2000) (quoting 5 U.S.C. § 7062(A)).  "In all its actions, an agency is constrained by the statutory authority given by Congress.  Thus, where Congress has spoken to a particular matter, Congress' plainly expressed intent governs."  *Id.* (citing *Indep. Petroleum Ass'n*

15

*of America v. Babbitt*, 92 F.3d 1248, 1255 (D.C. Cir. 1996) (citing *Chevron U.S.A. v. National Res. Defense Council*, 467 U.S. 837, 844 (1984)).

Through MAHRA, Congress has provided two tracks for the renewal of expiring project-based HAP Contracts.   As discussed below, these two tracks are separate and there is no basis, with one limited exception, for transferring a project from one track to the other.

The first track is Section 515 of MAHRA, which authorizes the "Initial Renewal" of an expiring HAP Contract for an "Eligible Multifamily Housing Project."  A HAP Contract renewed pursuant to the authority of Section 515 is processed in accordance with Section 514 of MAHRA and Option Three of HUD's Renewal Guide.  Section 514 (a)(1) requires "the submission of a mortgage restructuring and rental assistance sufficiency plan for each eligible multifamily housing project with an expiring contract." Each such plan will result in the reduction of a project's Contract Rents to a market level. Section 514(e)(1); Renewal Guide, Sections 5-2 A1 and 2.  However, the types of projects specified in Section 514(h) of MAHRA "shall not be covered by a mortgage restructuring and rental assistance sufficiency plan," even if a project is an "Eligible Multifamily Housing Project."

The second renewal track under MAHRA is for projects that are not "Eligible Multifamily Housing Projects" or that are exempt from the requirements of Section 514 under Section 514(h) of MAHRA.  These projects are authorized to be renewed in accordance with Section 524 of MAHRA.

One type of project exempt from the rent reduction and mortgage restructuring requirements of Section 514 under Section 514(h) of MAHRA, and therefore entitled to

have the "Initial Renewal" processed under Section 524(b)(1), are projects that were primarily financed by a unit of state government, a unit of general local government, or an agency or instrumentality of either, and where the financing was insured by HUD under the National Housing Act "such that implementation of a mortgage restructuring and rental sufficiency plan … is in conflict with the applicable law or agreements governing such financing."  This was the basis for HUD's determination that for Plaintiff's "Initial Renewal," Plaintiff's HAP Contract was exempt from the requirements of Section 514 and, therefore, entitled to be renewed under Section 524(b)(1) of MAHRA and Option Four of the Renewal Guide.

Section 524(c)(1) which is entitled, "(c) Rent adjustments after renewal of contract.—(1) Required" states that, "After the initial renewal of a contract for assistance under section 8 … pursuant to subsection (a), (b)(1), or (e)(2) [of Section 524] … the Secretary **shall annually** adjust the rents using an operating cost adjustment factor … or upon the request of the owner and subject to approval of the Secretary, on a budget basis." (emphasis added).  Section 524(c)(1) further requires HUD, for a project renewed under Section 524(a) or 524(e)(2) with Contract Rents equal to comparable market rents, to compare the project's existing Contract Rents with comparable market rents "at the expiration of each 5-year period."  If this comparison shows that the project's Contract Rents are more or less than the comparable market rents, HUD may adjust the project's Contract Rents to "a level not greater than comparable market rents."

The meaning of Section 524(c)(1) is patent.  For HAP Contracts renewed under Sections 524(a), 524(b)(1) or (524)(e)(2) of MAHRA, HUD "shall annually adjust" a project's Contract Rents using an operating cost adjustment factor, unless the project's

owner requests that the Contract Rents be adjusted on a budget basis, and HUD approves the request.  There is no exception for adjustments to a project's Contract Rents when its HAP Contract expires and is renewed again.  Therefore, the requirement of Section 524(c)(1) to adjust a project's Contract Rents annually with an operating cost adjustment factor for HAP Contracts initially renewed under Sections 524(a), 524(b)(1) or 524(e)(2) is equally applicable to adjustments during the term of an "Initial Renewal" and to all renewals after an "Initial Renewal" under Section 524, and the concomitant adjustment of the Contract Rents at such future renewals.

There are only two exceptions to the requirement of Section 524(c)(1) that a project's Contract Rents be adjusted annually by an operating cost adjustment factor after an "Initial Renewal" under Section 524.  The first exception, in accordance with Section 524(c)(1), permits an adjustment to the Contract Rents of projects initially renewed under Section 524(a) or 524(e)(2), "at the expiration of each 5-year period", to an amount that is equal to the comparable market rents.

