UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STEINHORST ASSOCIATES, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 07-813 (HHK) |
| | ) |
| ALPHONSO JACKSON, in his capacity as Secretary of the United States Department of Housing and Urban Development, | ) ) ) |
| | ) |
| Defendant. | ) |
| | ) |

**OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION**

Defendant, Alphonso Jackson, in his capacity as Secretary of the United States Department of Housing and Urban Development ("HUD"), respectfully submits his opposition to Plaintiff's motion for a preliminary injunction. Plaintiff Steinhorst Associates ("Steinhorst") has asked this court for a preliminary injunction to compel the defendant, the United States Department of Housing and Urban Development ("HUD") to resume making annual contributions payments to the Municipal Housing Authority of the City of Utica, which in turn will remit a portion of those payments to the plaintiff per the Housing Assistance Payment ("HAP") contract.  In effect, plaintiff seeks to obtain an injunction that would allow it to charge rents higher than market rates.

As defendant establishes below, plaintiff is not entitled to a preliminary injunction.  First, Plaintiff does not have a substantial likelihood of success on the merits because the plaintiff no longer qualifies for the exemption it seeks.  Additionally, plaintiff does not face irreparable harm, as economic damages do not constitute irreparable harm, any alleged harm would be caused by plaintiff's own actions, and the alleged harm is merely speculative.  Finally, the public interest in the reduction of rents

for low income housing mandates denial of plaintiff's application for a preliminary injunction.

## PROGRAMMATIC BACKGROUND

This case involves two HUD programs: Section 8 rental assistance[1] and the Multifamily Assisted Housing Reform and Affordability Act ("MAHRA").[2] Section 8 housing assistance is the primary means through which HUD "aid[s] low-income families in obtaining a decent place to live and … promot[es] economically mixed housing." 42 U.S.C. § 1437f(a). Under the Section 8 program, eligible families pay thirty percent of their adjusted gross income toward their rental payment, while HUD pays the balance of the rent to the project owner, usually through public housing agencies. 42 U.S.C. § 1437f(c)(3), 42 U.S.C. § 1437a(a)(1).

MAHRA was enacted in 1997 as a vehicle through which HUD could continue Section 8 rental assistance at reduced rental levels (and thereby reduced cost to the Government). See 42 U.S.C. § 1437f. In essence, MAHRA reduces rents to market levels upon Section 8 contract expiration and renewal. When those contracts expire and are renewed, if the contract rents are found to be above comparable market rents for similar units in the same area, the MAHRA reduces the new contract rent for those units to market levels. By bringing above-market Section 8 rental rents in line with market levels, HUD controls costs of the Section 8 program and maximizes the number of

---

[1] 42 U.S.C. § 1437f (2000).

[2] 42 U.S.C. § 1437f note (2000) (MAHRA) states: the economic, physical, and management problems facing the stock of federally insured and assisted multifamily housing projects will be best served by reforms that—

    (A) reduce the cost of Federal rental assistance, including project based assistance, to these projects by reducing the debt service and operating costs of these projects while retaining the low-income affordability of this housing.

families that can be helped by such housing assistance. MAHRA reduces rents by requiring the Section 8 contract project owners to restructure their debt on the property, i.e., refinancing their mortgages. See 24 C.F.R. § 401.

If a property owner is faced with an impediment to restructure the debt on a Section 8 contract property, the property may qualify as an "exception projects" under Option Four of HUD's Section 8 Renewal Guide. Section 524(b) of MAHRA defines "exception projects" as "those that may be renewed at rents above market." Section 524(b).

The new regulation, 24 C.F.R. § 401.100(a), covers projects that are eligible for a Restructuring Plan under part 401, and provides that eligibility is determined by the status of a project on the earlier of: (1) the termination or expiration date of the project-based assistance contract, which includes a contract renewed under Section 524 of MAHRA; or (2) the date of the owner's request to HUD for a Restructuring plan. 24 C.F.R. § 401.100(a). The new regulation reflects HUD's Office of Affordable Housing Preservation's consistently held position that projects originally determined to be exempt from restructuring because of Section 514(h) of MAHRA are eligible for restructuring at the next contract renewal when the impediment imposed by the financing documents related to the State or local financing has been removed by the passage of time.

