UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STEINHORST ASSOCIATES, )<br><br>Plaintiff, )<br><br>v. )<br><br>ALPHONSO JACKSON, in his capacity as )<br>Secretary of the United States Department of )<br>Housing and Urban Development, )<br><br>Defendant. )<br>‎ ) | Civil Action No. 07-813 (HHK) |

**PLAINTIFF'S REPLY TO DEFENDANT'S OPPOSITION
TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

The Plaintiff, Steinhorst Associates, submits this Reply to the "Opposition to

Plaintiff's Motion for Preliminary Injunction" filed by Defendant Jackson ("Defendant").

As discussed below, the arguments advanced by Defendant in his Opposition are

unpersuasive.  Therefore, the Court should grant Plaintiff's Motion for Preliminary

Injunction.

**ARGUMENT**

**I.      STANDARD FOR INJUNCTIVE RELIEF**

As correctly noted by Defendant,  "To warrant preliminary injunctive relief, the

moving party must show:  (1) a substantial likelihood of success on the merits; (2) that it

would suffer irreparable injury if the injunction were not granted; (3) that an injunction

would not substantially injure other interested parties; and (4) that the public interest

would be furthered by the injunction."  Opposition 4 ("Opp.") (citations omitted).

However, Defendant's assertion that "A party faces an even <u>greater</u> burden when it seeks

injunctive relief, which, if granted, would interfere with governmental operations," is incorrect. Neither of the two cases cited by Defendant, *Yakus v. United States*, 321 U.S. 414, 440 (1944) or *Virginian Railway Co. v. Systems Federation No.* 40, 300 U.S. 515, 552 (1937), support this proposition.

The most that can be said about *Yakus* and *Virginian Railway* is that they are consistent with the equitable nature of an injunction and that a court will exercise discretion, through its balancing of the four factors, in deciding whether to grant a request for injunctive relief. Moreover, both *Yakus* and *Virginian Railway* must be viewed in the context of the issues decided in those cases.

*Virginian Railway*, which was decided seventy years ago, decided "the constitutional validity of certain provisions of the Railway Labor Act … and as to the nature and extent of the relief which courts are authorized by the Act to give." 300 U.S. at 538. Similarly, one of the issues decided in *Yakus* was whether the prohibition of a temporary stay or injunction found in the Emergency Price Control Act of January 30, 1942 constituted a denial of due process. 321 U.S. at 418. The statute challenged in *Yakus* was a statute passed by Congress "in the interest of the national defense and security and necessary to the effective prosecution of the present war." *Id.* at 420. Accordingly, neither case supports Defendant's assertion that Plaintiff has a burden greater than that imposed by the four factors that the Court must consider in ruling on Plaintiff's motion.

## II.    PLAINTIFF HAS A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS

In this action, Plaintiff is challenging, under the Administrative Procedure Act ("APA"), HUD's decision not to approve Plaintiff's request to renew its HAP contracts

under Option Four of HUD's Section 8 Renewal Guide ("Renewal Guide"), as in effect

before December 2006.  It is Plaintiff's contention that HUD's refusal to approve

Plaintiff's request is arbitrary, capricious and not otherwise in accordance with law.

### A.    HUD's Refusal To Approve Plaintiff's Request To Renew Plaintiffs' HAP Contracts Under Option Four Violates The APA

Defendant asserts that, "Because HUD appropriately followed the new regulation,

its actions were neither arbitrary nor capricious."  Opp. 7-8.  The "new" regulation

referred to by Defendant is 24 C.F.R. § 401.100(b)[1] which states,

> Eligibility for a Restructuring Plan under paragraph (1) of this section is determined by the status of a project on the earlier of the termination or expiration date of the project-based assistance contract, which includes a contract renewed under section 524 of MAHRA, or the date of the owner's request to HUD for a Restructuring Plan.

However, this regulation is invalid because (1) it is contrary to the plain language of the

Multifamily Assisted Housing Reform and Affordability Act of 1997 ("MAHRA"), (2) it

was not validly adopted and (3) any reliance by HUD on this regulation is arbitrary and

capricious because it departs from prior HUD precedent and HUD has not adequately

explained the reasons for its departure from prior precedent.

