UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| STEINHORST ASSOCIATES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 07-813 (HHK) |
| | ) | |
| ALPHONSO JACKSON, in his capacity as | ) | |
| Secretary of the United States Department of | ) | |
| Housing And Urban Development, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION
## FOR SUMMARY JUDGMENT

For the reasons discussed below, the Court should deny Defendant's Motion for

Summary Judgment.

## INTRODUCTION

This is an action for declaratory and injunctive relief.  Plaintiff has requested that

the Court declare that Plaintiff is entitled to renew the Housing Assistance Payments

("HAP") Contracts between Plaintiff and the Municipal Housing Authority of the City of

Utica, New York ("Housing Authority") under Section 524(c)(1) of the Multifamily

Assisted Housing Reform and Affordability Act of 1997 ("MAHRA") and Option Four

of the Section 8 Renewal Guide ("Renewal Guide") issued by the U.S. Department of

Housing and Urban Development ("HUD").  In addition, Plaintiff has requested that the

Court order HUD to approve the renewal of Plaintiff's HAP Contracts, consistent with

the declaratory judgment sought by Plaintiff.

**FACTS**

**I.    THE SECTION 8 PROGRAM**

Section 8 of the United States Housing Act of 1937 ("Section 8") was enacted in 1974 for the purpose of aiding low-income families in obtaining a decent place to live and promoting economically mixed housing. 42 U.S.C. § 1437f(a).  Section 8 seeks to achieve these goals by providing rent subsidies on behalf of low-income families living in rental housing owned primarily by private persons and entities.

Section 8 authorizes the Secretary of HUD to enter into an Annual Contributions Contract ("ACC") with a public housing agency ("PHA"), such as the Housing Authority, pursuant to which the PHA may enter into HAP Contracts with private owners of multifamily rental housing projects to make housing assistance payments to the owners for some or all of a project's units which are leased to low-income families.  *Id.* at § 1437f(b).  A Section 8 HAP Contract establishes the maximum monthly rent which an owner is entitled to receive ("Contract Rent") for each unit covered by the contract.  *Id.* at § 1437f(c)(1).  Under the HAP Contract, the monthly assistance payment to which an owner is entitled for a tenant is equal to the difference between the Contract Rent and the amount the tenant is required by law to pay as rent.  *Id.* at § 1437f(c)(3). The ACC obligates HUD to provide funding to the PHA, through payments called annual contributions, for the purpose of making the housing assistance payments to the private owners pursuant to the HAP Contracts between the PHA and the owners.

HUD has implemented Section 8 through several distinct programs.  Two such programs are the Section 8 Programs for New Construction and Substantial Rehabilitation.  *See* 24 C.F.R. Parts 880 and 881.

II.    **THE MULTIFAMILY ASSISTED HOUSING REFORM AND AFFORDABILITY ACT OF 1997**

MAHRA was enacted for the purpose of, among other things, "protect[ing] the interest of project owners and managers, because they are partners of the Federal Government in meeting the affordable housing needs of the Nation through the Section 8 rental housing assistance program." 42 U.S.C. § 1437f note, Section 511(b)(7). This is consistent with the choice made by Congress when it enacted Section 8 in 1974 to utilize the private sector for construction of the housing that was to be assisted under Section 8. *See* S. Rep. No. 93-693, at 611 (1974) ("The Committee has accepted the essence of HUD's recommendation which is to give private developers the incentive for profit and the risk of loss in the construction and management of housing developed for low income families."). MAHRA established new policies for the renewal of all Section 8 project-based HAP Contracts. In general, Section 515 and Section 524 of MAHRA authorize the "Initial Renewal" of an expiring Section 8 project-based HAP Contract. The term "Initial Renewal" is defined as, "The first renewal of a project's contract or stage that is processed under the rules established by MAHRA." Renewal Guide, Section 2-1A.

When a Section 8 project-based HAP Contract first expires, its renewal is authorized under Section 515 of MAHRA if the renewal "is in accordance with the terms and conditions specified in the mortgage restructuring and rental assistance sufficiency plan" required by Section 514 of MAHRA. Under Section 514 of MAHRA, a mortgage restructuring and rental assistance sufficiency plan is required to be submitted for every "Eligible Multifamily Housing Project", unless a project is exempt under section 514(h). Section 512(2) of MAHRA defines the term "Eligible Multifamily Housing Project" as a project that (1) has rents on an average per unit basis that exceed the rent of comparable

3

projects in the same market area, (2) is covered by a contract for project-based assistance under the New Construction or Substantial Rehabilitation Programs under Section 8(b)(2) of the United States Housing Act of 1937 or one of the other HUD programs specified in Section 512(2), and (3) is financed by a mortgage insured or held by HUD under the National Housing Act, 12 U.S.C. § 1701 *et seq*.

Section 514 of MAHRA requires that for an "Initial Renewal," an "Eligible Multifamily Housing Project" will have its Contract Rents reduced in accordance with the mortgage restructuring and rental assistance sufficiency plan for the project. In addition, the project will have its mortgage loan restructured to enable the project to meet its financial obligations at the reduced Contract Rents.[1]

Section 514(h) of MAHRA exempts an "Eligible Multifamily Housing Project" from the restructuring requirements of Section 514, if the project was primarily financed by a unit of state or local government, or an agency or instrumentality of either, and where the financing involved mortgage insurance under the National Housing Act "such that implementation of a mortgage restructuring and rental sufficiency plan" would be "in conflict with the applicable law or agreements governing such financing."

A project that is not an "Eligible Multifamily Housing Project", or that is exempt from the restructuring requirements of Section 514 under Section 514(h) of MAHRA, is entitled under Section 524(b)(1) of MAHRA, for its "Initial Renewal", to have its HAP Contract renewed with its Contract Rents set at the lesser of the Contract Rents in effect when the HAP contract expires, as adjusted by an operating cost adjustment factor ("OCAF"), or Contract Rents established on a budget basis.

---

[1] These rent reduction and mortgage loan restructuring requirements of Section 514 are hereinafter referred to simply as "restructuring" or "the restructuring requirements."

After the "Initial Renewal" of a HAP Contract under Section 524(b)(1), HUD is required under Section 524(c)(1) of MAHRA to "annually adjust the rents using an operating cost adjustment factor … or upon the request of the owner and subject to the approval of the Secretary, on a budget basis." This provision requires that, for all "Subsequent Renewals" of a HAP Contract that had its "Initial Renewal" processed under Section 524(b)(1), the Contract Rents specified in the "Subsequent Renewals" will be the Contract Rents in effect when the HAP Contract expires, as adjusted with an OCAF, unless the owner requests that the Contract Rents be established on a budget basis and HUD approves the request. A "Subsequent Renewal" is defined as, "The renewal of an expiring contract that was initially renewed under 524 of MAHRA." Renewal Guide, Glossary of Terms.

HUD has implemented MAHRA through regulations, various Notices and its Section 8 Renewal Guide. In accordance with the Renewal Guide, HUD has established six options, Options One through Six, from which an owner must choose whenever a Section 8 project-based HAP contract expires.

## III.    STEINHORST SQUARE APARTMENTS

Steinhorst Square Apartments ("Steinhorst Square") is a 100-unit multifamily rental housing project located in Utica, New York. Slavet Declaration ("Dec."), ¶ 2.[2] Steinhorst Square was developed in two stages. *Id.*, ¶ 3. The first stage was the construction of sixty units built under HUD's Section 8 New Construction Program. *Id.* The second stage was the rehabilitation of forty units that were rehabilitated under HUD's Section 8 Substantial Rehabilitation Program. *Id.*

---

[2] The Declaration of Gerald Slavet is attached as Exhibit 1 to Plaintiff's Opposition.

Financing for the mortgage loan on Steinhorst Square was provided by Mortgage Revenue Bonds issued in 1980 by the Utica Senior Citizen Housing Corporation, a New York not-for-profit corporation and an instrumentality of the Housing Authority. *Id.*, ¶ 4. The terms of Plaintiff's mortgage loan are specified in a Mortgage Note that is insured by HUD under Section 221(d)(4) of the National Housing Act, 12 U.S.C. § 1715l(d)(4), and in the Mortgage executed by Plaintiff to secure its loan. *Id.*

In 1996, the Utica Senior Citizen Housing Corporation refunded the Mortgage Revenue Bonds it had issued in 1980 with a new issue of Mortgage Revenue Bonds. *Id.*, ¶ 5. In connection with the 1996 bond refunding, the Steinhorst Square Mortgage Note was amended to prohibit prepayment of the Steinhorst Square mortgage loan before April 15, 2006. *Id.* Prepayment between April 15, 2006 and April 15, 2008 will incur a prepayment penalty. *Id.*

Ninety-nine of the units at Steinhorst Square are covered by a project-based Section 8 HAP Contract between Plaintiff and the Housing Authority. *Id.*, ¶ 6. There were two stages to Plaintiff's original HAP Contract. *Id.* Stage 1 of the original HAP Contract was effective September 7, 1981 and expired on September 6, 2001. *Id.*, ¶¶ 6-7. Stage 2 of the original HAP Contract was effective on November 12, 1981 and expired on November 11, 2001. *Id.*

When both stages of Plaintiff's original HAP Contract expired in 2001, Plaintiff requested that the Contract be renewed under Option Four of the Renewal Guide. *Id.*, ¶ 7. Option Four is available to an exception project and permits renewal of a HAP Contract with new Contract Rents at the lesser of the Contract Rents in effect when the HAP Contract expires, as adjusted by an OCAF, or Contract Rents established on a

budget basis.  MAHRA, § 524(b); Renewal Guide, Sections 6-1 and 6-2.  An exception project is a project that is not an "Eligible Multifamily Housing Project" or that is exempt from mortgage restructuring pursuant to Section 514(h) of MAHRA.  Renewal Guide, Section 6-1A.