The second exception, in accordance with Section 524(c)(2), permits an adjustment, once during each 5-year period after the "Initial Renewal" of a HAP Contract under Section 524, of a project's Contract Rents to an amount that is equal to the comparable market rents.  Again, however, this exception is only applicable to HAP Contracts initially renewed under either Section 524(a) or section 524(e)(2) of MAHRA.  Therefore, neither of these two exceptions apply to Plaintiff's HAP Contracts which were initially renewed under Section 524(b)(1).  Accordingly, HUD is required, under Section 524(c)(1), to renew Plaintiff's HAP Contracts with new Contract Rents calculated by multiplying the current Contract Rents by the applicable operating cost adjustment factor.

As noted above, there are two tracks for the "Initial Renewal" of an expiring HAP Contract; track 1 is for projects renewed under the authority of Section 515 of MAHRA and track two is for projects renewed in accordance with Section 524.  Moreover, both tracks provide for how all renewals subsequent to the "Initial Renewal" are to be handled.

Section 515(b) of MAHRA states,

After the <u>initial renewal</u> of a section 8 contract pursuant to this section, the owner shall accept each offer made pursuant to subsection (a) to renew the contract, for the term of the affordability and use restrictions required by section 514(e)(6) [section 514(e)(6) of Pub. L. 105-65, set out in this note], if the offer to renew is on terms and conditions specified in the mortgage restructuring and rental assistance sufficiency plan.  (emphasis added)

Therefore, in accordance with Section 515(b) of MAHRA, an owner of a track 1 project, after an "Initial Renewal", is required to accept any offer made by HUD to renew its HAP Contract "if the offer to renew is on terms and conditions specified in the mortgage restructuring and rental assistance sufficiency plan."

In contrast, there is no similar requirement imposed on an owner of a project that had its "Initial Renewal" processed under Section 524 of MAHRA.  (In fact, under Option Six of the Renewal Guide, any such owner may choose not to renew the owner's HAP Contract when it expires.)  Rather, under Section 524(c)(1), it is HUD that must renew any expiring Section 8 project-based HAP Contract that had its "Initial Renewal" processed under Section 524.

The fact that MAHRA specifies different requirements for the renewal of track 1 and track 2 HAP Contracts after an "Initial Renewal" supports the proposition that the two tracks are separate and no crossover is permitted.  This reinforces the conclusion that Plaintiff's HAP Contracts must be renewed in accordance with Section 524(c)(1) of MAHRA.

Further reinforcing the conclusion that Plaintiff's HAP Contracts must be renewed in accordance with Section 524(c)(1) is Section 512(2) which, in relevant part, states,

> Notwithstanding any other provision of this title, the Secretary may treat a project as an eligible multifamily housing project for purposes of this title if (I) the project is assisted pursuant to a contract for project-based assistance under section 8 of the United States Housing Act of 1937 renewed under section 524 of this Act [section 524 of this note], (II) the owner consents to such treatment, and (III) the project met the requirements of the first sentence of this paragraph for eligibility as an eligible multifamily housing project before the initial renewal of the contract under section 524.

This provision permits HUD, if "the owner consents to such treatment", to have a project's "Subsequent Renewal" processed under the rent reduction and mortgage restructuring provisions of Section 514 of MAHRA, notwithstanding that the project had its "Initial Renewal" processed under Section 524. This provision, which was added in 2001, is the only provision that authorizes, but only with an owner's consent, a transfer of a project from track 2 to track 1. Pub. L. No. 107-116, 115 Stat. 2224 (2001).

There have been no other substantive changes to MAHRA since 2001. Therefore, if HUD already had the authority in 2001 to redetermine, at a "Subsequent Renewal", whether a project was still eligible to have its HAP Contract renewed under Section 524, as HUD has asserted in connection with the renewal of Plaintiff's Renewal HAP Contracts, there would have been no need for Congress to amend Section 512(2) in 2001 to permit an exception project to be renewed pursuant to Section 514 of MAHRA. However, since HUD did not have the authority, Congress gave HUD the authority in 2001 to renew a HAP Contract under Section 515 of MAHRA, pursuant to Section 514 of MAHRA, when the "Initial Renewal" was processed under Section 524 as long as the project's owner consents to the transfer.