## BACKGROUND FACTS

Plaintiff renewed its original twenty year HAP contract in 2001 for five additional years in accordance with Section 524(b)(1) of MAHRA and Option Four of HUD's Section 8 Renewal Guide--Renewal of Projects Exempted from the Office of Multifamily Housing Assistance Restructuring ("OMHAR"). See Plt's Memo p. 2. At that time,

Plaintiff had an impediment for restructuring its debt and was consequently found to be exempt from OMHAR. See Exhibit A, Theodore Toon Declaration ("Toon Dec.") ¶ 6. Upon the expiration of the five-year term, plaintiff requested another renewal under Option Four. Plt's Mt Expedited Hearing, p. 2. Plaintiff no longer faces an impediment to restructuring its debt. See Toon Dec. ¶ 6. Pursuant to new regulation, HUD denied plaintiff's request to renew under Option Four because the plaintiff is now eligible for mortgage restructuring. See Plt's Ex. 2, 3.

## ARGUMENT

### I.  Standard for Injunctive Relief

The grant of a preliminary injunction is a drastic and unusual judicial measure. Marine Transport Lines, Inc. v. Lehman, 623 F. Supp. 330, 334 (D.D.C. 1985). The D.C. Circuit holds that injunctive relief is "an extraordinary remedy that should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion." Cobell v. Norton, 391 F.3d 251, 258 (D.C. Cir. 2004). To warrant preliminary injunctive relief, the moving party must show: (1) a substantial likelihood of success on the merits; (2) that it would suffer irreparable injury if the injunction were not granted; (3) that an injunction would not substantially injure other interested parties; and (4) that the public interest would be furthered by the injunction. E.g., Mova Pharmaceutical Corp., 140 F.3d 1060, 1066 (D.C. Cir. 1998) (*quoting* CityFed Financial Corp. v. Office of Thrift Supervision, 58 F.3d 738, 746 (D.C. Cir. 1995) (internal quotation marks omitted). A district court must "balance the strengths of the requesting party's arguments in each of the four required areas." CityFed, 58 F.3d at 747. A party faces an even greater burden when it seeks injunctive relief, which, if granted,

4

would interfere with governmental operations. Yakus v. United States, 321 U.S. 414, 440 (1940); Virginia Railway Co. v. Systems Federation No. 40, 300 U.S. 515, 552 (1937). As shown below, the plaintiff does not meet these standards.

## II. Plaintiff Does Not Have a Substantial Likelihood of Success on the Merits

### 1. Standard of APA review

The plaintiff seeks injunctive relief under the Administrative Procedure Act ("APA"), 5 U.S.C. § 704, *et seq*. Plt's Memo, p. 15. Under the APA, a reviewing court must "compel agency action unlawfully withheld or unreasonably delayed; and hold unlawful and set aside agency action, findings and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(1) and (2)(A); Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 414 (1971). An agency decision will be found "arbitrary and capricious" and set aside only if:

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).

A reviewing court must not "substitute its judgment for that of the agency." Overton Park, 401 U.S. at 415-16. If substantial evidence exists in the record as a whole to support the agency's factual findings, those findings are conclusive. Anthony v. Sullivan, 954 F.2d 289, 295 (5th Cir. 1992) (internal citations omitted), cited in Estate of Morris v. Shalala, 207 F.3d 744, 745 (5th Cir. 2000). The Court must only look for a "rational connection between the facts found and the choice made" and "consider

5

whether the decision was based upon a consideration of the relevant factors and whether there has been a clear error in judgment." State Farm, 463 U.S. at 43; citations omitted. So long as an agency complies with the proper procedure and the record supports the choice made, a Court must afford the agency's decision "substantial deference." Marsh v. Oregon Natural Res. Council, 490 U.S. 360, 372 (1989). Moreover, the "principal purpose of the APA limitations. . .is to protect agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve." Norton v. Southern Utah Wilderness Alliance, 542 U.S. 55, 63 (2004).