### 1.  24 CFR § 401.100(b) Is Contrary To MAHRA

Defendant asserts that its interpretation of 24 C.F.R. § 401.100(b) is entitled to

deference.  Opp. 7-8.  However, when "Congress has directly spoken to the precise

question at issue," a court "must give effect to the unambiguously expressed intent of

Congress." *Arizona v. Thompson*, 281 F.3d 248, 253 (D.C. Cir. 2002) (quoting *Chevron*

*U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984)).  Moreover,

---

[1] Although Defendant cites 24 C.F.R. § 401.100(a) in his Opposition, the language quoted by Defendant is from 24 C.F.R. § 401.100(b).

if a statute is silent or ambiguous, a court will only defer to an agency's interpretation as long as it is "based on a permissible construction of the statute."  *Id.*

Section 524(c)(1) of MAHRA states,

**(c) Rent adjustments after renewal of contract.—**

**(1) Required.**—After the initial renewal of a contract for assistance under section 8 of the United States Housing Act of 1937 pursuant to subsection (a), (b)(1), or (e)(2) [subsec. (a), (b)(1), or (e) of this section], the Secretary shall annually adjust the rents using an operating cost adjustment factor established by the Secretary (which shall not result in a negative adjustment) or, upon the request of the owner and subject to approval of the Secretary, on a budget basis.  In the case of projects with contracts renewed pursuant to subsection (a) or pursuant to subsection (e)(2) at rent levels equal to comparable market rents for the market area, at the expiration of each 5-year period, the Secretary shall compare existing rents with comparable market rents for the market area and may make any adjustments in the rent necessary to maintain the contract rents at a level not greater than comparable market rents or to increase rents to comparable market rents.

42 U.S.C. § 1437f note.  As conceded by Defendant, Plaintiff renewed its original HAP Contract under Section 524(b)(1) of MAHRA and Option Four of the Renewal Guide. Opp. 3.  Therefore, in accordance with the plain, unambiguous language of Section 524(c)(1), HUD "shall annually adjust the rents using an operating cost adjustment factor."

There is no exception to this mandate when the "Subsequent Renewal" of a HAP Contract which had its "Initial Renewal" processed under Section 524(b)(1).  Therefore, HUD's attempt to compel Plaintiff to restructure its mortgage loan and **reduce** Plaintiff's Contract Rents, rather than adjusting them with an operating cost adjustment factor[2], is contrary to Section 524(c)(1) and otherwise "not in accordance with law."  *Cf. Louisville & N.R. Co. v. United States*, 268 F. Supp. 71, 75 (W.D. Ky. 1967) (holding that an

---

[2] As stated in Section 524(c)(1), adjusting a project's Contract Rents with an operating cost adjustment factor "shall not result in a negative adjustment."

administrative order that is based on an erroneous interpretation or misapplication of relevant statutory provisions is "not in accordance with law."), *rev'd on other grounds*, 392 U.S. 571.

Plaintiff made several other arguments in its Memorandum of Points and Authorities in Support of Plaintiff's Motion for Preliminary Injunction ("Memorandum") as to why there is a substantial likelihood that Plaintiff will prevail on the merits of this action. Significantly, Defendant did not address any of those arguments. Rather, he trotted out the trite aphorism, as all executive agencies do when challenged under the APA, that the Court should defer to HUD because HUD, as the administrative agency, knows best. However, as discussed above and in Plaintiff's Memorandum, HUD's interpretation of 24 C.F.R § 401.100(b) is not entitled to deference because it is contrary to the express provisions of MAHRA.

### 2. 24 CFR § 401.100(b) Was Not Promulgated In Accordance With The APA

HUD has implemented MAHRA through 24 C.F.R. Parts 401 and 402. Parts 401 and 402 were first promulgated through an interim rule published on September 11, 1998. 63. Fed. Reg. 48926 *et seq.* (Sept. 11, 1998). 24 C.F.R. § 401.100 was not part of the interim rule. *Id.*

HUD published a final rule implementing Part 401 on March 22, 2000. 65 Fed. Reg. 15452 *et seq.* (March 22, 2000). As with the interim rule, 24 C.F.R. § 401.100 was not part of the final rule. *Id.*

As part of the March 22, 2000 final rule, HUD stated that it would publish a separate final rule "for those sections of the interim rule that govern renewal of section 8 project-based assistance contracts for projects outside of the Mark-to-Market Program."