Prior to December 12, 2006, the Contract Rents of a project that had been determined to be an exception project at its "Initial Renewal" were, under Option Four, adjusted with an OCAF, unless the owner requested that the Contract Rents be adjusted on a budget basis and HUD approved the request.  Renewal Guide, Section 6-4A.[3] However, on December 12, 2006, HUD revised Option Four of the Renewal Guide to require that the Contract Rents adjusted in connection with a "Subsequent Renewal", be calculated as the lesser of a project's current Contract Rent, as adjusted by an OCAF, or a Contract Rent determined on a budget basis.  Renewal Guide, Section 6-4A.[4]  This revision was effective April 19, 2007 and does not apply to a renewal request filed on or before April 19, 2007 as long as the request was not filed more than 120 days before a HAP Contract's anniversary date.  *See* Ex. 4.

HUD approved the request to renew Plaintiff's original HAP Contract under Option Four because HUD determined that Steinhorst Square was, under Section 514(h) of MAHRA, an exception project.  Slavet Dec., ¶ 7.  HUD's determination was made on the basis that the financing for Steinhorst Square was provided by an instrumentality of a unit of local government and a mortgage restructuring would conflict with the prohibition on prepaying the Steinhorst Square mortgage loan before April 15, 2006 imposed in

---

[3] A copy of Chapter Six of the Renewal Guide, as in effect before it was revised on December 12, 2006, is attached as Exhibit 2.

[4] A copy of Chapter Six of the Renewal Guide currently in effect is attached as Exhibit 3.

connection with the 1996 bond refunding.  A Renewal HAP Contract for each stage was executed in November 2001.  *Id.*  The Stage 1 Contract was effective September 7, 2001 and the Stage 2 Contract was effective November 12, 2001.  *Id.*  Each contract was for five years.  *Id.*

Several months before the expiration of Plaintiff's 2001 HAP Contracts, HUD told MB Management Company, the management agent for Steinhorst Square, that Steinhorst Square would not automatically be considered an exception project when Plaintiff's two HAP Contracts expired later that year.  *Id.*, ¶ 8,  Instead, HUD informed MB that HUD would make a determination, at the time the Plaintiff's Renewal HAP Contracts expired, whether Steinhorst Square was still exempt from the restructuring requirements of Section 514 of MAHRA.  *Id.*

HUD confirmed its position in writing on August 8, 2006 in a letter from Theodore Toon, HUD's Deputy Assistant Secretary for the Office of Affordable Housing Preservation, to Plaintiff's counsel.  Citing "new regulatory provisions" under 24 C.F.R. § 401.100[5], Mr. Toon in his letter stated, "… Steinhorst Apartments' eligibility will be determined at the expiration of the current contract without reference or consideration given to any prior determination of exemption under Section 514(h) at the expiration of a previous contract."  *See* Ex. 5.

On November 30, 2006, MB Management Company requested in writing that HUD renew both the Stage 1 and Stage 2 Renewal HAP Contracts under Option Four

---

[5]  Defendant provides no substantiation for its assertion that the "new regulation", i.e., 24 C.F.R. § 401.100(b), reflected HUD's "consistently held position" that projects originally determined to be exempt from restructuring under Section 514(h) of MAHRA are eligible for restructuring when the impediment imposed by the financing documents has been removed by the passage of time.  Motion 3.  In fact, the many HUD Housing Notices issued to implement MAHRA after its enactment in October 1997, and the Renewal Guide issued in January 2001, stated the exact opposite prior to the revision of the Renewal Guide in December 2006.  *See* e.g. Ex. 3, Section 6-4A ("No 'lesser of' test is required at subsequent renewal.").

retroactive to their expiration dates.  Slavet Dec, ¶9.  HUD denied MB's request on

January 17, 2007 and directed MB to resubmit its renewal request under another Option

of the Renewal Guide.  *See* Ex. 6.

**ARGUMENT**

## I.  LEGAL STANDARDS

### A.  Summary Judgment

Summary judgment is appropriate when the pleadings and other evidence "show

that there is no genuine issue as to any material fact and that the moving party is entitled

to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary

judgment bears the initial responsibility of demonstrating the absence of a genuine issue

of material fact.  *Wright v. Sony Pictures Entertainment Inc.,* 394 F. Supp.2d 27, 30

(D.D.C. 2005) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)).  After the

moving party satisfies its initial burden, "the nonmoving party must demonstrate 'specific

facts showing that there is a genuine issue for trial'".  *Rashid  v. U.S. Dep't of HHS,* 2000

U.S. Dist. LEXIS 22717, at *6.  (D.D.C. 2000) (quoting *Celotex,* 477 U.S. at 324;

*McKinney v. Dole,* 765 F.2d. 1129, 1135 (D.C. Cir 1985)).

"The substantive law will identify which facts are material.  Only disputes over

facts that might affect the outcome of the suit under the governing law will properly

preclude the entry of summary judgment."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S.

242, 248 (1986).  All inferences must be viewed in the light most favorable to the

nonmoving party.  *Tao v. Freeh,* 27 F. 3d 635, 638 (D.C. Cir. 1994) (citing *Anderson*,

477 U.S. at 250, 255).

## B.    Administrative Procedure Act

The scope of review under 5 U.S.C. § 706(2)(A) is narrow and a court may not substitute its judgment for the agency's. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Nevertheless, an agency must "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Id.* (*quoting Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)). In reviewing an agency's explanation, a court must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* (*quoting Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 285 (1974); *Volpe*, 401 U.S. at 416).

"Normally, an agency rule would be arbitrary and capricious if the agency has (1) relied on factors which Congress has not intended it to consider, (2) entirely failed to consider an important aspect of the problem, (3) offered an explanation for its decision that runs counter to the evidence before the agency, or (4) is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. The reviewing court should not attempt itself to make up for such deficiencies; we may not supply a reasoned basis for the agency's action that the agency itself has not given." *Id.* (*quoting SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)) (numbers in parenthesis added).[6]

---

[6] Defendant asserts that an "agency decision will be found 'arbitrary and capricious' and set aside only if" a court determines that one of the four grounds quoted from *State Farm* exists. Motion 4-5. However, the Court in *State Farm* did not state that these are the only grounds on which an agency action may be found to be arbitrary and capricious.

It should be noted that many of Defendant's statements regarding the standard of review under the Administrative Procedure Act ("APA") are disingenuous.[7]  Specifically,

1.      Defendant cites *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992), for the proposition that, "If substantial evidence exists in the record as a whole to support the agency's factual findings, those findings are conclusive."  Motion 5.  However, *Anthony* involved a review of the denial of disability benefits by the Department of Health and Human Services.  954 F.2d at 290.  Moreover, that review was conducted pursuant to 42 U.S.C. § 405(g), not the APA.  *Id.*  Therefore, the standard of review cited by Defendant from *Anthony* is not applicable to this case.

It is unclear why Defendant states that *Anthony* was cited in *Estate of Morris v. Shalala*, 207 F.3d 744, 745 (5th Cir. 2000).  Although this is true, *Morris* cited *Anthony* for the two issues that are to be decided on appellate review of Social Security disability cases where 42 U.S.C. § 405(g) governs the standard of review.  *Id.*  Moreover, *Morris* rejected the plaintiff's assertion that the standard of review was governed by the APA.

2.      Defendant cites *Marsh v. Oregon Natural Res. Council,* 490 U.S. 360, 372 (1989), for the principle that "So long as an agency complies with the proper procedure and the record supports the choice made, a Court must afford the agency's decision 'substantial deference.'"  Motion 5.  Although, as Defendant infers, the words "substantial deference" were used by the Court in *Marsh* on page 372, the words were used in the sentence, "The CEQ regulations, which we have held are entitled to

---

[7] In addition, a consistent theme of Defendant's articulation of the standard of review under the APA is that the Court must review the administrative record and uphold HUD's decision if the record supports that decision.  However, no administrative record was filed.  This begs the question of what Defendant believes the Court should review.

**substantial deference**, *see Robertson, ante,* at 355-356; *Andrus v. Sierra Club*, 442 U.S.

347,358 (1979), imposed a duty on all federal agencies to prepare supplements to either

draft or final EIS's if there 'are significant new circumstances or information relevant to

environmental concerns and bearing on the proposed action or its impacts.'" (emphasis

added).  The sentence preceding this sentence in the opinion was, "This reading of the

statute is supported by Council on Environmental Quality (CEQ) and Corps regulations,

both of which make plain that at times supplementation is required."

The "substantial deference" accorded the CEQ regulations in *Marsh* was based on

the holding in two previous cases.  Moreover, the regulations were cited as supporting the

Court's interpretation of the statute at issue in *Marsh*.  Nothing was said about the

"substantial deference" accorded to the CEQ regulations being derived from the agency

complying with proper procedure and the record supporting the choice made by the

agency.  Therefore, any reliance on *Marsh* for the principle cited by Defendant is

inappropriate.

3.    Defendant cites *Norton v. Southern Utah Wilderness Alliance*, 542 U.S.

55, 66 (2004) for the proposition that the, "principal purpose of the APA limitations … is

to protect agencies from undue judicial interference with their lawful discretion, and to

avoid judicial entanglement in abstract policy disagreements which courts lack both

expertise and information to resolve."  Motion 5.  However, the entire sentence, with the

words omitted by Defendant in bold, is, "The principal purpose of the APA limitations

**we have discussed, and of the traditional limitations upon mandamus from which**

**they were derived –** is to protect agencies from undue judicial interference with their

lawful discretion and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve."