Even if section 524(c)(1) of MAHRA did not prevent a HAP Contract initially renewed under Section 524 from being renewed under section 514 at a "Subsequent Renewal", Plaintiff's HAP Contracts are not eligible to be renewed under Sections 514 and Section 515 of MAHRA.  This is because Section 514(a)(1) of MAHRA makes Section 514 applicable only to an "Eligible Multifamily Housing Project."

Section 512(2) defines an "Eligible Multifamily Housing Project" as a project that (1) has above market rents, (2) "is covered in whole or in part by a contract for project-based assistance under – (i) the new construction or substantial rehabilitation program under section 8(b)(2) of the United States Housing Act of 1937… (as in effect before October 1, 1983)," and (3) has a mortgage loan insured or held by HUD.  Although Steinhorst Square satisfies criteria 1 and 3, it does not satisfy the second criterion.

Plaintiff's original HAP Contract, which was effective in 1981, was executed under the authority of Section 8(b)(2) of the United States Housing Act of 1937. However, when Plaintiff's original HAP Contract under Section 8(b)(2) expired, it was renewed under Section 524(b)(1) of MAHRA, not Section 8(b)(2).  Renewing Plaintiff's original HAP Contracts under Section 8(b)(2) in 2001, as well as now, was not legally possible because Section 8(b)(2) was repealed effective October 1, 1983.  Pub. L. No. 98-181, 97 Stat. 1183 (1983).  Therefore, since Steinhorst Square is not covered by a HAP Contract under Section 8(b)(2), it is not an "Eligible Multifamily Housing Project."

Plaintiff's Section 524 Renewal HAP Contracts incorporate many of the terms of the original Section 8(b)(2) contract.  Nevertheless, they are Section 524 contracts. Although Congress could have made the "Subsequent Renewal" of a Section 524 Contract subject to Section 514, it did not do so.  Therefore, HUD's decision to require

the renewal of Plaintiff's HAP Contracts pursuant to Section 514 of MAHRA is contrary to the express provisions of MAHRA.

Lastly, the authority for renewing expiring Section 8 project-based HAP Contracts under Sections 514 and 515 is temporary; Sections 511 through 523 of MAHRA expire on October 1, 2011.  Pub. L. No. 110-5, Sec. 21043 (2007).  The authority, however, for renewing HAP Contracts under Section 524 is permanent; there is no expiration date for Section 524.

HUD's position that it may redetermine a project's status, i.e., whether the project is still an exception project, at a "Subsequent Renewal", is inconsistent with the temporary-permanent dichotomy between Sections 514/515 and Section 524.  Five years from now when the renewal authority under sections 514 and 515 has expired, HUD will be unable, if HUD's position is correct, to renew the HAP Contract of a project which is no longer an exception project.  Certainly, this is not a result intended by Congress.

Clearly, the two renewal tracks specified by MAHRA are separate.  There is no provision in MAHRA which permits HUD to compel a project that was initially renewed under Section 524(b)(1) of MAHRA to have a "Subsequent Renewal" processed under Sections 515 and 514 of MAHRA.  As stated by Rudyard Kipling, "East is East, West is West and never the twain shall meet".  Similarly, there is no meeting of, or crossover from, tracks 1 and 2, unless an owner requests a "Subsequent Renewal" pursuant to the language added to Section 512(2) in 2001.

Accordingly, HUD's refusal to renew Plaintiff's HAP Contracts in accordance with Section 524(c)(1) of MAHRA and Option Four of the Renewal Guide is contrary to the express provisions of MAHRA and constitutes a violation of the Administrative

Procedure Act.  Therefore, HUD's reliance on either 24 C.F.R § 401.100(b) or 24 C.F.R. § 402.6, or any other regulation, in support of its decision not to renew Plaintiff's HAP Contracts under Option Four is invalid. *See Chevron U.S.A. Inc. v. Natural Res. Defense Council,* 467 U.S. 837, 843 n.9 (1984) ("If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise questions at issue, that intention is the law and must be given effect.").

### III.    THE PUBLIC INTEREST FAVORS THE GRANTING OF AN INJUNCTION

All of the tenants at Steinhorst Square are low-income.  In addition, all the tenants are elderly and/or disabled.  Therefore, they are more dependent on the goods and services provided by Plaintiff than other tenant populations.  Moreover, they are without the resources other persons may be able to access to mitigate a disruption in the provision of such goods and services.