    2.    HUD's Actions Were Neither Arbitrary nor Capricious

Projects originally determined to be exempt from restructuring because of section 514(h) of MAHRA are eligible for restructuring at the next contract renewal when the primary basis for which the project was exempt at its initial renewal has been removed by the passage of time. See 24 C.F.R. 401.100 (a). Eligibility for a Restructuring Plan is determined by the status of a project on the earlier of: "(1) the termination or expiration date of the project-based assistance contract, which includes a contract renewed under Section 524 of MAHRA; or (2) the date of the owner's request to HUD for a Restructuring plan." 24 C.F.R. 401.100 (a) (emphasis added). Plaintiff no longer faces an impediment to restructuring its debt. Therefore, Plaintiff's renewal request was the appropriate time for HUD to determine that the Plaintiff was eligible for restructuring and thus no longer qualified under Option Four, the exemption to restructuring.

Plaintiff no longer qualified for an exemption because its impediment to restructuring no longer existed. See Toon Dec. ¶ 6; Plt's Exhibit 2 and 3. Because HUD

6

appropriately followed the new regulations, its actions were neither arbitrary nor capricious.

      3.  <u>HUD's Interpretation Entitled to Deference</u>

Courts "have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer." <u>Chevron U.S.A. v. National Res. Defense Council</u>, 467 U.S. 837, 844 (1984). "Administrative implementation of a particular statutory provision qualifies for <u>Chevron</u> deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority."  <u>U.S. v. Mead Corp.</u>, 533 U.S. 218, 226-227 (2001).  Delegation of such authority may be shown by an agency's power to engage in notice-and-comment rulemaking.  <u>Id.</u>

Where <u>Chevron</u> is inapplicable, agency interpretations are still entitled to respect. <u>See</u> <u>Skidmore v. Swift & Co.</u>, 323 U.S. 134, 139-140 (1944) (agency's interpretation merits some deference regardless of its form, given the "specialized experience and broader investigations and information" available to the agency and the value of uniformity in its administrative and judicial understanding of what a national law requires); <u>Central South Dakota Co-operative Grazing District v. Secretary of Agriculture</u>, 266 F.3d 889, 894-95 (8th Cir. 2001) (When analysis of relevant information "requires a high level of technical expertise, [the court] must defer to the informed discretion of the responsible federal agencies."); <u>Metropolitan Stevedore Co. v. Rambo</u>, 521 U.S. 121 (1997) (reasonable agency interpretations carry some added persuasive force where <u>Chevron</u> is inapplicable); <u>see</u> <u>also</u>  <u>Martin v. Occupational Safety and Health</u>

Review Comm'n, 499 U.S. 144 (1991); Madison v. Res. for Human Dev., Inc., 233 F.3d 175, 186 (3rd Cir. 2000).

Congress' intent in creating and then extending MAHRA was that long-term costs had to be reduced, and that it would be less expensive and more effective to proactively address the physical, financial, and managerial challenges facing HUD's affordable housing portfolio than to wait for the properties to physically decline and financially fail. See 143 Cong. Rec. 22076 (daily ed. Oct. 9, 1997)(statement of Sen. Sarbanes). To that end, HUD's interpretation of the regulations promulgated under 24 C.F.R. 401.100 support that mandate.

### III.   **Plaintiff Will Not Suffer Irreparable Harm**

This Court should deny Plaintiff's motion for a preliminary injunction because: (1) Plaintiff will not suffer irreparable harm because loss of income does not constitute irreparable harm; (2) any harm that Plaintiff claims is caused by its own refusal to restructure its debt or pursue other available renewal options; and (3) Plaintiff's claim of harm is speculative.