Id. at 15452.  Accordingly, in the March 22, 2000 final rule, HUD stated it was "separating parts 401 and 402" and that "the rest of interim part 402 continues in effect until other changes to part 402 are published later as a separate final rule."  *Id.*  at 15453

HUD published its final rule implementing Part 402 on January 12, 2006.  71 Fed. Reg. 2111 *et seq.*  (Jan. 12, 2006).  In addition to the changes made to part 402, the January 12, 2006 final rule also made some revisions to part 401, including adding § 401.100.

The APA requires that "General notice of proposed rule making shall be published in the Federal Register."  5 U.S. C. § 553(B).  An agency may not make substantive, or legislative, changes without first undergoing notice and comment. *Batterton v. Marshall*, 648 F.2 694, 700-702 (D.C. Cir. 1980) (specifying the notice and comment requirements under the APA).

After the enactment of MAHRA, HUD "issued a number of Housing Notices which established Section 8 renewal policies."  Renewal Guide § 1-4.  HUD's Renewal Guide, which was issued in 2001, superseded the Notices that had been issued by HUD. *Id.*  Accordingly, since its publication, the Renewal Guide, in addition to Parts 401 and 402, has specified HUD's policies for the renewal of Section 8 HAP Contracts in accordance with MAHRA.

Chapter 6 of the Renewal Guide specifies HUD's policy for renewing a Section 8 HAP Contract under Option Four.  When first published, the "Initial Renewal" of a HAP Contract required that "the initial renewal rents shall be set at the lesser of: (1) the current rent adjusted by the applicable operating cost adjustment factor or (2) rents set on a

budget basis." *See* Memorandum, Ex. 4, § 6-3B.  This policy has remained unchanged since the Renewal Guide was first published.

Section 6-4 of the Renewal Guide specifies HUD's policy for the "Subsequent Renewal" of a HAP Contract that had its "Initial Renewal" processed under Option Four. Before HUD revised the Renewal Guide on December 12, 2006, an owner of such projects, at a "Subsequent Renewal", was entitled to a renewal with new Contract Rents adjusted by an operating cost adjustment factor, unless the owner requested an adjustment on a budget basis.  Memorandum, Ex. 4, § 6-4.  Neither the Renewal Guide nor any other printed guidance authorized HUD to redetermine a project's status at a "Subsequent Renewal."  In fact, prior to the adoption of 24 C.F.R. § 401.100(b), HUD did not redetermine, at a "Subsequent Renewal," the status of a project that had its "Initial Renewal" processed under Option Four.

By giving HUD the authority to redertermine a project's status at a "Subsequent Renewal" instead of automatically adjusting a project's rents with an operating cost adjustment factor, 24 C.F.R. § 401.100(b) has effected a substantive change to the way HUD processes the "Subsequent Renewal" of a project which had its "Initial Renewal" processed under Option Four.  Therefore, HUD has violated the APA through its failure to publish 24 C.F.R. § 401.100(b) for notice and comment in the Federal Register.

### 3.  HUD's Reliance On 24 C.F.R. § 401.100(b) Is Arbitrary And Capricious

"This court emphatically requires that administrative agencies adhere to their own precedents or explain any deviation from them."  *Greyhound Corp. v. ICC,* 551 F. 2d, 414, 416 (D.C. Cir 1977) (citations omitted).  "[W]hen an agency decides to reverse its course, it must provide an opinion or analysis indicating that the standard is being

changed and not ignored, and assuring that it is faithful and not indifferent to the rule of law." *Id.* "Agency decisions that depart from established precedent without a reasoned explanation will be vacated as arbitrary and capricious." *Graphic Communications Int'l Union v. Salem-Gravure Div. of World Color Press, Inc.*, 843 F.2d 1490, 1493 (D.C. Cir. 1988).

HUD's "new" regulation, 24 C.F.R. § 401.100(b), deviates significantly from its prior practice. Instead of automatically permitting an exception project to have its "Subsequent Renewal" processed under Option Four, HUD now redetermines a project's status which could, as with Steinhorst Square Apartments, lead to HUD prohibiting the project from having its "Subsequent Renewal" processed under Option Four. HUD has not offered a "reasoned explanation" for its departure from its prior precedent. Therefore, HUD's refusal to permit Plaintiff to have its renewal processed under Option Four must be vacated as arbitrary and capricious.