The issue decided in *Norton* was whether the authority of federal courts under the APA, 5 U.S.C. § 706(1), to "compel agency action unlawfully withheld or unreasonably delayed" applied to the Bureau of Land Management ("BLM"). *Id. at* 57. Specifically, the three claims at issue involved assertions that the BLM failed to take action with respect to off road vehicle use that it was allegedly required to take. *Id.* at 61. Acknowledging that an agency's failure to act is sometimes remediable under the APA, but not always, the Court began its analysis "by considering what limits the APA places upon judicial review of agency **inaction**." *Id.* (emphasis added). Therefore, the "APA limitations" cited by Defendant are not applicable in this case which involves a challenge to HUD's action of denying Plaintiff's request to renew its HAP Contracts under Option Four.

**II.    HUD'S REFUSAL TO APPROVE THE RENEWAL OF PLAINTIFF'S HAP CONTRACTS UNDER OPTION FOUR OF THE RENEWAL GUIDE IS ARBITRARY AND CAPRICIOUS AND NOT IN ACCORDANCE WITH LAW**

In his Motion for Summary Judgment, Defendant asserts that, "Because HUD appropriately followed the new regulation, its actions were neither arbitrary nor capricious." Motion 6. The "new" regulation referred to by Defendant is 24 C.F.R. § 401.100(b)[8] which states,

> Eligibility for a Restructuring Plan under paragraph (a) of this section is determined by the status of a project on the earlier of the termination or expiration date of the project-based assistance contract, which includes a contract renewed

---

[8] Although Defendant refers to 24 C.F.R. § 401.100(a) in part II of his Motion, the language quoted by Defendant is from 24 C.F.R. § 401.100(b). After part II of his motion, Defendant correctly refers to 24 C.F.R. § 401.100(b).

> under section 524 of MAHRA, or the date of the owner's request to HUD for a Restructuring Plan…

However, this regulation is invalid because (1) it was not validly adopted, (2) any reliance by HUD on this regulation is arbitrary and capricious because it departs from prior HUD precedent and HUD has not adequately explained the reasons for its departure from prior precedent and (3) it is contrary to the plain language of MAHRA.

### A. 24 CFR § 401.100(b) Was Not Promulgated In Accordance With The Administrative Procedure Act

HUD has implemented MAHRA through 24 C.F.R. Parts 401 and 402.  HUD has also implemented MAHRA through the Renewal Guide since it was issued in 2001. Parts 401 and 402 were first promulgated through an interim rule published on September 11, 1998.  63 Fed. Reg. 48926 *et seq.* (Sept. 11, 1998).  24 C.F.R. § 401.100 was not part of the interim rule.  *Id.*

HUD published a final rule implementing Part 401 on March 22, 2000.  65 Fed. Reg. 15452 *et seq.* (March 22, 2000).  As with the interim rule, 24 C.F.R. § 401.100 was not part of the final rule.  *Id.*

In the March 22, 2000 final rule, HUD stated that it would publish a separate final rule "for those sections of the interim rule that govern renewal of section 8 project-based assistance contracts for projects outside of the Mark-to-Market Program."  Id. at 15452. Accordingly, in the March 22, 2000 final rule, HUD stated it was "separating parts 401 and 402" and that "the rest of interim part 402 continues in effect until other changes to part 402 are published later as a separate final rule."  *Id.*  at 15453

HUD published its final rule implementing Part 402 on January 12, 2006.  71 Fed. Reg. 2111 *et seq.*  (Jan. 12, 2006).  In addition to the changes made to part 402, the

January 12, 2006 final rule also made some revisions to part 401, including adding
§ 401.100.

Prior to the adoption of 24 C.F.R. § 401.100(b), no printed HUD directive
authorized HUD to redetermine, at a "Subsequent Renewal," the status of a project that
had its "Initial Renewal" processed under Option Four.  In fact, as stated in Section 6-4A
of the Renewal Guide, before it was revised on December 12, 2006, "No 'lesser of' test is
required at subsequent renewal." *See* Ex. 2.[9]  Rather, the owner of a project that had the
"Initial Renewal" of its HAP Contract processed under Option Four, was entitled to a
"Subsequent Renewal" with new Contract Rents equal to the then current rents as
adjusted by an OCAF, unless the owner requested an adjustment on a budget basis.  *Id.*

The APA requires that "General notice of proposed rule making shall be
published in the Federal Register …"  5 U.S.C. § 553(b).  After a notice is published in
the Federal Register, an agency is required to "give interested persons an opportunity to
participate in the rule making through submission of written data, views, arguments …"
*Id.* at 553(c).[10]  These requirements of notice and comment "appl[y] to all rules except
'interpretative rules, general statements of policy or rules of agency organization,
procedure or practice.'"  *Batterton v. Marshall*, 648 F.2d 694, 701 (D.C. Cir. 1980)
(*quoting* 5 U.S.C. § 553(b)(3)(A)).  Accordingly, advance notice and public participation
are required for so-called legislative or substantive rules, i.e. rules that have substantive
legal effect.  *Id.* at 701-702.

---

[9] The "lesser of " test refers to the adjustment of a project's Contract Rents at "Initial Renewal" to the lesser
of the project's then current rents, as adjusted with an OCAF, or rents established on a budget basis.  *See*
Exs. 2 and 3, Section 6-2B.

[10] HUD has adopted similar notice and comment requirements.  *See* 24 C.F.R. Part 10.

HUD's "new" regulation, 24 C.F.R. § 401.100(b), conclusively determines whether a HAP Contract must be renewed in accordance with the restructuring provisions of Section 514 of MAHRA.  Therefore, 24 C.F.R. § 401.100(b) is a legislative rule that is subject to the notice and comment requirements of the APA.  *See Am. Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1112 (D.C. Cir. 1993) (holding that when a federal agency publishes a rule in the Federal Register it is a legislative rule, not an interpretive rule).  *Cf. Batterton*, 648 F.2d at 706 (Department of Labor methodology that conclusively determined the unemployment statistics which triggered federal emergency job program fund allocations was a legislative rule).

HUD did not publish 24 C.F.R. § 401.100(b) for notice and comment in the Federal Register.  Therefore, it must be invalidated.  *See Natural Resources Def. Council v. EPA,* 489 F.3d 1250, 1261 (D.C. Cir. 2007) (regulation that conflicts with plain meaning of statute must be vacated); *Batterton*, 648 F.2d at 711.  ("Normally, a judicial determination of procedural defect requires invalidation of the challenged rule") (citation omitted).  In turn, HUD's decision not to approve the renewal of Plaintiff's HAP Contracts under Option Four must be reversed since HUD's refusal to approve the renewal of Plaintiff's HAP Contracts under Option Four is based entirely on 24 C.F.R. § 401.100(b).

### B.     HUD's Reliance On 24 C.F.R. § 401.100(b) Is Arbitrary And Capricious

"This court emphatically requires that administrative agencies adhere to their own precedents or explain any deviation from them."  *Greyhound Corp. v. ICC,* 551 F. 2d, 414, 416 (D.C. Cir 1977) (citations omitted).  "[W]hen an agency decides to reverse its course, it must provide an opinion or analysis indicating that the standard is being

changed and not ignored, and assuring that it is faithful and not indifferent to the rule of law." *Id.* "Agency decisions that depart from established precedent without a reasoned explanation will be vacated as arbitrary and capricious." *Graphic Communications Int'l Union v. Salem-Gravure Div. of World Color Press, Inc.*, 843 F.2d 1490, 1493 (D.C. Cir. 1988).

HUD's "new" regulation, 24 C.F.R. § 401.100(b), deviates significantly from its prior practice. Instead of automatically permitting an exception project to have its "Subsequent Renewal" processed under Option Four, HUD now redetermines a project's status which could, as with Steinhorst Square Apartments, lead to HUD prohibiting the project from having its "Subsequent Renewal" processed under Option Four. HUD has not offered a "reasoned explanation" for its departure from its prior precedent. Therefore, HUD's refusal to approve the renewal of Plaintiff's HAP Contracts under Option Four is arbitrary and capricious and its decision must be reversed.

### C.    24 CFR § 401.100(b) Is Contrary to MAHRA

Defendant justifies HUD's refusal to approve the renewal of Plaintiff's HAP Contracts under Option Four on the basis that 24 C.F.R. § 401.100(b) is consistent with MAHRA and provides clarity to MAHRA by determining when eligibility for mortgage restructuring occurs. Motion 6-7. However, 24 C.F.R. § 401.100(b) is directly contrary to MAHRA. Therefore, any reliance by Defendant on 24 C.F.R. § 401.100(b) is inappropriate.

Section 524(c)(1) of MAHRA states,

**(c) Rent adjustments after renewal of contract.—**

**(1) Required.**—After the initial renewal of a contract for assistance under section 8 of the United States Housing Act of 1937 pursuant to subsection (a), (b)(1), or

17

(e)(2) [subsec. (a), (b)(1), or (e) of this section], the Secretary shall annually adjust the rents using an operating cost adjustment factor established by the Secretary (which shall not result in a negative adjustment) or, upon the request of the owner and subject to approval of the Secretary, on a budget basis.  In the case of projects with contracts renewed pursuant to subsection (a) or pursuant to subsection (e)(2) at rent levels equal to comparable market rents for the market area, at the expiration of each 5-year period, the Secretary shall compare existing rents with comparable market rents for the market area and may make any adjustments in the rent necessary to maintain the contract rents at a level not greater than comparable market rents or to increase rents to comparable market rents.

42 U.S.C. § 1437f note.  As conceded by Defendant, Plaintiff renewed its original HAP Contract under Section 524(b)(1) of MAHRA and Option Four of the Renewal Guide. Motion 3.  Therefore, in accordance with the plain, unambiguous language of Section 524(c)(1), HUD "shall annually adjust the rents using an operating cost adjustment factor."