Since Plaintiff has not received any housing assistance payments since January, it has been unable to pay its vendors and suppliers, including utility companies.  Therefore, if the Court does not grant Plaintiff's motion, it is only a matter of time before the utilities at Steinhorst Square are cut off and the provision of essential goods and services is terminated.  This will have a devastating effect on the tenants at Steinhorst Square. Clearly, the public interest favors the granting of a preliminary injunction.

### IV.    A PRELIMINARY INJUNCTION WILL NOT SUBSTANTIALLY INJURE OTHER PARTIES

The parties potentially affected by this action are Plaintiff, HUD and the tenants who live at Steinhorst Square.  Through its motion for a preliminary injunction, Plaintiff is requesting that the Court order HUD to resume making the annual contributions to the

Housing Authority, on behalf of Plaintiff and the tenants who live at Steinhorst Square, and that HUD direct the Housing Authority to use those annual contributions to make the housing assistance payments to which Plaintiff would be entitled if HUD had not unlawfully denied Plaintiff's request to renew its HAP Contracts.  Since these payments would be from funds already budgeted, appropriated and allocated for this purpose,[14] HUD would not be substantially injured should the Court grant Plaintiff's motion.

The tenants at Steinhorst Square will not be substantially injured by the granting of a preliminary injunction.  Rather, as discussed above, they will be substantially injured if an injunction is not granted.  Therefore, this factor also favors the granting of Plaintiff's motion.

## CONCLUSION

All the factors that the Court must consider favor the granting of Plaintiff's motion for a preliminary injunction.  First, the harm to Plaintiff if Plaintiff's motion is not granted will be irreparable; Plaintiff's business will be destroyed.

Second, HUD's refusal to approve the renewal of Plaintiff's HAP Contracts under Option Four of the Renewal Guide, as in effect before HUD revised Option Four in December 2006, is contrary to the express provisions of MAHRA.  Therefore, Plaintiff will likely prevail on the merits of its claim.

Third, if Plaintiff's motion is not granted, Plaintiff will continue to be unable to pay its creditors.  This will lead to a disruption in the goods and services provided by Plaintiff to the tenants at Steinhorst Square, including a cutoff of the utilities to Steinhorst Square.  This will have a devastating effect on the tenants at Steinhorst Square, all of

---

[14] As is true for all Section 8 Renewal HAP Contracts, the payments would be subject to the availability of sufficient appropriations for any year.

whom are elderly and/or disabled.  Therefore, the public interest favors the granting of Plaintiff's motion.

Fourth, money has already been budgeted, appropriated and allocated for HUD to make annual contributions to the Housing Authority so that the Housing Authority can make housing assistance payments to Plaintiff.  Therefore, HUD will not be harmed if the Court grants Plaintiff's motion.  In fact, if the Court denies Plaintiff's motion, the elderly and disabled tenants at Steinhorst Square will be substantially injured.

For these reasons, the Court should grant Plaintiff's motion.

Respectfully submitted,


May 4, 2007                          /s/ Carl A.S. Coan, Jr.
                                    Carl A.S. Coan, Jr. (D.C. Bar No. 89466)
                                    Carl A.S. Coan, III (D.C. Bar No. 358034)
                                    Coan & Lyons
                                    1100 Connecticut Ave., N.W.
                                    Suite 1000
                                    Washington, DC 20036
                                    Phone No. 202-728-1070
                                    Fax No. 202-293-2448

                                    Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on May 4, 2007 "Plaintiff's Memorandum of Points and

Authorities in Support of Plaintiff's Motion for Preliminary Injunction", which was filed

the day after the Complaint was filed, was served with the Complaint on Defendant by

mailing a copy thereof via certified mail, return receipt requested, to:

      a.      Civil Process Clerk
              Office of the United States Attorney
              555 4th Street, N.W.
              Washington, DC 20001

      b.      Alberto Gonzales
              Attorney General of the United States
              Main Justice Building
              950 Pennsylvania Avenue, N.W.
              Washington, DC 20530

      c.      Alphonso Jackson
              Secretary
              U.S. Department of Housing and Urban Development
              451 7th Street, S.W.
              Washington, DC 20410

              /s/ Carl A.S. Coan, Jr.
              Carl A.S. Coan, Jr.