   1.   Loss of income does not constitute irreparable harm

In order for a preliminary injunction to be granted, any alleged injury that purportedly will result "must be both certain and great; it must be actual and not theoretical." Wisconsin Gas Co. v. Federal Energy Regulatory Commission, 758 F.2d 669, 674 (D.C. Cir. 1985). Plaintiff must show that "'[t]he injury complained of [is] of such imminence that there is a 'clear and present' need for equitable relief to prevent irreparable harm.'" Id., quoting Ashland Oil, Inc. v. FTC, 409 F. Supp. 297, 307 (D.D.C.), aff'd, 548 F.2d 977 (D.C. Cir. 1976) (citations and internal quotations omitted

8

in Court's citation). The moving party's failure to show any irreparable harm is therefore grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief. See, e.g., Sea Containers Ltd. v. Stena AB, 890 F.2d 1205, 1210-11 (D.C. Cir.1989).

Loss of income simply does not constitute irreparable injury. Sampson v. Murray, 415 U.S. 61, 89 (1974) ("Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough"); Mead Johnson Pharmaceutical Group v. Bowen, 655 F. Supp. 53-56 (D.D.C. 1986). Therefore, Plaintiff's argument that the loss of income (via HUD assistance payments) is irreparable harm fails.

    2.    Any harm that Plaintiff claims is caused by its own refusal to restructure or pursue other available renewal options

Plaintiff argues that the loss of income due to HUD's actions will be so great as to threaten its survival. The alleged financial bind plaintiff portrays, however, has been caused by its own decision not to restructure its debt and insistence that it apply for Option Four under the Section 8 Policy Renewal Guide. Plaintiff was aware in mid August 2006 that HUD did not deem it eligible for Option Four and has had time to determine how to best handle its business operations. See Plt's Memo p. 7. Plaintiff has the option to restructure its debt, which likely will reduce or eliminate the alleged financial shortfall. See Toon Dec. ¶¶ 6-7. In addition, Plaintiff has sought to qualify under Option Four despite being counseled numerous times that it no longer qualified for that option, along with plaintiff's refusal to avail itself of the other renewal options available. Plt's Exhibit 2 and 3; see Toon Dec. ¶ 7. Applying for another renewal option may cure, if not in total, to a significant degree, the financial shortfall plaintiff claims it

9

has had since January 2007.

      C.     *Plaintiff's claim of harm is speculative*

Speculative injury is insufficient for the issuance of a preliminary injunction. United States v. Emerson, 270 F.3d 203, 262 (5th Cir. 2001). The Plaintiff alleges that its inability to meet its most recent mortgage payment may result in either an immediate foreclosure or an assignment to HUD where HUD would have the right to foreclose, which will in turn ruin its overall business. However, plaintiff offers no evidence to support this claim. Moreover, plaintiff has not discussed the option of restructuring its debt so as to avoid these financial problems of its own making.

**IV.**    **HUD and the Public Interest Will Be Harmed If The Injunction Issues**

HUD's goal is to preserve low-income affordable housing, thus there is a need to restructure mortgages where necessary in order to reduce costs, preserve housing, and alleviate situations - such as the one plaintiff alleges - where property owners cannot pay for routine maintenance and utilities as well as the mortgage. Plaintiff argues HUD's refusal to pay "could cause a reduction in the project's Contract Rents and a restructuring of the project's mortgage loan." Plt's Memo p. 3. This is precisely in line with HUD's overall goal.