### III.    PLAINTIFF WILL SUFFER IRREPARABLE HARM IF A PRELIMINARY INJUNCTION IS NOT GRANTED

Defendant asserts that Plaintiff will not be irreparably harmed because, "Loss of income simply does not constitute irreparable injury." Opp. 9. However, it is not the loss of income that Plaintiff asserts will cause it to suffer irreparable harm. Rather, it is the loss of Plaintiff's multimillion dollar asset, through foreclosure, and the concomitant destruction of Plaintiff's business that will cause Plaintiff irreparable harm.

Plaintiff concedes that economic loss, by itself, does not constitute irreparable harm. *Wis. Gas Co. v. Fed. Energy Regulatory Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985). However, the destruction of a person's business does satisfy the irreparable harm requirement. *See Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d.

841, 843 (D.C. Cir. 1977) (finding that destruction of a party's business constituted irreparable harm).  *Cf. DRG Funding Corp. v. Secretary of Housing and Urban Dev.*, 1988 U.S. Dist. LEXIS, at * 18 (D.D.C. 1988) (holding that where failure to grant a preliminary injunction would lead to bankruptcy, harm to the party would be "immediate and irreparable").

Plaintiff is in default of both its mortgage loan and the mortgage that secures the loan.  Second Slavet Aff. ¶ 5.[3]  Unless Plaintiff cures its default by June 30, 2007, Plaintiff's mortgage will be subject to foreclosure.  *Id.*

Plaintiff will not be able to cure its current default unless it obtains a loan or Plaintiff's housing assistance payments are resumed. *Id.* ¶ 6.  There is no assurance that Plaintiff will be able to continue to borrow enough money to make mortgage payments.

Plaintiff was formed for the purpose of acquiring, developing, holding, managing, maintaining and operating Steinhorst Square. Slavet Aff., ¶ 3.  Moreover, Plaintiff is forbidden by its Limited Partnership Agreement from engaging in any other business.  *Id.*  Therefore, the loss of Steinhorst Square Apartments will result in the termination and destruction of Plaintiff's business.  The irreparable harm to Plaintiff is patent.

Defendant does not dispute the magnitude of Plaintiff's adverse financial position.[4]  Instead, Defendant places the blame for Plaintiffs' adverse financial position on Plaintiff through Plaintiff's failure to accept a renewal option other than Option Four, the option to which Plaintiff is entitled.  Opp. 9.  Defendant's argument is sophistic.

---

[3] A copy of the Second Affidavit of Gerald Slavet is attached as Exhibit 1.

[4] As of June 5, 2007, Plaintiff had $1731.91 cash available to it and accounts payable in the approximate amount of $246,600.  Second Slavet Aff. ¶¶ 4 and 8.

Defendant states, "Plaintiff has the option to restructure its debt, which will likely reduce or eliminate the alleged (undisputed) financial shortfall." Opp. 9. Restructuring is accomplished through Option Three. See Renewal Guide, Chap. 5. Although renewing under Option Three would result in the resumption of Plaintiff's housing assistance payments, Option Three requires an owner to dedicate the owner's project, through the execution of a use agreement, as affordable housing for thirty years, ten years beyond the availability of continued Section 8 assistance for its tenants. This would impose restrictions and limitations on Plaintiff's property that would not be imposed under Option Four, although there would be some restrictions and limitations imposed under Option Four. Under Option Four, a project owner, such as Plaintiff, can limit future use restrictions to one year at a time.

Accordingly, Plaintiff is presented with a Hobson's choice. Plaintiff can either continue to pursue a renewal under Option Four, to which Plaintiff firmly believe it is entitled under MAHRA, and risk foreclosure and the destruction of its business, or it can pursue a renewal under another option, possibly Option Three, thereby ensuring a resumption of Plaintiff's housing assistance payment and presumably rescuing Plaintiff from financial ruin. However, this latter choice would be at the expense of additional restrictions and limitations on the use of Plaintiff's property for a significantly greater period of time. Plaintiff should not have to make this choice.