Defendant asserts that Section 524(c)(1) "deals with *annual* rent adjustments to *ongoing* contracts, not contract renewal of expired contracts."  Motion 7 (emphasis in original).  However, Defendant provides no basis for, or authority in support of, this assertion.  This is because Defendant's assertion is incorrect.

For HAP Contracts renewed under Sections 524(a) or 524(e)(2), the second sentence of Section 524(c)(1) requires HUD, every five years, to compare a project's current rents with comparable market rents.  Based on this comparability study, the second sentence permits HUD to increase or decrease the project's rents to market.  Since a comparability study is required every five years, the second sentence of Section 524(c)(1) is clearly applicable to projects during the term of both an "Initial Renewal" and a "Subsequent Renewal."  Therefore, the first sentence of Section 524(c)(1),

consistent with the second sentence, can only be construed as applying to both ongoing contracts and the renewal of expired contracts.

Under the plain language of Section 524(c)(1), there is no exception to the mandate to "annually adjust the rents using an operating cost adjustment factor"; no distinction is made between annual adjustments to ongoing contracts after an "Initial Renewal" and adjustments at "Subsequent Renewal."  Therefore, HUD's attempt to compel Plaintiff to restructure its mortgage loan and **reduce** Plaintiff's Contract Rents, rather than adjusting them with an OCAF[11], is contrary to Section 524(c)(1) and "not in accordance with law."  *Cf. Chrysler Corp. v. Brown*, 441 U.S. 281, 318 (1979) (disclosure of information in violation of the Trade Secrets Act is "not in accordance with law" within the meaning of 5 U.S.C. § 706(2)(A)); *Louisville & N.R. Co. v. United States*, 268 F. Supp. 71, 75 (W.D. Ky. 1967) (holding that an administrative order that is based on an erroneous interpretation or misapplication of relevant statutory provisions is "not in accordance with law."), *rev'd on other grounds*, 392 U.S. 571 (1968).

Reinforcing the conclusion that 24 C.F.R. § 401.100(b) is contrary to Section 524(c)(1) of MAHRA is the fact that in 2002 Congress rejected a similar statutory provision.  Specifically, in January 2002, several amendments were made to MAHRA in connection with the enactment of the Mark-to-Market Extension Act of 2001 ("Extension Act") as part of the Departments of Labor, Health and Human Services, and Education, and Related Agencies Act, 2002.  *See* Pub. L. No. 107-116, 115 Stat. 2177, 2220-2228

---

[11] As stated in Section 524(c)(1), adjusting a project's Contract Rents with an OCAF "shall not result in a negative adjustment."

(2002).  This Act was necessary because all provisions of MAHRA, except for Section 524, expired on September 30, 2001.[12]

One of the major changes to MAHRA contained in the Extension Act was to the definition of Eligible Multifamily Housing Project contained in Section 512(2) of MAHRA. This amendment stated that, notwithstanding any of the provisions of Title V of the FY 1998 HUD Appropriations Act[13], a project may be treated by HUD as an Eligible Multifamily Housing Project if its HAP contract had been initially renewed under Section 524 of MAHRA, if "the owner consents to such treatment", and if the project met the requirements for eligibility as an Eligible Multifamily Housing Project before the initial renewal of its HAP Contract under Section 524 of MAHRA.

Although the principal motive for Congress in acting on and passing the Extension Act was to keep in force HUD's ability to restructure mortgage loans on Eligible Multifamily Housing Projects, the Act, as passed, contained several other provisions that were added during its consideration by Congress.

Hearings on the need to extend HUD's mark-to-market/ restructuring authority under MAHRA were held in the Senate Banking Committee on June 19, 2001. Among the witnesses were the HUD Assistant Secretary for Housing-FHA Commissioner, *See The Multifamily Assisted Housing Reform and Affordability Act of 1997: Hearing on Exploring the Success of the "Multifamily Assisted Housing Reform and Affordability Act of 1997" and the So-Called Mark-To-Market Legislation Before the S. Subcomm. on*

---

[12] Temporary extensions had been passed to keep MAHRA in effect until the Extension Act became law.

[13] MAHRA was originally enacted as Title V of the Departments of Veterans Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act, 1998.  *See* Pub. L. No. 105-65, 111 Stat. 1344, 1384 *et seq.* (1997).

*Housing and Transportation of the S. Comm. on Banking, Housing, and Urban Affairs,*
107th Cong. 4-6 (2001) (Statement of John C. Weicher), and the Director of the HUD
Office of Multifamily Housing Assistance Restructuring.  *Id.* 7-13 (Statement of Ira G.
Peppercorn).  This testimony principally sketched out the successes that had been
achieved under MAHRA and the need to maintain HUD's ability to continue its mark-to-
market/ restructuring activities for at least another three years. *Id.* No other specific
proposals were advanced, other than the placement of OHMAR under the direct
supervision of the Assistant Secretary for Housing, although a set of recommendations
was promised for later.  *Id.*

On July 26, 2001, Senator Sarbanes, Chairman of the Senate Banking Committee
introduced the Mark-to-Market Extension Act of 2001.  S. 1254, 107th Cong. (2001).  As
introduced, S. 1254 contained a proposed amendment to Section 512(2) of MAHRA that
included within the definition of an Eligible Multifamily Housing Project a project
determined by HUD as having rents that exceeded the rents of comparable properties in
the same market area "prior to, and notwithstanding, any renewal of project-based
assistance" under MAHRA. *Id.*

This bill was referred to the Banking Committee and reported out of the
Committee on August 1, 2001 with an amendment. *Id.*  The sole amendment, found in
Section 9 of the bill, related to directing the submission of annual reports to the Congress
by the Comptroller General of the United States. *Id.*  No Committee Report accompanied
the reported bill.  The Senate never acted on S. 1254.

In the House of Representatives, Rep. Roukema, the Chair of the Subcommittee
on Housing and Community Opportunity of the Financial Services Committee,

introduced the Mark-to-Market Extension Act of 2001, on July 23, 2001. H.R. 2589, 107th Cong. (2001). No hearings were held on the bill and it was ordered reported by the Financial Services Committee on July 25, 2001, without amendment. The Committee issued a report on September 5, 2001. *See* H.R. Rep. No. 107-196 (2001).

As introduced and reported out of committee, H.R. 2589 only provided for the extension of MAHRA, other than Section 524 which was permanent, to September 30, 2004 and the assignment of oversight over the mark-to-market restructuring program to the HUD Assistant Secretary for Housing.

H.R. 2589 was taken up on the floor of the House of Representatives under Suspension of the Rules on September 24, 2001. As presented to the House, H.R. 2589 went significantly beyond the provisions of the bill as introduced and subsequently reported out of the Financial Services Committee. As stated by Rep. Green of Wisconsin, the floor manager of the bill, the revised bill presented to the House "represents a House-Senate consensus." 147 Cong. Rec. H5952 (daily ed. Sept. 24, 2001).

Rep. Carson of Indiana, who was managing the bill on the floor for the minority stated:

> "The bill before us differs somewhat from the bill passed by voice vote in the Committee on Financial Services in July. However, the changes represent informed bipartisan, bicameral discussions that have taken place over the last few months. The final product is a good consensus bill with bipartisan support…" *Id.* at H5954.

These remarks were echoed by Rep. Barney Frank, the ranking minority member of the Subcommittee on Housing and Community Opportunity who stated in reference to the bill, "This is bipartisan. It is bicameral." *Id.* at H5954.

Rep. Oxley, Chairman of the Financial Services Committee stated in an insert for the Congressional Record, "The Committee majority and minority staff worked with our Senate counterparts…. Moreover, this Committee worked with the Administration and the Department of Housing and Urban Development to accommodate their concerns." *Id.* at H5955.

H.R. 2589 was approved by the House on September 24, 2001 by a voice vote, *Id.*, and sent to the Senate where no action was taken. However, on October 11, 2001, the House took up and passed H.R. 3061, the Departments of Labor, Health and Human Services, and Education and Related Agencies Appropriations Act for the fiscal year ending September 301, 2002. Included in the bill, as Title VI, was the text of H.R. 2589, the Mark-to-Market Extension Act of 2001, as passed by the House in September2001. *See* 147 Cong. Rec. H6662-6664 (daily ed. Oct. 11, 2001). The President signed H.R. 3061 on January 10, 2002. *See* Pub. L. No. 107-116, 115 Stat. 2177 *et seq.* (2002). Title VI of that Act, the Extension Act, is identical to H.R. 2589 as approved by the House. *Id.*, 115 Stat. 2220-2228.

While the Extension Act incorporated several of the provisions of S. 1254 as reported by the Senate Banking Committee, such as the extension of MAHRA to September 30, 2006 rather than to September 30, 2004, as included in H.R. 3061 and reported by the House Committee on Financial Services, the Act did not include the language of Section 4(8) of the Senate bill amending Section 512(2) of MAHRA to include within the definition of an Eligible Multifamily Housing Project a project whose rents HUD determines exceeded the rents of comparable projects in the same market area "prior to, and notwithstanding, any renewal of project-based assistance" under MAHRA.

The only comparable provision contained in the Extension Act was Section 612(f) which amended Section 512(2) of MAHRA to permit HUD to treat a project as an Eligible Multifamily Housing Project with the owner's consent, if the project is assisted pursuant to a Section 8 contract which had been renewed under Section 524 of MAHRA and the project had met the other requirements of Section 512(2) before its initial renewal under Section 524.

Since the enactment of the Extension Act, there have been no other amendments to either Section 512(2) or Section 524 of MAHRA that would affect the status of Steinhorst Square Apartments as an exception project. Therefore, the renewal of Plaintiff's HAP Contracts is governed solely by Section 524(c) of MAHRA and the project's mortgage loan is not subject to restructuring.