EXHIBIT 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| STEINHORST ASSOCIATES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. |
| | ) | |
| ALPHONSO JACKSON, in his capacity as | ) | |
| Secretary of the United States Department of | ) | |
| Housing And Urban Development, | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## AFFIDAVIT OF GERALD SLAVET

I, Gerald Slavet, being first duly sworn, under oath, depose and state the

following:

1. I am a citizen of the United States, over the age of 21 and am competent to

testify to the matters contained herein.

2. I am a General Partner of Steinhorst Associates, the owner of Steinhorst

Square Apartments ("Steinhorst"), a 100-unit rental apartment project in Utica, New

York, developed for occupancy by low-income elderly families and individuals.

3. Steinhorst Associates was established as a limited partnership under the laws

of the State of New York on September 16, 1980. Pursuant to the Amended and Restated

Agreement and Certificate of Limited Partnership, as of April 29, 1981, Steinhorst

Associates' purpose is limited to acquiring the necessary real property and developing

and operating  Steinhorst and it is barred from participating in any other business.

4. The development of Steinhorst was financed by mortgage funds provided through the issuance in 1980 of Mortgage Revenue Bonds by the Utica Senior Citizens Housing Corporation, a New York not-for-profit corporation and an instrumentality of the Housing Authority of the City of Utica, New York ("Authority"). The bonds providing the funds for the mortgage were refunded through a new issue of Mortgage Revenue Bonds in 1996. The mortgage note securing the mortgage loan is insured by the Federal Housing Administration ("FHA") of the U.S. Department of Housing and Urban Development ("HUD"), pursuant to Section 221(d)(4) of the National Housing Act.

5. Steinhorst Associates entered into a housing assistance payments ("HAP") contract with the Authority under Section 8 of the United States Housing Act of 1937, covering 99 of the 100 units at Steinhorst. The contract was effective in two stages. Stage 1 covering 59 units was effective September 7, 1981 and Stage 2 covering 40 units was effective November 12, 1981. This assistance covers the difference between the contract rents established from time to time by HUD and 30% of each tenant's adjusted gross income.

6. The original HAP contract was for a term of 20 years and upon its expiration in 2001, it was split into two contracts and renewed for a further 5-year period to 2006 under Option Four of HUD's Section 8 Renewal Guide ("Guide").

7. On November 30, 2006, Steinhorst Associates, through its management agent for the project, requested a further renewal of its HAP contracts for a term of 20 years, in accordance with Option Four of the Guide, as in effect on November 30, 2006. The contract rents requested for this second renewal were at the rents in effect when the HAP contracts expired, as adjusted by an Operating Cost Adjustment Factor (OCAF)

2

established by HUD. These rents for the first year after the second renewal were projected to be $872 for the one-bedroom units and $1,060 for the two-bedroom units.

8. In January 2007, HUD denied Steinhorst Associates' November 30, 2006 request to renew the Steinhorst HAP contracts for 20 years under Option Four of the Guide. HUD has refused to approve the request of Steinhorst Associates for a 20-year renewal, or for a renewal for any term, unless Steinhorst Associates agrees to seek a renewal under one of the other options specified in the Guide.

9. The terms of the other Options are different from those under Option Four and are not acceptable to Steinhorst Associates.

10. HUD has refused to renew the HAP contracts for Steinhorst unless and until Steinhorst Associates accedes to HUD's directive to seek a renewal under one of the Guide's other Options.

11. As a consequence of HUD's refusal to renew the HAP contracts except pursuant to its directive, Steinhorst Associates has received no Section 8 assistance for its 99 low-income elderly tenants since January 2007. As a result, since January Steinhorst Associates has lost, and will continue to lose, $67,000 per month.

12. Steinhorst Associates receives approximately $19,500 per month from the tenants at Steinhorst.

13. Steinhorst Associates' monthly financial obligations, based on the average monthly expenditures during 2006 (and without any adjustment for inflation), are approximately $74,142, of which $37,740 is needed to make the monthly mortgage loan payment for principal, interest and escrows. Without receipt of the Section 8 housing

assistance payments, Steinhorst Associates has a monthly shortfall of approximately

$54,600 in the funds needed to meet its monthly financial obligations.

14.  Notwithstanding receiving no housing assistance payments during February,

March and April 2007, Steinhorst Associates was able to meet its mortgage obligations

during those three months by (1) the use of funds available from operations in previous

years and deferring payment of non-mortgage obligations and (2) obtaining a loan to

make the April mortgage payment.  As a result, Steinhorst Associates has had to postpone

payment on most of its other operating expenses.