MAHRA reduces rents to market levels upon Section 8 contract expiration and renewal. HUD contracts with private owners of rental units to help ensure a certain number of units for occupancy by low-income residents. See 42 U.S.C. § 1437f. When those contracts expire and are renewed, if the contract rents are found to be above comparable market rents for similar units in the same area, the MAHRA reduces the new contract rent for those units to market levels. By bringing above-market Section 8 rental

rents in line with market levels, HUD controls costs of the Section 8 program and maximizes the number of families that can be helped by such housing assistance. HUD has been very successful at balancing the dual Mark-to-Market program goals of reducing long-term Section 8 subsidy costs while preserving affordable housing. Exhibit B, Testimony of Theodore Toon.[3] To date, HUD has preserved 2,200 properties around the country comprising over 188,000 affordable housing units, and in so doing has promoted the long-term physical and financial viability of these properties. Id. The program has generated net savings totaling $2 billion to HUD and the American taxpayers. By preserving affordable housing, HUD has provided stability for many low income families and the communities where they live. If HUD was not able to require the restructuring of debt on subsequent renewal of properties where the conditions under which the project was designated an exception project no longer exist, the enumerated purposes of MAHRA could not be met. Consequently, if the Court were to grant the plaintiff's motion for a preliminary injunction, it would risk HUD's ability to preserve low-income housing affordability and availability, as well as create huge Section 8 subsidy costs. Specifically, it would allow the Plaintiff to needlessly charge higher rents than market rate. This would harm both HUD and the public at large.

---

[3]   Exhibit A, Testimony of Theodore Toon the Deputy Assistant Secretary for the Office of Affordable Housing Preservation given to the United States Senate Banking, Housing, and Urban Affairs Committee, Subcommittee on Housing and Transportation on June 16, 2006.

## **CONCLUSION**

Plaintiff's motion for a preliminary injunction should be denied.


June 6, 2007                              Respectfully submitted,

                                          _____/s/_____
                                          JEFFREY A. TAYLOR, D.C. BAR # 498610
                                          United States Attorney


                                          _____/s/_____
                                          RUDOLPH CONTRERAS, D.C. BAR # 434122
                                          Assistant United States Attorney.

                                          _____/s/_____
                                          ANDREA McBARNETTE, D.C. Bar  # 483789
                                          Assistant United States Attorney
                                          555 Fourth Street, N.W.
                                          Washington, D.C. 20530
                                          (202) 514-7153

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STEINHORST ASSOCIATES, )
)
      Plaintiff, )
)
) Civil Action No. 07-813 (HHK)
v. )
)
ALPHONSO JACKSON, in his capacity as )
Secretary of the United States Department of )
Housing and Urban Development, )
)
      Defendant. )
)
)

### DECLARATION OF THEODORE K. TOON

    I, Theodore Toon do hereby make the following declaration under penalty of perjury:

1.     I am the Deputy Assistant Secretary for the Office of Affordable Housing Preservation (OAHP) in HUD Headquarters and have served in that capacity since August of 2005.

2.     The Office of Multifamily Housing Assistance Restructuring (OMHAR) was established by the Multifamily Assisted Housing Reform and Affordability Act of 1997 (MAHRA) to administer the Mark-to-Market program until sunset on September 30, 2004. HUD established a new office, OAHP effective October 1, 2004. OAHP was established to assure the smooth continuation of the Mark to Market program (M2M) utilizing authorities that continued after the legislative sunset of OMHAR on September



30, 2004. OAHP also provides assistance to affordable housing areas in the oversight and preservation of a wide spectrum of affordable housing programs.

3. I make the following statements based on personal knowledge and information obtained by me during the course of my official duties.

4. Under MAHRA, the statute creating the Mark-to-Market program, upon expiration of a Section 8 subsidy contract, if the project owner intends to renew the Section 8 contract, and the property meets certain other criteria, the owner must elect to restructure the project through M2M.

5. However, mortgages often contain prepayment lockout provisions. MAHRA specifically makes projects that are financed through state or local bond financing, with a mortgage subject to lockout provisions that currently prohibit prepayment of the mortgage, exempt from restructuring under M2M. HUD reviews the mortgage documents to determine that the lockout provision is still active, as most such provisions expire at a date certain. If, upon Section 8 contract expiration, the prepayment lockout provision has expired, that project is **not** exempt from restructuring, and therefore must enter M2M for a restructure if it meets the other criteria.