Defendant asserts that Plaintiff has offered no evidence to support Plaintiff's allegation that Plaintiff's "inability to meet its most recent mortgage payment may result in either an immediate foreclosure or an assignment to HUD where HUD would have the right to foreclose, which in turn will ruin its overall business." Opp. 10. However, it is

10

undisputed that Plaintiff is in default of its mortgage loan and mortgage, and unless

Plaintiff cures its default by June 30, 2007, Plaintiff's mortgagee may either foreclose on

the mortgage or assign it to HUD.  Second Slavet Aff. ¶5.  It is also undisputed that if

Plaintiff's mortgagee assigns the mortgage to HUD, HUD may foreclose on the

mortgage, *Id.*, and foreclosure will result in the loss of Plaintiff's principal asset which

has an estimated value of $6.2 million.  Slavet Aff. ¶17.

Defendant knows, through his employees and/or agents, that upon default,

mortgagees normally assign a defaulted mortgage to HUD immediately.  Defendant also

knows that it is HUD's policy, in effect for the past two to three years, to foreclose as

expeditiously as possible upon the assignment of a defaulted mortgage to HUD.

Moreover, as shown in Exhibit 2 to the Reply, Plaintiff's creditors have begun to threaten

action if they are not paid.  Clearly, the potential harm to Plaintiff, if a preliminary

injunction is not granted, is significant, certain and imminent.

### IV.    NEITHER HUD NOR THE PUBLIC INTEREST WILL BE HARMED IF THE COURT GRANTS PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

Defendant asserts that HUD "has been very successful in balancing the dual

Mark-to-Market program goals of reducing long-term Section 8 subsidy cost while

preserving affordable housing."  Opp. 11.  As support for this assertion, Defendant touts

HUD's success in implementing MAHRA through the Preservation of 2200 projects with

more than 188,000 units and the net savings of $2 billion that has been generated by

HUD through the Mark-to-Market program.  Accordingly, Defendant asserts that "If

HUD was not able to require the restructuring of debt on subsequent renewal of

properties the conditions under which the project was designated an exception project no

longer exists, the enumerated purposes of MAHRA could not be met. *Id*. Defendant further asserts that both HUD and the public will be harmed if the Court grants Plaintiff's motion for a preliminary injunction because, "[I]t would risk HUD's ability to preserve low-income housing affordability and availability, as well as create huge Section 8 subsidy costs." *Id.*

Defendant offers no evidence of how many projects there are where the conditions under which the project was designated an exception project at its "Initial Renewal" might not exist at a "Subsequent Renewal." Therefore, Defendant's alarmist statement that the granting of Plaintiff's motion "would risk HUD's ability to preserve low-income housing affordability and availability, as well as create huge Section 8 subsidy costs" is sheer speculation.

Under Option Six of the Renewal Guide, an owner may, at the expiration of its HAP Contract, choose not to renew the contract. If HUD continues to try and deprive owners of the benefits to which they are entitled, it is reasonable to believe that more owners will choose Option Six. This will not be helpful to HUD in achieving its goal of preserving low-income affordable housing.

In 1999, Congress amended MAHRA. *See* Pub. L. No. 106-74, 113 Stat. 1047, 1109-1116 (Oct. 20, 1999). "This legislation made modifications to the previous section 8 renewal policies and established specific provisions for rent adjustments in subsequent years after an initial renewal under MAHRA." Renewal Guide, § 1-1B. Specifically, "The Act modified Section 524(a)(1) and 524(a)(2) of the original MAHRA. Projects that previously fell under section 524(a)(1), are now covered under section 524(a), and projects that previously fell under section 524(a)(2), are now covered by Section 524(b)."

*Id.*, 1-1B1.  Section 524(b) of MAHRA is the provision that governs the "Initial Renewal" of an exception project.

In addition to modifying and replacing Section 524(a)(1) and 524(a)(2) of MAHRA as originally enacted with section 524(a) and 524(b), the 1999 legislation added Section 524(c).  Pub. L. No. 106-74, 113 Stat. 1047, 1113 (Oct. 20, 1999).  As discussed above, this is the provision that requires, after the "Initial Renewal" of a project's HAP Contract under Section 524(b)(1) of MAHRA, that HUD adjust the project's Contract Rents annually, including at a "Subsequent Renewal", using an operating cost adjustment factor.  Therefore, although one purpose under section 511(b)(1) of MAHRA is "to preserve low-income rental housing affordability and availability while reducing the long-term costs of project-based assistance", Congress has made a policy decision, through Section 524(c), that some projects are entitled to annual rent adjustments irrespective of their rent levels.  This is consistent with the purpose specified in Section 511(b)(7) of MAHRA "to protect the interest of project owners and managers, because they are partners of the Federal Government in meeting the affordable housing needs through the Section 8 rental housing assistance program."  Therefore, Defendant's policy argument in support of its assertion that both HUD and the public will be harmed if the Court grants Plaintiff's motion for a preliminary injunction is unavailing.