### D.    Defendant's Interpretation Is Not Entitled To Deference

A court reviewing an agency action is to apply a two-step framework to issues of statutory construction. First, the court must ask "whether Congress has directly spoken to the precise question at issue." If so, the court "must give effect to the unambiguously expressed intent of Congress." *Arizona v. Thompson*, 281 F.3d 248, 253 (D.C. Cir. 2002) *quoting Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984). If the statute is silent or ambiguous, the court moves to the second step and defers to the agency's interpretation as long a it is "based on a permissible construction of the statute". *Id.*

Congress has spoken to the precise issue in question. As discussed above, Section 524(c)(1) of MAHRA requires that once a HAP Contract is renewed under Section 524(b)(1) of MAHRA, the Contract Rents specified in the contract must be renewed

annually using an OCAF.   Therefore, since 24 C.F.R. § 401.100(b) is contrary to this express statutory mandate, Defendant's interpretation is not entitled to deference.

Plaintiff does not disagree with Defendant's assertion that when *Chevron* is not applicable, an agency's interpretation is still entitled to respect.  Motion 8.  However, the weight given to an agency interpretation depends "upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control."  *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).

As discussed above, 24 C.F.R. § 401.100(b) is contrary to the manner in which HUD previously processed the "Subsequent Renewal" of the HAP Contract of an exception project.  Moreover, Defendant has not provided a reasoned explanation for HUD's departure from prior precedent.  Therefore, HUD's interpretation is not entitled to *Skidmore* respect.  Similarly, Defendant's interpretation is not entitled to any deference under either *Central South Dakota Cooperative Grazing District v. Sec'y of Agriculture*, 266 F.3d 889 (8th Cir. 2001), because this case does not involve "a high level of expertise," or *Metro. Stevedore Co. v. Rambo*, 521 U.S. 121 (1997), because HUD's interpretation is not reasonable.

Defendant also infers that his interpretation is entitled to deference or respect because it supports the objective of MAHRA to reduce long-term costs of the Section 8 Program.  Motion 9.  However, since Defendant's interpretation is contrary to the express provisions of MAHRA, it cannot stand under *Chevron* and its progeny.  Moreover, the reduction of long-term costs of the Section 8 Program is only one of the many objectives of MAHRA.  *See* MAHRA, Sections 511(b)(1)-(9).  In addition, MAHRA expressly

permits some projects to charge above-market rents. Therefore, meeting one of MAHRA's objectives, is not an adequate reason for according Defendant's interpretation deference or respect.

### III.    NEITHER HUD NOR THE PUBLIC INTEREST WILL BE HARMED IF THE COURT ISSUES AN INJUNCTION

Under the APA, "agency action **must** be set aside if the action was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 414 (1971) (*quoting* 5 U.S.C. § 706(2)(A)) (emphasis added). If the Court determines that HUD's decision not to approve the renewal of Plaintiff's HAP Contracts under Option Four is arbitrary and capricious or not otherwise in accordance with law, the Court will be required to reverse HUD's decision. Therefore, whether HUD or the public interest will be harmed by any such decision is not a valid basis for not providing the relief to which Plaintiff would otherwise be entitled. However, neither HUD nor the public interest will be harmed by the granting of an injunction consistent with a declaratory judgment by the Court in favor of Plaintiff.

Defendant treats MAHRA as if it established a single means for dealing with the renewal of HAP contracts upon the expiration of their initial terms. That is not true. There were a variety of circumstances surrounding these HAP contracts and their initial terms. Congress recognized this when it drafted MAHRA, especially the changes made in 1999 when Section 524 of MAHRA was put in its present form. While Congress sought to reduce contract rents in excess of the market, it also recognized that one approach did not fit all circumstances. It realized that in seeking to achieve the goal of

reducing rents to the market, it had to be careful to safeguard projects for which severe rent reductions would result in severe economic consequences for the project.

Thus, Congress sought to ease the impact of these reductions when they were significant by providing for mortgage restructuring for those loans that were insured or held by HUD's Federal Housing Administration ("FHA") and where FHA could absorb the impact of the contract rent reduction in conjunction with FHA's ultimate responsibility for the mortgage debt if it is not paid by the owner. This is the traditional mark-to-market restructuring approach.

In other cases, Congress recognized that HUD's interests were shared with other parties, including those holding mortgages not insured by FHA and mortgage loans from State and local governments and their housing agencies with or without FHA insurance. Congress recognized that these other parties played a significant role in financing needed low-income housing.

Most Section 8 projects were and are owned by private profit-motivated and non-profit entities. Congress also recognized that the continued involvement of these private owners could not be expected, if rents were reduced to a non-sustainable level.

In recognition of these distinctions, Congress structured the provisions of MAHRA for the continued assistance to these latter groups of projects, so as to not undermine the continued financial health of these important participants. Where State and local government lenders and owners without FHA mortgages were involved, Congress set an initial renewal rent approach that gave an owner a continued rent based on the lower of its then current rents as adjusted by an OCAF or a budget-based rent

determined by the project's operating and mortgage costs.  Where this resulted in reduced rents, the federal government saved money.

In addition, Congress structured MAHRA so as to provide in Section 524(c) for exception project owners certainty as to the calculation of their future contract rents. This decision served the major public interest of keeping as broad a base of low-income project ownership as possible and assuring the State and local governments would continue to play a major role in financing these projects.  That public-private partnership is dishonored by subsequent rule changes to the possible detriment of the owner and its lender.

Defendant attempts to give the impression that every dollar not spent because rents have been reduced could go to "maximize the number of families that can be helped."  Motion 2 and 10.  Defendant offers no substantiation to support this contention or his further contention that "it would risk HUD's ability to preserve low income housing and availability", Motion 11, if the injunction sought by Plaintiff is issued. Significantly, Defendant does not contend that HUD or the public interest suffered any harm during the many years, 1997-2006, prior to HUD's adoption of 24 C.F.R. § 401.100(b) in January 2006, during which HUD's policy was:  once an exception project, always an exception project.

Defendant tries to draw a direct line between money it might save by not living up to its statutory obligations and the number of families that can be helped, ignoring the fact that Section 8 HAP Contract renewals shall only occur "to the extent sufficient amounts are made available in Appropriation Acts."  Section 524 (a)(1).  Accordingly, any funds saved through restructuring would not be available except to the extent

expressly authorized in an Appropriations Act and no moneys could be appropriated for

additional new construction or substantial rehabilitation Section 8 projects, since the

statutory authority for such projects was repealed effective October 1, 1983.  Pub. Law

No. 98-181, § 209, 97 Stat. 1153, 1183 (1983).

**CONCLUSION**

For the reasons discussed above, Defendant's Motion for Summary Judgment

should be denied.

Respectfully submitted,

September 11, 2007

/s/ Carl A.S. Coan, Jr.
Carl A.S. Coan, Jr. (D.C. Bar No. 89466)
Carl A.S. Coan, III (D.C. Bar No. 358034)
Coan & Lyons
1100 Connecticut Avenue, N.W.
Suite 1000
Washington, DC 20036
Phone No. 202-728-1070
Fax No. 202-293-2448

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA

STEINHORST ASSOCIATES

v.

ALPHONSO JACKSON, in his capacity as
Secretary of the United States
Department of Housing and Urban Development

Civil Action No. 07-813(HHK)

PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT

EXHIBIT 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| STEINHORST ASSOCIATES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 07-813(HHK) |
| | ) | |
| ALPHONSO JACKSON, in his capacity as | ) | |
| Secretary of the United States Department of | ) | |
| Housing And Urban Development, | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DECLARATION OF GERALD SLAVET

I, Gerald Slavet, make the following declarations under penalty of perjury:

1. I am a citizen of the United States, over the age of 21 and am competent to testify to the matters contained herein.

2. I am a General Partner of Steinhorst Associates, the owner of Steinhorst Square Apartments ("Steinhorst Square"), a 100-unit rental apartment project in Utica, New York, developed for occupancy by low-income elderly families and individuals.

3. Steinhorst Square was developed in two stages. The first stage was the construction of sixty units built under HUD's Section 8 New Construction Program. The second stage was the rehabilitation of forty units that were rehabilitated under HUD's Section 8 Substantial Rehabilitation Program.

4. The development of Steinhorst Square was financed by a mortgage loan, the proceeds of which were provided through the issuance in 1980 of Mortgage Revenue Bonds by the Utica Senior Citizens Housing Corporation, a New York not-for-profit

corporation and an instrumentality of the Housing Authority of the City of Utica, New York ("Authority"). The terms of the mortgage loan are specified in a Mortgage Note that is insured by the Federal Housing Administration of the U.S. Department of Housing and Urban Development ("HUD"), under Section 221(d)(4) of the National Housing Act, and in the Mortgage executed by Steinhorst Associates to secure its mortgage loan.

5. In 1996, the Utica Senior Citizen Housing Corporation refunded the Mortgage Revenue Bonds it had issued in 1980 with a new issue of Mortgage Revenue Bonds. In connection with the 1996 bond refunding, the Steinhorst Square Mortgage Note was amended to prohibit prepayment of the Steinhorst Square mortgage loan before April 15, 2006. Prepayment between April 15, 2006 and April 15, 2008 will incur a prepayment penalty.

6. Steinhorst Associates entered into a housing assistance payments ("HAP") contract with the Authority under Section 8 of the United States Housing Act of 1937, covering 99 of the 100 units at Steinhorst Square. The contract was effective in two stages. Stage 1 covering 59 units was effective September 7, 1981 and Stage 2 covering 40 units was effective November 12, 1981. This assistance covers the difference between the contract rents established from time to time by HUD and 30% of each tenant's adjusted gross income.