15.  There are no remaining reserves available to Steinhorst Associates and the

$19,500 received monthly from tenants is insufficient to make the monthly mortgage

payment of $37,740, let alone allow Steinhorst Associates to meet its other obligations to

its employees and its vendors.  As a result, there is not enough money available to

Steinhorst Associates to make the May mortgage payment.

16.  Steinhorst Associates will not be able to make its May mortgage payment on

May 1, the date on which the payment is due and, under the terms of its mortgage, it will

be in default. If that default is not corrected by May 31, 2007 (and without receipt of

housing assistance payments on behalf of Steinhorst's tenants, there will be no funds to

correct the default) the mortgagee, PNC Bank, Ohio, is authorized to either foreclose on

the mortgage or to assign it to HUD for the insurance benefits under the FHA Mortgage

Insurance contract between HUD and PNC.

17.  If the mortgagee forecloses on the mortgage, Steinhorst Associates will lose

the project, its principal asset which has an estimated value of $6.2 million, and

Steinhorst Associates will be out of business. If the mortgagee assigns the mortgage to

4

HUD in return for payment of insurance benefits, HUD will be able to foreclose on the mortgage with the same result to Steinhorst Associates as if PNC Bank Ohio had foreclosed.

_____
Gerald Slavet

State of Massachusetts          )
City/County of _____    ) ss:

    Subscribed and sworn to before me this _____ day of April, 2007.

_____
Notary Public

My commission expires:_____

ROSANNA CORMIER
Notary Public
My Commission Expires Dec. 31, 2010

5

EXHIBIT 2

**U. S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**
451 7th Street, SW, Suite 6222
Washington, DC 20410
www.hud.gov    espanol.hud.gov

**OFFICE OF AFFORDABLE HOUSING PRESERVATION**

**August 8, 2006**

Carl A. S. Coan, Jr.
Coan & Lyons Attorneys at Law
1100 Connecticut Avenue, N.W., Suite 1000,
Washington DC 20036

Subject:    **Steinhorst Square Apartments,**
            **Utica, NY**
            **FHA # 013-35077**

Dear Mr. Coan:

After careful review, the Office of Affordable Housing Preservation believes the issue raised in
your July 12, 2006 letter has been addressed in the Regulations that were published on January
12, 2006.  The new 24 CFR 401.100 (a) discusses projects that are eligible for a Restructuring
Plan under part 401, and provides that eligibility is determined by the status of a project on the
earlier of: (1) the termination or expiration date of the project-based assistance contract, <u>which
includes a contract renewed under Section 524 of MAHRA</u>; or (2) the date of the owner's request
to HUD for a Restructuring plan.  The point that eligibility is determined at contract renewal is
also made in the Preamble to the Regulations at Page 2119 of the Federal Register, which states:

>    "The rule now provides that once a project has been renewed under section 524 of
>    MAHRA, it will be renewed at the owner's request under any renewal option for
>    which the project is eligible, <u>except that if it is eligible for a restructuring plan
>    under Section 401.100, HUD or the PAE will determine whether a renewal with
>    or without a restructuring plan is necessary</u> [emphasis added]."

These new regulatory provisions are more definitive and carry more weight than the provisions
of the Section 8 Contract Renewal Guide cited in your letter.

The new Regulations support the position that OAHP has consistently held:  projects originally
determined to be exempt from restructuring because of Section 514(h) of MAHRA are eligible
for restructuring at the next contract renewal when the impediment imposed by the financing
documents related to the state or local financing has been removed by the passage of time.
Consistent with the new Regulations and OAHP policy, Steinhorst Apartments' eligibility will be
determined at the expiration of the current contract without reference or consideration given to
any prior determination of exemption under Section 514(h) at the expiration of a previous
contract.

If you have questions, please contact John F. Prusch at (202) 708-0614, extension 8368, or Claude Dickson at extension 8372.


Sincerely,


Theodore K. Toon
Deputy Assistant Secretary
Office of Affordable Housing Preservation


CC:    Claude Dickson, Bond Manager, OAHP

        Ms. Camille M. Seweryniak, HUD Project Manager,
        Buffalo Multifamily Housing Office

**EXHIBIT 3**



**U.S. Department of Housing and Urban Development**
Buffalo Office
465 Main Street
Buffalo, New York 14203-1780
(716) 551-5755

January 17, 2007

Mr. Kevin Baptista
MB Management Company
220 Forbes Road
Suite 205
Braintree, Massachusetts 02184-2709

SUBJECT: Project Number 013-35077, Steinhorst Square Apartments, Utica, NY

Dear Mr. Baptista:

This is in response to your letter of November 30, 2006 in which you request Stages 1 and 2 of the above referenced Section 8 HAP Contract be renewed under Option Four for twenty (20) years.