6. OAHP reviewed Steinhorst's financial documents and discovered that its previous lock out provision expired in April 2006, thus there remained no impediment for Steinhorst to restructure its mortgage. HUD indicated that Steinhorst would not be eligible for Option Four which exempts a project from restructuring.

7. The attorney for the plaintiff is Mr. Carl Coan. Prior to my August 2006 letter to Mr. Coan regarding the subject property, there had been correspondence between myself,

others within OAHP, and Mr. Coan regarding the subject property and the specific issue of the lockout, and project eligibility for M2M. Neither Mr. Coan nor the plaintiff have disputed that the lockout provision has expired nor indicated that Steinhorst would not be unable to restructure its mortgage for any other reason. To my recollection, this correspondence included phone calls, emails, and maybe letters.

I declare under penalty of perjury that the foregoing statements are true and correct.

Dated: 6/6/07

Theodore K. Toon

This page is located on the U.S. Department of Housing and Urban Development's Homes and Communities Web site at **http://www.hud.gov/offices/cir/test061406.cfm**.



# HUD Testimony

**STATEMENT OF THEODORE K. TOON**
**Deputy Assistant Secretary**
**Office of Affordable Housing Preservation**
**U.S. Department of Housing and Urban Development**
**Hearing before the United States Senate Banking, Housing, and Urban Affairs Committee, Subcommittee on Housing and Transportation**

**United States Senate**
**"Extension of the Mark-to-Market Program"**

**June 14, 2006**

Thank you Chairman Allard, Ranking Member Reed, and members of the Subcommittee for inviting me here today to testify on the proposed Mark-to-Market Extension Act. The preservation of affordable housing in our communities continues to be a top priority for Secretary Jackson, Assistant Secretary Montgomery and the Department of Housing and Urban Development (HUD).

The Mark-to-Market program, originally created by Congress in 1997 (the Multifamily Assisted Housing Reform and Affordability Act (MAHRA)), and extended in 2001 (the Mark-to-Market Extension Act), reduces rents to market levels upon Section 8 contract expiration and renewal. HUD contracts with private owners of rental units to help ensure a certain number units for occupancy by low-income residents. When those contracts expire and are renewed, if the contract rents are found to be above comparable market rents for similar units in the same area, the Mark-to-Market program reduces the new contract rent for those units to market levels. By bringing above-market Section 8 rental rents in line with market levels, HUD controls costs of the Section 8 program and maximizes the number of families that can be helped by such housing assistance. The Mark-to-Market authorities will sunset September 30, 2006. The bill that you have introduced, Mr. Chairman, proposes a five-year extension of the existing Mark-to-Market restructuring authorities, administered by HUD.

As you are aware, under Mark-to-Market, HUD has the mandate to reduce rents to market levels, saving dollars on project-based Section 8 expenditures. Mark-to-Market also includes authorities essential to maintaining the physical and financial viability of the properties with reduced rents. In Mark-to-Market, HUD staff oversees a network of public and private entities to analyze property viability, recommend repairs and other preservation activities, and if necessary re-size the FHA-insured debt to a level that can be serviced by the reduced rents. If debt is re-sized, the owner enters into a long-term use agreement through which the property is preserved as affordable housing for at least 30 years. To be sure, this is a significant tool in HUD's preservation toolbox. Unfortunately, HUD's mandate to reduce rents will continue beyond September 30, 2006, but the Mark-to-Market authorities will not.

Over the past nine years, HUD has been very successful at balancing the dual Mark-to-Market program goals of reducing long-term Section 8 subsidy costs while preserving affordable housing. To date, HUD has preserved 2,200 properties around the country comprising over 188,000 affordable housing units, and in so doing we have promoted the long-term physical and financial viability of these properties. The program has generated net savings totaling $2 billion to HUD and the American taxpayers. And by preserving affordable housing, we have provided stability for many low income families and the communities where they live.