Steinhorst Square Apartments is one project in a universe of thousands.  Moreover, the funds for the payments sought by Plaintiff have been budgeted, appropriated and allocated for the purpose of making these payments to Plaintiff.  Clearly, HUD will not be harmed if Plaintiff's motion is granted.  Moreover, the elderly and disabled tenants at Plaintiff's project will be harmed when Plaintiff's creditors,

including the companies that provide utilities to the project, terminate the goods and services provided to the project. *See, e.g.* Ex. 2.

## CONCLUSION

A preliminary injunction "is preventative, or protective; it seeks to maintain the status quo pending a final determination on the merits of the suit." *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 844 (D.C. Cir. 1977). Of the four factors that the Court must consider in making its decision on Plaintiff's motion for a preliminary injunction, no one factor is determinative. Rather, "These factors interrelate on a sliding scale and must be balanced against each other." *Fund for Animals v. Norton*, 281 F. Supp. 2d 209, 219 (D.D.C. 2003) (*quoting Serono Laboratories, Inc. v. Shalala*, 158 F.3d 1313, 1318 (D.C. Cir. 1998)). "If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak." *City Fed*, 58 F.3d at 747.

In this case, all the factors strongly favor the granting of Plaintiff's motion for a preliminary injunction. First, the harm to Plaintiff if Plaintiff's motion is not granted will be irreparable; Plaintiff's business will be destroyed. Moreover, the potential harm to Plaintiff is certain and imminent.

Second, HUD's refusal to approve the renewal of Plaintiff's HAP Contracts under Option Four of the Renewal Guide, as in effect before HUD revised Option Four in December 2006, is contrary to the express provisions of MAHRA. Moreover, the "new" regulation, 24 C.F.R. § 401.100(b), relied on by Defendant to support HUD's decision not to permit Plaintiff to renew its HAP contracts under Option Four, is invalid because (1) it was adopted without notice and comment and (2) it represents a departure from

HUD's prior practice and HUD has not provided a reasoned explanation for its departure. Therefore, there is a substantial likelihood that Plaintiff will prevail on the merits of this action.

Third, if Plaintiff's motion is not granted, Plaintiff will continue to be unable to pay its creditors. *See, e.g.* Ex. 2. This will lead to a disruption in the goods and services provided by Plaintiff to the tenants at Steinhorst Square, including a cutoff of the utilities to Steinhorst Square. This will have a devastating effect on the tenants at Steinhorst Square, all of whom are elderly and/or disabled. Therefore, the public interest favors the granting of Plaintiff's motion.

Fourth, funds have already been budgeted, appropriated and allocated for HUD to make annual contributions to the Housing Authority so that the Housing Authority can make housing assistance payments to Plaintiff. Granting Plaintiff's motion will preserve the status quo in effect before HUD stopped making annual contributions to the Housing Authority. Therefore, HUD will not be harmed if the Court grants Plaintiff's motion. In fact, if the Court denies Plaintiff's motion, the elderly and disabled tenants at Steinhorst Square will be substantially injured.

For the reasons discussed above and in Plaintiff's Memorandum, the Court should grant Plaintiff's motion for a preliminary injunction.

Respectfully submitted,


June 11, 2007                           /s/ Carl A.S. Coan, Jr.
                                        Carl A.S. Coan, Jr. (D.C. Bar No. 89466)
                                        Carl A.S. Coan, III (D.C. Bar No. 358034)
                                        Coan & Lyons
                                        1100 Connecticut Ave., N.W.
                                        Suite 1000
                                        Washington, DC 20036
                                        Phone No. 202-728-1070
                                        Fax No. 202-293-2448

                                        Attorneys for Plaintiff

Steinhorst Associates v. Jackson
Civil Action No. 07-813 (HHK)

Plaintiff's Reply to Defendant's
Opposition to Plaintiff's
Motion for Preliminary injunction