7. The original HAP contract was for a term of 20 years and upon its expiration in 2001, it was split into two contracts and renewed under Option Four of HUD's Section 8 Renewal Guide ("Guide"), based on a determination by HUD that Steinhorst Square was an exception project. A Renewal HAP Contract for each stage was executed in

November 2001. The Stage 1 contract was effective September 1, 2001 and the Stage 2 contract was effective November 12, 2001. The term of each contract was five years.

8. Several months before the expiration of the 2001 Steinhorst Square HAP Contracts, HUD told MB Management Company, the management agent for Steinhorst Square, that Steinhorst Square would not automatically be considered an exception project when the two HAP Contracts expired later that year. Instead, HUD informed MB that HUD would make a determination, at the time the Renewal HAP Contracts expired, whether Steinhorst Square was still exempt from the rent reduction and mortgage restructuring requirements of Section 514 of MAHRA.

9. On November 30, 2006, Steinhorst Associates, through its management agent for the project, requested a further renewal of its HAP contracts for a term of 20 years, in accordance with Option Four of the Guide, as in effect on November 30, 2006. The contract rents requested for this second renewal were at the rents in effect when the HAP contracts expired, as adjusted by an operating cost adjustment factor established by HUD.

10. In January 2007, HUD denied Steinhorst Associates' November 30, 2006 request to renew the Steinhorst Square HAP contracts for 20 years under Option Four of the Guide. HUD has refused to approve the request of Steinhorst Associates for a 20-year renewal, or for a renewal for any term, unless Steinhorst Associates agrees to seek a renewal under one of the other options specified in the Guide.

I declare under penalty of perjury that the forgoing statements are true.


9/10/07
_____
Date

_____
Gerald Slavet

UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA

STEINHORST ASSOCIATES

v.

ALPHONSO JACKSON, in his capacity as
Secretary of the United States
Department of Housing and Urban Development

Civil Action No. 07-813(HHK)

PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT

EXHIBIT 2

## Chapter Six

# Option Four  *Renewal of Projects Exempted from OMHAR*

## ELIGIBILITY

### Section 6-1

Certain project types are not eligible for OMHAR even though the contract rents may exceed market.  Projects without FHA-insured loans are exempt, as are certain FHA-insured properties.

Specifically, the following projects are identified by the statute as "exception projects."

A.  <u>Definition</u>.  Section 524(b) of MAHRA defines "exception projects" as those that may be renewed at rents above market.  Projects fitting one of the following characteristics may renew under Option Four as an "exception project."

    1.  <u>State or Local Government financing</u>.  Projects for which the primary financing or mortgage insurance was provided by a unit of State government or a unit of general local government (or an agency or instrumentality of either) and is not insured under the National Housing Act.

    However, if the primary financing or mortgage insurance is provided by a State government or a unit of general local government, and the financing involves mortgage insurance under the National Housing Act, a determination must be made by OMHAR as to whether or not implementation of a Mark-to-Market Restructuring Plan is in conflict with applicable law, or agreements governing such financing. In these cases, the contract and supporting documentation of the potential conflict must  be referred to OMHAR for review.  The owner (or lender) must submit an opinion of counsel in a form acceptable to HUD, along with copies of the relevant financing documents or applicable local or State legal authority.

Upon receipt of the Owner's documentation, OMHAR will complete its review and notify the PM/CA of its determination generally within 5 business days.

In cases where OMHAR determines that the contract is eligible for debt restructuring, the PM/CA will notify the owner that a RCS is required. If the RCS demonstrates that the rents are above market, the project will be renewed for six months using the  Contract for Entry Into OMHAR and OMHAR will process the renewal.

*Note:  In cases where referral to OMHAR is necessary, CAs must return the contract to the PM with the recommendation that the PM forward the contract to OMHAR for review.*

In cases where OMHAR determines that the Restructuring Plan would be in conflict with applicable laws and/or agreements, OMHAR will return the case to the Project Manager or Contract Administrator for a renewal under the Option Four provisions.

2. Section <u>202/8 and 515/8 Projects</u>.  Projects currently financed under Section 202 of the Housing Act of 1959 or Section 515 of the Housing Act of 1949.  However, these projects can be eligible for restructuring if refinanced with FHA mortgage insurance.  Section 202 and 811 Capital Advance projects are not eligible because they do not have Section 8 contracts.

3. <u>SRO Mod Rehab</u>.  Projects that have an expiring contract under Section 8 of the United States Housing Act of 1937 pursuant to Section 441 of the Stewart B. McKinney Homeless Assistance Act.

4. <u>Section 512 (2) of MAHRA</u>. Projects that do not qualify as eligible multifamily housing projects pursuant to Section 512(2) of MAHRA include:

   a. a project that is not subject to a HUD-held or insured mortgage; or,

   b. a project that has FHA mortgage insurance or is HUD-held with rents at or below comparable market rents.

   *For an Owner of an FHA-insured or HUD-held project to claim eligibility under 4b, they must obtain a RCS.*

## INITIAL AND SUBSEQUENT RENEWALS

## Section 6-2

A. <u>Owner submission</u>.  At least 120 days before contract expiration, the owner submits:

1. **Contract Renewal Request Form and OCAF Worksheet.**  The Renewal Worksheet documents the owner's option selection and the OCAF-adjusted rent potential.

2. **Budget.**  A Budget and rent schedule must be completed in accordance with the requirements of HUD Handbook 4350.1, Chapter 7, or the RHS approved budget, and Attachment 5.

3. **RCS.**  For an FHA-insured or HUD-held project that is requesting renewal (as described in Section A.4. above), a RCS must demonstrate that the project's current rents are at or below comparable market rents.

4. If the primary financing or mortgage insurance is provided by a State government or a unit of general local government, and the financing involves mortgage insurance under the National Housing Act:

   1. Copies of the original financing documents and,
   2. The under lying statutory authority which the Owner believes conflicts with a mark-to-market restructuring plan, and,
   3. Counsel's opinion as to the conflict

B. <u>Rent Determination</u>.  Based on the documentation submitted by the owner, the initial renewal rents shall be set at the lesser of:

1. **Current Rents + OCAF.**  The current rent potential of the expiring Section 8 contract(s) adjusted by the published OCAF; or

2. **Budget.**  The rent level required to meet operating expenses based on the format required by HUD Handbook 4350.1, Chapter 7 and Attachment 5, and submitted with the request for renewal.

   a. If the project had a budget approved by HUD less than one year before processing the initial renewal, a copy of that budget may be submitted in lieu of a new budget, unless the Owner refinanced the project.

   b. The "lesser of" test is conducted only once, at the contract's initial renewal under section 524 of MAHRA.  Once the contract undergoes the "lesser of" test, it does not have to repeat the test again at subsequent renewal or at any rent adjustments during a multi year contract.

## RENT ADJUSTMENTS FOR MULTI YEAR CONTRACTS

**Section 6-3**

For multi year contracts, at least 120 days before the anniversary date of the contract, the owner should submit:

1. OCAF Worksheet, Attachment 3; or

2. A budget-based rent increase request. If requesting a budget based rent adjustment, the rent level required to meet operating expenses based on the format required by HUD Handbook 4350.1, Chapter 7 and Attachment 5, must be submitted with the request.

## SUBSEQUENT RENEWALS

## Section 6-4

A. No "lesser of" test is required at subsequent renewal. An owner can receive either an OCAF adjustment or a budget based adjustment to the rent.

B. Owner Submission. At least 120 days before expiration of the Section 8 contract, the owner should submit:

1. The Contract Renewal Request Form and OCAF Worksheet.

2. If the Owner requests a budget-based rent increase, a budget prepared in accordance with HUD Handbook 4350.1, Chapter 7.

## PROCESSING INSTRUCTIONS

## Section 6-5

A. PM/CA Review. The PM should complete his/her review within 45 calendar days or whatever period is required to allow sufficient time for processing the contract renewal.

B. The PM/CA checks to see:

1. That the owner requested to renew under Option Four, *Renewal of Contract for Projects Exempted From OMHAR;*

2. If the Owner is eligible to renew the section 8 project-based contract under Option Four;

3. That the Owner submitted all the required documentation. For example:

    a. Contract Renewal Request Form and OCAF Worksheet;

b.  A Rent Comparability Study, if applicable, prepared in accordance with Chapter Nine of this Guide;

c.  A budget-based rent adjustment, prepared in accordance with Chapter Seven of HUD Handbook 4350.1.

4.  If the Owner specified on the Cover Sheet of the Contract Renewal Request Form whether they wanted any multiple stages or contracts combined at this time. See instructions provided in Chapter Two of this Guide.

C.  Review the Owner's certification regarding suspension or debarment on the worksheet. If the Owner checked that they are not suspended or debarred, verify that information by using the www.ARNet.gov/epls/.

D.  If it is determined that the Owner is suspended or debarred, HUD will permit the Owner to renew the Section 8 contract if the project(s) in question ~~are adequately managed and maintained, and activities there~~ were not the cause of the administrative actions against the Owner.

E.  Log the owner's request as indicated on Contract Renewal Request Form and any other relevant information in the REMS system.

F.  Prepare a 524(b) contract renewal.

1.  Initial renewals shall be at the lesser of the current rents adjusted by OCAF or the budget-based rent level.

2.  Rent Adjustments during term of multi year contracts shall be by:

a.  Application of OCAF, or

b.  Application of budget-based method.

3.  At subsequent renewals, apply the appropriate rent adjustment method:

a.  OCAF; or

b.  budget-based and;

c.  Apply the appropriate term for the contract.

---

UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA


STEINHORST ASSOCIATES


v.


ALPHONSO JACKSON, in his capacity as
Secretary of the United States
Department of Housing and Urban Development


Civil Action No. 07-813(HHK)


PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT


EXHIBIT 3

## Chapter Six

# Option Four *Renewal of Projects Exempted from OMHAR*

## ELIGIBILITY

### Section 6-1

Certain project types are not eligible for OMHAR even though the contract rents may exceed market. Projects without FHA-insured loans are exempt, as are certain FHA-insured properties.