Option Four is for owners whose properties are defined as "exempt properties" by statute, the property must fit into one of the categories which allows the rent to be renewed above market.

However, as per Mr. Theodore Toon's letter of August 8, 2006, OAHP (Office of Affordable Housing Preservation) has determined that the property is not eligible for Option 4.

Therefore, your Section 8 renewal package is being returned to you. You must select another Option and submit your request and the required worksheets to this Office within 15 days of this letter.

If you have any questions, do not hesitate to contact me at (716) 551-5755, extension 519.

Sincerely,

Camille Seweryniak
Project Manager

cc: Ann Marie Vallese

EXHIBIT 4

# Chapter Six

# Option Four *Renewal of Projects Exempted from OMHAR*

## ELIGIBILITY

## Section 6-1

Certain project types are not eligible for OMHAR even though the contract rents may exceed market. Projects without FHA-insured loans are exempt, as are certain FHA-insured properties.

Specifically, the following projects are identified by the statute as "exception projects."

A. <u>Definition</u>. Section 524(b) of MAHRA defines "exception projects" as those that may be renewed at rents above market. Projects fitting one of the following characteristics may renew under Option Four as an "exception project."

    1. <u>State or Local Government financing</u>. Projects for which the primary financing or mortgage insurance was provided by a unit of State government or a unit of general local government (or an agency or instrumentality of either) and is not insured under the National Housing Act.

    However, if the primary financing or mortgage insurance is provided by a State government or a unit of general local government, and the financing involves mortgage insurance under the National Housing Act, a determination must be made by OMHAR as to whether or not implementation of a Mark-to-Market Restructuring Plan is in conflict with applicable law, or agreements governing such financing. In these cases, the contract and supporting documentation of the potential conflict must be referred to OMHAR for review. The owner (or lender) must submit an opinion of counsel in a form acceptable to HUD, along with copies of the relevant financing documents or applicable local or State legal authority.

Upon receipt of the Owner's documentation, OMHAR will complete its review and notify the PM/CA of its determination generally within 5 business days.

In cases where OMHAR determines that the contract is eligible for debt restructuring, the PM/CA will notify the owner that a RCS is required. If the RCS demonstrates that the rents are above market, the project will be renewed for six months using the  Contract for Entry Into OMHAR and OMHAR will process the renewal.

*Note: In cases where referral to OMHAR is necessary, CAs must return the contract to the PM with the recommendation that the PM forward the contract to OMHAR for review.*

In cases where OMHAR determines that the Restructuring Plan would be in conflict with applicable laws and/or agreements, OMHAR will return the case to the Project Manager or Contract Administrator for a renewal under the Option Four provisions.

2.  Section 202/8 and 515/8 Projects.  Projects currently financed under Section 202 of the Housing Act of 1959 or Section 515 of the Housing Act of 1949.  However, these projects can be eligible for restructuring if refinanced with FHA mortgage insurance.  Section 202 and 811 Capital Advance projects are not eligible because they do not have Section 8 contracts.

3.  SRO Mod Rehab.  Projects that have an expiring contract under Section 8 of the United States Housing Act of 1937 pursuant to Section 441 of the Stewart B. McKinney Homeless Assistance Act.

4.  Section 512 (2) of MAHRA. Projects that do not qualify as eligible multifamily housing projects pursuant to Section 512(2) of MAHRA include:

    a.  a project that is not subject to a HUD-held or insured mortgage; or,

    b.  a project that has FHA mortgage insurance or is HUD-held with rents at or below comparable market rents.

        *For an Owner of an FHA-insured or HUD-held project to claim eligibility under 4b, they must obtain a RCS.*

## INITIAL AND SUBSEQUENT RENEWALS

## Section 6-2

A. <u>Owner submission</u>. At least 120 days before contract expiration, the owner submits:

1. **Contract Renewal Request Form and OCAF Worksheet**. The Renewal Worksheet documents the owner's option selection and the OCAF-adjusted rent potential.