In discussing reauthorization of Mark-to-Market, I think it's important to consider what has been achieved thus far. To date, this program has preserved properties in all 50 states and the District of Columbia. For example, Chairman Allard, in Colorado, HUD has preserved 31 properties with 1,800 units of affordable housing. In Rhode Island, Senator Reed, 12 properties with more than 1,000 housing units have been preserved, and another 21 properties with more than 2,000 units will become eligible under this proposed extension. (Attachment A shows the number of properties and units preserved through and active in Mark-to-Market, and the potential referrals over the next five years.) Once restructured, these properties are physically improved and on solid financial footing. That is a "win-win" situation for the tenants and the community.

Not every property can or will be preserved through Mark-to-Market. While preservation is a primary goal of the program, Congress has made it very clear that prudent use of limited resources is an equally important goal. HUD has taken this charge seriously. There have been, and will continue to be, properties referred into Mark-to-Market that simply cannot be responsibly preserved. These projects may be too expensive, functionally obsolete, or located in markets with ready availability of replacement housing.

- In other situations, properties that in the Department's opinion require restructuring do not receive the benefits of the program because the owners refuse to accept the terms of the restructuring. In these cases, HUD makes the determination that the project is infeasible for restructuring. These are difficult decisions, made with consideration of the needs of the affected residents and communities, and with cooperation from both our office and the HUD field offices. Properties that need restructuring but don't accomplish it are closely monitored by HUD to allow early intervention if the property deteriorates. The analysis done while in Mark-to-Market informs and shapes the Department's decisions on other management options for the properties thereafter.

Now, let us turn to the discussion before us today, which is the proposed reauthorization of Mark-to-Market. According to the Department's analysis of potential referrals, if Mark-to-Market is extended as proposed in this bill, over five years (FY 2007-11) nearly 800 properties with 78,000 affordable units will meet the eligibility requirements for Mark-to-Market restructuring. These are project-based Section 8 properties with expiring Section 8 contracts, FHA-insured mortgages, and contract rents above Fair Market Rents. This is the universe of properties that, absent extension of restructuring authorities, will represent the most at-risk properties in HUD's insured mortgage portfolio because of the required reductions in rents.

In addition to the lost opportunity to preserve another 800 properties, or 78,000 units of affordable housing, the sunset of Mark-to-Market may also expose the FHA Insurance Fund to considerable risk. This is because MAHRA, the legislation

that created Mark-to-Market, will continue to require that contract rents on subsidized FHA-insured properties get marked down to market levels upon contract renewal, regardless of whether the program is extended. Reductions in rents to market levels will result in many properties being unable to pay their operating costs and/or their mortgage payments. As we see with other properties in negative cash flow positions, these property owners and managers will be faced with the decision of paying for utilities and routine maintenance, or making their mortgage payments.

It is important to keep in mind that FHA insures the underlying mortgages on these properties. Not only will we see physical deterioration of the projects, which will negatively impact residents, and the overall communities, but the mortgages on these projects also represent real, quantifiable default and foreclosure risk to the FHA Insurance Fund – risk that is estimated to total more than $400 million over the next five years.

In conclusion, I want to thank you for affording our Department the opportunity to testify on this legislation. Congress' intent in creating and then extending Mark-to-Market was that long-term costs had to be reduced, and that it would be less expensive and more effective to proactively address the physical, financial, and managerial challenges facing our affordable housing portfolio than to wait for the properties to physically decline and financially fail. This belief has been proven true by the successful restructuring of 188,000 apartment units across the country, which has also helped improve the lives of thousands of low-income families who call these units home.

On behalf of the entire Department, I look forward to working with you to ensure that we continue to provide affordable housing in a cost-effective man

###

Attachment A - Testimony of HUD DAS Theodore Toon

Content updated June 14, 2006

**U.S. Department of Housing and Urban Development**
451 7th Street, S.W., Washington, DC 20410
Telephone: (202) 708-1112  Find the address of a HUD office near you