Exhibit 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STEINHORST ASSOCIATES,                           )
                                                 )
                           Plaintiff,            )
                                                 )
        v.                                       )    Civil Action No. 07-813 (HHK)
                                                 )
ALPHONSO JACKSON, in his capacity as             )
Secretary of the United States Department of     )
Housing And Urban Development,                   )
                                                 )
                                                 )
                                                 )
                           Defendant.            )
_____         )

## SECOND AFFIDAVIT OF GERALD SLAVET

I, Gerald Slavet, being first duly sworn under oath, depose and state the following:

1.  I am a citizen of the United States, over the age of 21 and am competent to testify to the matters contained herein.

2.  I am a General Partner of Steinhorst Associates, the Plaintiff in this action and the owner of Steinhorst Square Apartments ("Steinhorst"), a 100-unit rental apartment project in Utica, New York, that was developed for occupancy by low-income elderly families and individuals.

3.  Plaintiff made its May mortgage loan payment, which was due May 1, on May 29, 2007. Plaintiff had to borrow the entire amount of the $37,739.54 payment. Plaintiff also borrowed the entire amount of the April mortgage loan payment.

4.  Plaintiff's June mortgage loan payment was due June 1, 2007.  Plaintiff did not make the payment because it did not have enough money available to make the payment. As of June 5, 2007, Plaintiff had $1,731.91 available to meet its operating expenses.

5.  Plaintiff is now in default of both its mortgage loan and the mortgage executed by Plaintiff to secure its mortgage loan.  Unless Plaintiff cures its default by June 30, 2007, Plaintiff's mortgagee may either foreclose on the mortgage or assign it to HUD.  If the mortgagee assigns the mortgage to HUD, HUD will be entitled to foreclose on the mortgage.

6.  Plaintiff will be unable to cure its default unless Plaintiff is able to obtain another loan or the housing assistance payments which have been earmarked for Steinhorst are resumed.

7.  Plaintiff has a limited ability to obtain another loan for the purpose of making Plaintiff's mortgage loan payments.  I estimate that Plaintiff will only be able to borrow enough money to make one or two more mortgage loan payments.

8.  In addition to being in default of its mortgage loan, as of June 5, 2007, Plaintiff had account payables in the approximate amount of $246,600.  This amount includes the $75,740 borrowed by Plaintiff to make its April and May mortgage loan payments and the June mortgage loan payment of $37,740 that was due June 1.

I hereby certify that the foregoing statements are true to the best of my knowledge, information and belief.

_____
Gerald Slavet


State of Massachusetts                    )
City County of _____  ) ss:

2

Subscribed and sworn to before me this ___/___ day of June, 2007.

_____
Notary Public

My commission expires:_____

**Steinhorst Associates v. Jackson**
**Civil Action No. 07-813 (HHK)**

**Plaintiff's Reply to Defendant's**
**Opposition to Plaintiff's**
**Motion for Preliminary injunction**


**Exhibit 2**

# **VP** **SUPPLY CORP.**

Wholesale Plumbing & HVAC Products

Office & Warehouse
3445 Winton Place
Rochester, New York 14623

P.O. Box 23868
Rochester, New York 14692

585-272-0110
FAX 585-272-0547

8/1/2007

STEINHORST SQUARE APARTMENTS
612 SOUTH STREET
UTICA, NY  13501

Re: $13310.29

To Whom It May Concern::

        We are sending you this notice of your past due indebtedness to us.  Unless we receive
your remittance covering the past due indebtedness in ten (10) days, we will file the account
for legal action with Paul Goldstein Attorney at Law.

        We trust that you will not compel us to take this action.

                                        Yours truly,
                                        VP Supply Corp.

                                        Ray Northrup
                                        Credit Manager

Cc: Mr. Joseph M Shur ESQ.
Enc.

**HOLLEY**
14 Geddes Street
Holley, NY 14470
(585) 638-6344
FAX (585) 638-6164

**BUFFALO**
2240 Harlem Road
Cheektowaga, NY 14225
(716) 895-2800
FAX (716) 895-2855

**SYRACUSE**
601 Erie Boulevard West
Syracuse, NY 13204
(315) 425-6200
FAX (315) 478-3308

**NEW HARTFORD**
4676 Commercial Dr.
New Hartford, NY 13413
(315) 768-7878
FAX (315) 768-4774