Specifically, the following projects are identified by the statute as "exception projects."

A. Definition. Section 524(b) of MAHRA defines "exception projects" as those that may be renewed at rents above market. Projects fitting one of the following characteristics may renew under Option Four as an "exception project."

1. State or Local Government financing. Projects for which the primary financing or mortgage insurance was provided by a unit of State government or a unit of general local government (or an agency or instrumentality of either) and is not insured under the National Housing Act.

   However, if the primary financing or mortgage insurance is provided by a State government or a unit of general local government, and the financing involves mortgage insurance under the National Housing Act, a determination must be made by OMHAR as to whether or not implementation of a Mark-to-Market Restructuring Plan is in conflict with applicable law, or agreements governing such financing. In these cases, the contract and supporting documentation of the potential conflict must be referred to OMHAR for review. The owner (or lender) must submit an opinion of counsel in a form acceptable to HUD, along with copies of the relevant financing documents or applicable local or State legal authority.

Upon receipt of the Owner's documentation, OMHAR will complete its review and notify the PM/CA of its determination generally within 5 business days.

In cases where OMHAR determines that the contract is eligible for debt restructuring, the PM/CA will notify the owner that a RCS is required. If the RCS demonstrates that the rents are above market, the project will be renewed for six months using the  Contract for Entry Into OMHAR and OMHAR will process the renewal.

*Note:  In cases where referral to OMHAR is necessary, CAs must return the contract to the PM with the recommendation that the PM forward the contract to OMHAR for review.*

In cases where OMHAR determines that the Restructuring Plan would be in conflict with applicable laws and/or agreements, OMHAR will return the case to the Project Manager or Contract Administrator for a renewal under the Option Four provisions.

2. Section 202/8 and 515/8 Projects.  Projects currently financed under Section 202 of the Housing Act of 1959 or Section 515 of the Housing Act of 1949. However, these projects can be eligible for restructuring if refinanced with FHA mortgage insurance. Section 202 and 811 Capital Advance projects are not eligible because they do not have Section 8 contracts.

3. SRO Mod Rehab.  Projects that have an expiring contract under Section 8 of the United States Housing Act of 1937 pursuant to Section 441 of the Stewart B. McKinney Homeless Assistance Act.

4. Section 512 (2) of MAHRA. Projects that do not qualify as eligible multifamily housing projects pursuant to Section 512(2) of MAHRA include:

   a.  a project that is not subject to a HUD-held or insured mortgage; or,

   b.  a project that has FHA mortgage insurance or is HUD-held with rents at or below comparable market rents.

      *For an Owner of an FHA-insured or HUD-held project to claim eligibility under 4b, they must obtain a RCS.*

## INITIAL AND SUBSEQUENT RENEWALS

## Section 6-2

A. Owner submission. At least 120 days before contract expiration, the owner submits:

1. **Contract Renewal Request Form and OCAF Worksheet.** The Renewal Worksheet documents the owner's option selection and the OCAF-adjusted rent potential.

2. **Budget.** A Budget and rent schedule must be completed in accordance with the requirements of HUD Handbook 4350.1, Chapter 7, or the RHS approved budget, and Attachment 5.

3. **RCS.** For an FHA-insured or HUD-held project that is requesting renewal (as described in Section A.4. above), a RCS must demonstrate that the project's current rents are at or below comparable market rents.

4. If the primary financing or mortgage insurance is provided by a State government or a unit of general local government, and the financing involves mortgage insurance under the National Housing Act:

   1. Copies of the original financing documents and,
   2. The under lying statutory authority which the Owner believes conflicts with a mark-to-market restructuring plan, and
   3. Counsel's opinion as to the conflict.

B. Rent Determination. Based on the documentation submitted by the owner, the initial renewal rents shall be set at the lesser of:

1. **Current Rents + OCAF.** The current rent potential of the expiring Section 8 contract(s) adjusted by the published OCAF; or

2. **Budget.** The rent level required to meet operating expenses based on the format required by HUD Handbook 4350.1, Chapter 7 and Attachment 5, and submitted with the request for renewal.

   If the project had a budget approved by HUD less than one year before processing the initial renewal, a copy of that budget may be submitted in lieu of a new budget, unless the Owner refinanced the project.

# RENT ADJUSTMENTS FOR MULTI YEAR CONTRACTS

## Section 6-3

For multi-year contracts, at least 120 days before the anniversary date of the contract, the owner should submit:

1. OCAF Worksheet, Attachment 3; or

2. A budget-based rent increase request.  If requesting a budget based rent adjustment, the rent level required to meet operating expenses based on the format required by HUD Handbook 4350.1, Chapter 7 and Attachment 5, must be submitted with the request.

## SUBSEQUENT RENEWALS

## Section 6-4

A. The "lesser of" test is required at subsequent renewal.  (24 CFR §402.5(b)).

B. Owner Submission.  At least 120 days before expiration of the Section 8 contract, the owner should submit:

1. The Contract Renewal Request Form and OCAF Worksheet; and

2. A budget prepared in accordance with HUD Handbook 4350.1, Chapter 7.

## PROCESSING INSTRUCTIONS

## Section 6-5

A. PM/CA Review.  The PM should complete his/her review within 45 calendar days or whatever period is required to allow sufficient time for processing the contract renewal.

B. The PM/CA checks to see:

1. That the owner requested to renew under Option Four, *Renewal of Contract for Projects Exempted From QAHP;*

2. If the Owner is eligible to renew the section 8 project-based contract under Option Four;

3. That the Owner submitted all the required documentation.  For example:

   a. Contract Renewal Request Form and OCAF Worksheet;

   b. A Rent Comparability Study, if applicable, prepared in accordance with Chapter Nine of this Guide;

   c. A budget-based rent adjustment, prepared in accordance with Chapter Seven of HUD Handbook 4350.1.

4. If the Owner specified on the Cover Sheet of the Contract Renewal Request Form whether they wanted any multiple stages or contracts combined at this time. See instructions provided in Chapter Two of this Guide.

C. Review the Owner's certification regarding suspension or debarment on the worksheet. If the Owner checked that they are not suspended or debarred, verify that information by using the www.epls.gov.

D. If it is determined that the Owner is suspended or debarred, HUD will permit the Owner to renew the Section 8 contract if the project(s) in question were not the cause of the administrative actions against the Owner.

E. Log the owner's request as indicated on Contract Renewal Request Form and any other relevant information in the REMS system.

F. Prepare a 524(b) contract renewal.

1. Renewals shall be at the lesser of the current rents adjusted by OCAF or the budget-based rent level.

2. Rent Adjustments during term of multi year contracts shall be by:

a. Application of OCAF, or

b. Application of budget-based method.

UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA


STEINHORST ASSOCIATES


v.


ALPHONSO JACKSON, in his capacity as
Secretary of the United States
Department of Housing and Urban Development


Civil Action No. 07-813(HHK)


PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT


EXHIBIT 4

**Mulholland, Kerry J**

| | |
|---|---|
| **From:** | Kerry J. Mulholland [kerry.j.mulholland@hud.gov] |
| **Sent:** | Thursday, January 18, 2007 12:50 PM |
| **To:** | aboyle@NHHFA.org; anne.christensen@wheda.com; anng@hacanet.org; annh@hacanet.org; antoinette.thornton@cgi.com; asharkey@masshousing.com; Alsmith@DHCR.State.Ny.US; bjackson@inquadel.com; bjbradstreet@mainehousing.org; bob.vandenhoek@state.mn.us; bporter@kshousingcorp.org; bradk@hacanet.org; brian.m.adams@cgi.com; BGerwig@maconhousing.com; Bruce.tant@sha.state.sc.us; calvarado@prhfc.com; calvarado@prhfc.gobierno.pr; cameron.oyen@state.mn.us; carold@housingaz.com; cathyr@vsha.org; cbloom@aahsa.org; chaseD@kccha.org; WY-Buffalo, Michael Stanfield; cha_mstotts@vcn.com; cheryl@paulhus.net; clarenceb@thafl.com; cmiller@nhhfa.org; cnelson@contractmgmt.org; Cheryl.Jett@state.tn.us; darrell.beavers@OHFA.org; dbokel@quadel.com; ddrost@mainehousing.org; deboragreathouse@wvhdf.com; deirdre.young@cgi.com; demby@dhcd.state.md.us; devans@phfa.org; dgiffin@mhdc.com; djohnson@mainehousing.org; dkeene@masshousing.com; dmorton@renoha.org; dmuha@hudnlha.com; dons@thafl.com; dsims@mhdc.com; eddie.williams@cgi.com; emilys@hacanet.org; estrong@jeffcohousing.com; fdorwart@phfa.org; Fred.h@eps-tracs.com; geralda@hacanet.org; gparker@mainehousing.org; grieman@ncsha.org; gwoliver@evergreen-solutions.net; hlevandowski@ncquadel.com; hominc@vcn.com; HMukasa@masshousing.com; isaihh@hacanet.org; james.branck@cgi.com; james.vanloan@cgi-ams.com; jboardman@Mainehousing.org; jcaufield@renoha.org; jclaus@icapllc.com; jennifer@vsha.org; jenniferp@hacanet.org; jgordon@rihousing.com; jmagoon@nhhfa.org; john.marshall@ohfa.org; john.ward@state.mn.us; joseph.deangelis@cgi.com; jrobotti@dhcr.state.ny.us; jsturk@mainehousing.org; julieW@IHFA.org; jwirrick@ghaca.org; JosephR@kccha.org; JulieW@IHFA.ORG; katherine.papp@cgi.com; kenneth.nicholson@cgi.com; knagel@phfa.org; krista.turner@state.mn.us; KathyB@vsha.org; lemillano@caquadel.com; lfarner@oakha.org; ND-NDHFA, Larry Stockert; linda@vsha.org; lisa@sdhda.org; lnewport@phfa.org; lpierce@ahscohio.org; ltreamer@nhhfa.org; lucie.du@mmam.net; markf@colohfa.org; marlys.laver@hcs.state.or.us; matthew.perry@hcs.state.or.us; MT-MDOC, Maureen Martin; mbrown@mainehousing.org; mcmillando@michigan.gov; michael.kramer@cgi.com; michaelo@hacanet.org; misi@paulhus.net; mmaher@hacla.org; mmccunniff@housingnm.org; mstaton@njhmfa.state.nj.us; IND-IHFA State, M Young; Marybeth.Carragher@cgi.com; nancym@hacanet.org; nancyparsons@wvhdf.com; ndowdy@dc-ahsc.org; nyspbca@dhcr.state.ny.us; pamela.dodson@hcdch.hawaii.gov; panos.kyprianou@cgi.com; paulas@housingaz.com; pekimball@nchfa.com; rhonda.watson@ohfa.org; robert.dwyer@cgi.com; roger.brown@iowa.gov; rosullivan@quadel.com; roxie@roxiemunn.com; rwilliams@kshousingcorp.org; RAE_Ellen.Packard@WHEDA.com; Richard.hutto@sha.state.sc.us; sbourrie@mainehousing.org; scnewsom@nchfa.com; scochran@ahscohio.com; scollier@mhdc.com; sgbelcredi@nchfa.com; sharon.dahle@hcs.state.or.us; sharon@destatehousing.com; skenney@nhhfa.org; smannix@mt.gov; smithke@dhcd.state.md.us; smonaghan@rihousing.com; ssutton@kyhousing.org; stacey.tisch@cgi.com; stevenr@ihfa.org; suzannec@hacanet.org; SCochran@ahscohio.com; tammyf@hacanet.org; tbutler@ahfc.state.ak.us; tereza.buzdon@cgi.com; tjohnson@renoha.org; tony.gorris@cgi.com; tperkins@nhhfa.org; tshackelford@lhfa.state.la.us; vhilton@lhfa.state.la.us; vlockwood@lhfa.state.la.us; vona@sdhda.org; vtodaro@ghaca.org; vwilson@ahfc.state.ak.us; wclark@mhdc.com; whintz@ndhfa.org; zakrzewskim@michigan.gov; zanettij@michigan.gov |
| **Subject:** | Option 4 Renewals and the lesser of test |