2. **Budget**. A Budget and rent schedule must be completed in accordance with the requirements of HUD Handbook 4350.1, Chapter 7, or the RHS approved budget, and Attachment 5.

3. **RCS**. For an FHA-insured or HUD-held project that is requesting renewal (as described in Section A.4. above), a RCS must demonstrate that the project's current rents are at or below comparable market rents.

4. If the primary financing or mortgage insurance is provided by a State government or a unit of general local government, and the financing involves mortgage insurance under the National Housing Act:

    1. Copies of the original financing documents and,
    2. The under lying statutory authority which the Owner believes conflicts with a mark-to-market restructuring plan, and,
    3. Counsel's opinion as to the conflict

B. <u>Rent Determination</u>. Based on the documentation submitted by the owner, the initial renewal rents shall be set at the lesser of:

1. **Current Rents + OCAF**. The current rent potential of the expiring Section 8 contract(s) adjusted by the published OCAF; or

2. **Budget**. The rent level required to meet operating expenses based on the format required by HUD Handbook 4350.1, Chapter 7 and Attachment 5, and submitted with the request for renewal.

    a. If the project had a budget approved by HUD less than one year before processing the initial renewal, a copy of that budget may be submitted in lieu of a new budget, unless the Owner refinanced the project.

    b. The "lesser of" test is conducted only once, at the contract's initial renewal under section 524 of MAHRA. Once the contract undergoes the "lesser of" test, it does not have to repeat the test again at subsequent renewal or at any rent adjustments during a multi year contract.

## RENT ADJUSTMENTS FOR MULTI YEAR CONTRACTS

## Section 6-3

For multi year contracts, at least 120 days before the anniversary date of the contract, the owner should submit:

1. OCAF Worksheet, Attachment 3; or

2. A budget-based rent increase request. If requesting a budget based rent adjustment, the rent level required to meet operating expenses based on the format required by HUD Handbook 4350.1, Chapter 7 and Attachment 5, must be submitted with the request.

## SUBSEQUENT RENEWALS

### Section 6-4

A. No "lesser of" test is required at subsequent renewal. An owner can receive either an OCAF adjustment or a budget based adjustment to the rent.

B. Owner Submission. At least 120 days before expiration of the Section 8 contract, the owner should submit:

1. The Contract Renewal Request Form and OCAF Worksheet.

2. If the Owner requests a budget-based rent increase, a budget prepared in accordance with HUD Handbook 4350.1, Chapter 7.

## PROCESSING INSTRUCTIONS

### Section 6-5

A. <u>PM/CA Review</u>. The PM should complete his/her review within 45 calendar days or whatever period is required to allow sufficient time for processing the contract renewal.

B. The PM/CA checks to see:

1. That the owner requested to renew under Option Four, *Renewal of Contract for Projects Exempted From OMHAR;*

2. If the Owner is eligible to renew the section 8 project-based contract under Option Four;

3. That the Owner submitted all the required documentation. For example:

   a. Contract Renewal Request Form and OCAF Worksheet;

---

    b.  A Rent Comparability Study, if applicable, prepared in accordance with Chapter Nine of this Guide;

    c.  A budget-based rent adjustment, prepared in accordance with Chapter Seven of HUD Handbook 4350.1.

4.  If the Owner specified on the Cover Sheet of the Contract Renewal Request Form whether they wanted any multiple stages or contracts combined at this time. See instructions provided in Chapter Two of this Guide.

C.  Review the Owner's certification regarding suspension or debarment on the worksheet. If the Owner checked that they are not suspended or debarred, verify that information by using the www.ARNet.gov/epls/.

D.  If it is determined that the Owner is suspended or debarred, HUD will permit the Owner to renew the Section 8 contract if the project(s) in question ~~are adequately managed and maintained, and activities there~~ were not the cause of the administrative actions against the Owner.

E.  Log the owner's request as indicated on Contract Renewal Request Form and any other relevant information in the REMS system.

F.  Prepare a 524(b) contract renewal.

1.  Initial renewals shall be at the lesser of the current rents adjusted by OCAF or the budget-based rent level.

2.  Rent Adjustments during term of multi year contracts shall be by:

    a.  Application of OCAF, or

    b.  Application of budget-based method.

3.  At subsequent renewals, apply the appropriate rent adjustment method:

    a.  OCAF; or

    b.  budget-based and;

    c.  Apply the appropriate term for the contract.