On December 20, 2006, HUD issued the new instructions for the renewal of Section 8 contracts under option 4, renewal of projects exempted from OMHAR. Specifically at initial and subsequent renewal the rents shall be se at the lesser of current rents as adjusted by the published OCAF or a budget based rent level. The implementation date for the "lesser of test" for subsequent renewal under option 4 is April 19, 2007, 120 day from the date the new instructions were issued. This grandfathers in owners that have already submitted their

1

renewal packages and provides HUD and the Contract Administrators time to notify owners of the new requirements.

If you have any questions feel free to contact Kerry Mulholland at 202.708.2649

UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA


STEINHORST ASSOCIATES


v.


**ALPHONSO JACKSON, in his capacity as
Secretary of the United States
Department of Housing and Urban Development**


Civil Action No. 07-813(HHK)


PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT


EXHIBIT 5

**U. S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**
451 7th Street, SW, Suite 6222
Washington, DC 20410
www.hud.gov    espanol.hud.gov

OFFICE OF AFFORDABLE HOUSING PRESERVATION

August 8, 2006

Carl A. S. Coan, Jr.
Coan & Lyons Attorneys at Law
1100 Connecticut Avenue, N.W., Suite 1000,
Washington DC 20036

Subject:    **Steinhorst Square Apartments,**
**Utica, NY**
**FHA # 013-35077**

Dear Mr. Coan:

After careful review, the Office of Affordable Housing Preservation believes the issue raised in your July 12, 2006 letter has been addressed in the Regulations that were published on January 12, 2006.  The new 24 CFR 401.100 (a) discusses projects that are eligible for a Restructuring Plan under part 401, and provides that eligibility is determined by the status of a project on the earlier of: (1) the termination or expiration date of the project-based assistance contract, <u>which includes a contract renewed under Section 524 of MAHRA</u>; or (2) the date of the owner's request to HUD for a Restructuring plan.  The point that eligibility is determined at contract renewal is also made in the Preamble to the Regulations at Page 2119 of the Federal Register, which states:

> "The rule now provides that once a project has been renewed under section 524 of MAHRA, it will be renewed at the owner's request under any renewal option for which the project is eligible, <u>except that if it is eligible for a restructuring plan under Section 401.100, HUD or the PAE will determine whether a renewal with or without a restructuring plan is necessary</u> [emphasis added]."

These new regulatory provisions are more definitive and carry more weight than the provisions of the Section 8 Contract Renewal Guide cited in your letter.

The new Regulations support the position that OAHP has consistently held:  projects originally determined to be exempt from restructuring because of Section 514(h) of MAHRA are eligible for restructuring at the next contract renewal when the impediment imposed by the financing documents related to the state or local financing has been removed by the passage of time. Consistent with the new Regulations and OAHP policy, Steinhorst Apartments' eligibility will be determined at the expiration of the current contract without reference or consideration given to any prior determination of exemption under Section 514(h) at the expiration of a previous contract.

If you have questions, please contact John F. Prusch at (202) 708-0614, extension 8368, or Claude Dickson at extension 8372.

Sincerely,

Theodore K. Toon
Deputy Assistant Secretary
Office of Affordable Housing Preservation

CC:    Claude Dickson, Bond Manager, OAHP

Ms. Camille M. Seweryniak, HUD Project Manager,
Buffalo Multifamily Housing Office

UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA


STEINHORST ASSOCIATES


v.


ALPHONSO JACKSON, in his capacity as
Secretary of the United States
Department of Housing and Urban Development


Civil Action No. 07-813(HHK)


PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT


EXHIBIT 6



**U.S. Department of Housing and Urban Development**
Buffalo Office
465 Main Street
Buffalo, New York 14203-1780
(716) 551-5755

January 17, 2007

Mr. Kevin Baptista
MB Management Company
220 Forbes Road
Suite 205
Braintree, Massachusetts 02184-2709

SUBJECT: Project Number 013-35077, Steinhorst Square Apartments, Utica, NY

Dear Mr. Baptista:

This is in response to your letter of November 30, 2006 in which you request Stages 1 and 2 of the above referenced Section 8 HAP Contract be renewed under Option Four for twenty (20) years.

Option Four is for owners whose properties are defined as "exempt properties" by statute, the property must fit into one of the categories which allows the rent to be renewed above market.

However, as per Mr. Theodore Toon's letter of August 8, 2006, OAHP (Office of Affordable Housing Preservation) has determined that the property is not eligible for Option 4.

Therefore, your Section 8 renewal package is being returned to you. You must select another Option and submit your request and the required worksheets to this Office within 15 days of this letter.

If you have any questions, do not hesitate to contact me at (716) 551-5755, extension 519.

Sincerely,

Camille Seweryniak
Project Manager

cc: Ann Marie Vallese

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| STEINHORST ASSOCIATES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 07-813 (HHK) |
| | ) | |
| ALPHONSO JACKSON, in his capacity as | ) | |
| Secretary of the United States Department of | ) | |
| Housing And Urban Development, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## <u>PLAINTIFF'S REPSONSE TO DEFENDANT'S STATEMENT OF MATERIAL FACTS NOT IN GENUINE DISPUTE</u>

Plaintiff responds to each numbered paragraph of Defendant's Statement of Material Facts not in Genuine Dispute as follows:

1. Not disputed.

2. Not disputed, except that Plaintiff was "not found to be exempt from OMAHR", the entity established by MAHRA to administer the Mark-to-Market Program. Rather, in 2001 Plaintiff was found to be exempt from the restructuring provisions of MAHRA.

3. The first sentence is disputed because Plaintiff does have an impediment to restructuring its debt. Plaintiff will incur a penalty if its mortgage loan is prepaid before April 15, 2008, which would probably be required in connection with a restructuring. With respect to the second sentence, Plaintiff does not dispute that  HUD denied Plaintiff's request to renew its HAP Contracts

under Option Four "Pursuant to new regulation."[1]  However, Plaintiff disputes

that it "is now eligible for mortgage restructuring."


                                        Respectfully submitted,


September 11, 2007                       _/s/ Carl A.S. Coan, Jr._____
                                        Carl A.S. Coan, Jr. (D.C. Bar No. 89466)
                                        Carl A.S. Coan, III (D.C. Bar No. 358034)
                                        Coan & Lyons
                                        1100 Connecticut Ave., N.W.
                                        Suite 1000
                                        Washington, DC 20036
                                        Phone No. 202-728-1070
                                        Fax No. 202-293-2448

                                        Attorneys for Plaintiff

---

[1] Although not specified, Plaintiff assumes the new regulation referred to in paragraph 3 is 24 C.F.R. § 401.100(b).

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STEINHORST ASSOCIATES, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Civil Action No. 07-813 (HHK) |
| | ) |
| ALPHONSO JACKSON, in his capacity as | ) |
| Secretary of the United States Department of | ) |
| Housing And Urban Development, | ) |
| | ) |
| | ) |
| Defendant. | ) |
| | ) |

## **ORDER**

Upon consideration of Defendant's motion for summary judgment, Plaintiff's

opposition and Defendant's reply thereto, it is this _____ day of _____, 2007

hereby

ORDERED that Defendant's motion for summary judgment is DENIED.


_____                      _____
Date                                                   HENRY H. KENNEDY, JR.
                                                            United States Distrit Judge