UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STEINHORST ASSOCIATES, )<br>              )<br>    Plaintiff, )<br>              )<br>    v. )<br>              )<br>ALPHONSO JACKSON, in his capacity as )<br>Secretary of the United States Department of )<br>Housing and Urban Development, )<br>              )<br>    Defendant. )<br>_____) | Civil Action No. 07-813 (HHK) |

**DEFENDANT'S OPPOSITION TO PLAINTIFF'S
CROSS-MOTION FOR SUMMARY JUDGMENT**

    Defendant, Alphonso Jackson, in his capacity as Secretary of the United States Department of Housing and Urban Development ("HUD"), respectfully submits this opposition to Plaintiff's cross-motion for summary judgment. Plaintiff Steinhorst Associates ("Steinhorst") seeks an injunction to compel HUD to approve the renewal of the Housing Assistance Payments ("HAP") Contract under Option Four of HUD's Section 8 Renewal Guide--Renewal of Projects Exempted from the Office of Multifamily Housing Assistance Restructuring ("OMHAR").

    Plaintiff was unable to restructure its loan at the time of its initial contract renewal, and therefore, qualified for an exemption to restructuring its loan pursuant to Option Four. At the time of its request for the second renewal of its contract, Plaintiff was capable for restructuring its loan, and therefore, no longer qualified for an exemption to loan restructuring pursuant to Option Four. Plaintiff objects to having to restructure its loan under MAHRA. In effect, Plaintiff seeks to obtain an injunction that would allow it

to charge higher than market rates rents under an exemption for which it no longer qualifies.

## PROGRAMMATIC BACKGROUND

This case involves two HUD programs: Section 8 rental assistance[1] and the Multifamily Assisted Housing Reform and Affordability Act ("MAHRA").[2]  Section 8 housing assistance is the primary means through which HUD "aid[s] low-income families in obtaining a decent place to live and … promot[es] economically mixed housing."  42 U.S.C. § 1437f(a).  Under the Section 8 program, eligible families pay thirty percent of their adjusted gross income toward their rental payment, while HUD pays the balance of the rent to the project owner, usually through public housing agencies.  42 U.S.C. § 1437f(c)(3), 42 U.S.C. § 1437a(a)(1).

MAHRA was enacted in 1997 as a vehicle through which HUD could continue Section 8 rental assistance at reduced rental levels (and thereby reduced cost to the Government).  See  42 U.S.C. § 1437f.  In essence, MAHRA reduces rents to market levels upon Section 8 contract expiration and renewal.  When those contracts expire and are renewed, if the contract rents are found to be above comparable market rents for similar units in the same area, the MAHRA reduces the new contract rent for those units to market levels.  By bringing above-market Section 8 rents in line with market levels,

---

[1]  42 U.S.C. § 1437f (2000).
[2]  42 U.S.C. § 1437f note (2000) (MAHRA) states:  the economic, physical, and management problems facing the stock of federally insured and assisted multifamily housing projects will be best served by reforms that—

> (A) reduce the cost of Federal rental assistance, including project based assistance, to these projects by reducing the debt service and operating costs of these projects while retaining the low-income affordability of this housing.

HUD controls costs of the Section 8 program and maximizes the number of families that can be helped by such housing assistance. MAHRA reduces rents by requiring the Section 8 contract project owners to restructure their debt on the property, i.e., refinancing their mortgages. See 24 C.F.R. § 401.

If a property owner is faced with an impediment to restructure the debt on a Section 8 contract property, the property may qualify as an "exception project" under Option Four of HUD's Section 8 Renewal Guide. Section 524(b) of MAHRA defines "exception projects" as "those that may be renewed at rents above market." Section 524(b).

The new regulation, 24 C.F.R. § 401.100(a), covers projects that are eligible for a Restructuring Plan under part 401, and provides that eligibility is determined by the status of a project on the earlier of: (1) the termination or expiration date of the project-based assistance contract, which includes a contract renewed under Section 524 of MAHRA; or (2) the date of the owner's request to HUD for a Restructuring plan. 24 C.F.R. § 401.100(a). The new regulation reflects HUD's Office of Affordable Housing Preservation's consistently held position that projects originally determined to be exempt from restructuring because of Section 514(h) of MAHRA are eligible for restructuring at the next contract renewal when the impediment imposed by the financing documents related to the State or local financing has been removed by the passage of time.

**BACKGROUND FACTS**

Plaintiff renewed its original twenty year HAP contract in 2001 for five additional years in accordance with Section 524(b)(1) of MAHRA and Option Four of HUD's Section 8 Renewal Guide--Renewal of Projects Exempted from the Office of Multifamily

3

Housing Assistance Restructuring ("OMHAR").  See Cross-Motion p. 2.  At that time, Plaintiff had an impediment for restructuring its debt and was consequently found to be exempt from OMHAR.  See MSJ, Exhibit A, Theodore Toon Declaration ("Toon Dec.") ¶ 6.  Upon the expiration of the five-year term, Plaintiff requested another renewal under Option Four.  See Cross-Motion, p. 3.  Plaintiff no longer faces an impediment to restructuring its debt.  See MSJ, Toon Dec. ¶ 6.  Pursuant to a new regulation, HUD denied Plaintiff's request to renew under Option Four because the plaintiff is now eligible for mortgage restructuring.  See Cross-Motion, p. 3.

## ARGUMENT

**I.      Plaintiff's HAP Contract Was Properly Exempted from Option Four**

Option Four is for owners of multifamily housing projects that meet the requirements of section 542(b)(2) of MAHRA, i.e., projects that (1) do not meet the definition of "eligible multifamily housing project" in section 512(2), or (2) are exempt under section 514(h) from debt-restructuring.  When the owner of a project that meets one of these two prongs requests renewal pursuant to Option Four, the renewal rents are determined in accordance with 524(b)(1), which in most cases yields, a renewal rent that is above the comparable market rents for the market area.  The initial HAP contract in this case was renewed under Option Four on the basis that the Steinhorst project was then subject to financing terms that would have made mortgage debt restructuring impossible.  Over time, the Steinhorst project's financing terms changed and the Steinhorst project currently is able to do debt restructuring.  See MSJ, Toon Dec. ¶ 6; Plt's Exhibit 2 and 3.

Plaintiff now seeks to compel HUD to approve the second renewal of the Section 8 HAP Contract under Option Four of HUD's Section 8 Renewal Guide--Renewal of

Projects Exempted from OMHAR[3] despite the fact that: (1) the basis on which the Steinhorst project was determined to be exempt from mortgage restructuring at the time of the first renewal is no longer applicable; and (2) the Steinhorst project now satisfies the definition of "eligible multifamily housing project" under section 512(2) and is thus eligible for mortgage debt restructuring.  See MSJ, Toon Dec. ¶ 6; Plt's Exhibit 2 and 3. HUD, however, correctly determined that the Steinhorst project no longer qualifies for exemption of debt restructuring under Option Four, because it can now restructure its loan.

MAHRA is silent on how subsequent HAP contract renewals are to be completed. HUD's interpretation of MAHRA is to allow owners of projects to request subsequent renewal of the HAP contract under any statutory (and corresponding administrative) option under MAHRA for which the project is eligible.  24 C.F.R. § 402.6.  Because MAHRA does not specifically address when such eligibility is to be determined, HUD promulgated 24 C.F.R. § 401.100, subsection (b) which establishes that the determination of whether a project satisfies section 512(2)'s definition of "eligible multifamily housing project" is to be made at the earlier of the date of (1) termination or expiration of the HAP contract, or (2) the owner's request for mortgage debt restructuring.  HUD's interpretation of MAHRA and its regulation are reasonable.

Plaintiff unreasonably seeks to interpret MAHRA in a manner in which the

---

[3] Congress terminated OMHAR effective at the end of September 30, 1994, MAHRA, section 579(c), and transferred authority and responsibility for the Mark-to-Market program from the director of OMHAR, which position was also abolished, to the Assistant Secretary of the Department of Housing and Urban Development –FHA Commissioner.  MAHRA, section 578.  Thereafter HUD established the Office of Assisted Housing Preservation ("OAHP"), which currently administers the Mark-to-Market program.

Plaintiff can maintain above-market rents in perpetuity. Such an interpretation would be in direct contravention of two of the critical reasons for MAHRA's enactment, namely to reduce the long-term costs of project-based assistance and in turn, to ensure the continued viability of multifamily rental housing projects. MAHRA, section 511(b)(1).

## II.     HUD's Actions Were Neither Arbitrary nor Capricious

Projects originally determined to be exempt from restructuring because of section 514(h) of MAHRA are eligible for restructuring at the next contract renewal when the primary basis for which the project was exempt at its initial renewal has been removed by the passage of time. See 24 C.F.R. 401.100 (a). Eligibility for a Restructuring Plan is determined by the status of a project on the earlier of: "(1) the termination or expiration date of the project-based assistance contract, <u>which includes a contract renewed under Section 524 of MAHRA</u>; or (2) the date of the owner's request to HUD for a Restructuring plan." 24 C.F.R. 401.100 (a) (emphasis added). Plaintiff no longer faces an impediment to restructuring its debt. Therefore, Plaintiff's renewal request was the appropriate time for HUD to determine that the Plaintiff was eligible for restructuring. Plaintiff no longer qualified for an exemption because its impediment to restructuring no longer existed. See Toon Dec. ¶ 6; Plt's Exhibit 2 and 3. Because HUD appropriately followed the new regulations, its actions were neither arbitrary nor capricious.

## III.    24 CFR § 401.100 (b) is consistent with MAHRA

MAHRA requires debt restructuring. HUD's new regulation clarifies when eligibility for debt restructuring occurs. Plaintiff objects to when eligibility for restructuring occurs and challenges HUD's new regulation by claiming that it conflicts with MAHRA.

6

HUD's Section 8 housing assistance program is the primary means through which HUD "aid[s] low-income families in obtaining a decent place to live and … promot[es] economically mixed housing." 42 U.S.C. § 1437f(a). However, by the late 1990s many of these Section 8 properties received rental subsidies that were substantially above market levels. HUD's analysis in the early 1990s indicated that the continued growth in the level of subsidies would eventually be unsupportable within HUD's budget limitations.

Therefore, Congress enacted the MAHRA Act in 1997 to reduce the federal government's cost of rental subsidies and to ensure the continued viability of multifamily rental housing projects. See § 511(b) of the MAHRA Act; H.R. Conf. Rep. No. 297, 105th Cong., 1st Sess. 137-39(1997). MAHRA reduces rents by requiring the Section 8 contract project owners to restructure their debt on the property, i.e., refinancing their mortgages. See 24 C.F.R. § 401. MAHRA permits owners of eligible multifamily housing projects with expiring project-based assistance contracts to enter into mortgage restructuring and rental assistance sufficiency plans.

Title 24 of the Code of Federal Regulations § 401.100 helps to achieve MAHRA goals by defining when eligibility for mortgage restructuring is determined. It states:

> (b) When is eligibility determined? Eligibility for a Restructuring Plan under paragraph (a) of this section is determined by the status of a project on the earlier of the termination or expiration date of the project-based assistance contract, which includes a contract renewed under section 524 of MAHRA, or the date of the owner's request to HUD for a Restructuring Plan. Eligibility is not affected by a subsequent change in status, such as contract extension under § 401.600 or part 402 of this chapter.

24 CFR § 401.100 (b). Thus, the regulation is not only consistent with MAHRA, but in fact provides clarity to MAHRA by determining when eligibility for the necessary

mortgage restructuring occurs.

**IV.    24 C.F.R. § 401.100(b) is an interpretive rule and not subject to notice and comment procedures**

In promulgating rules, federal administrative agencies are required by § 3 of the Administrative Procedure Act ("APA"), 5 U.S.C.A. § 553, to provide notice of the proposed rule and accept and consider comments from interested persons. "Interpretative" rules are exempt from this requirement under 5 U.S.C.A. § 553(b)(3)(A). Plaintiff argues that because HUD did not follow notice and comment procedures for the new regulation, 24 C.F.R. § 401.100(b), that the regulation is invalid. Cross-Motion, p. 15-19. Regulation 24 C.F.R. § 401.100(b) however, is an interpretative rule. Thus, HUD was not required to follow notice and comment procedures. Therefore, 24 C.F.R. § 401.100(b) was properly adopted.

Interpretative rules for purposes of 5 U.S.C.A. § 553 are those that clarify, interpret, or explain existing law, state an administrative officer's understanding of a statutory or regulatory term, and/or remind affected parties of their responsibilities under existing law, or some similar language. Batterton v. Marshall, 648 F.2d 694, 701 (D.C. Cir. 1980) ("An 'interpretative rule' describes the agency's view of the meaning of an existing statute or regulation); Gibson Wine Co. v. Snyder, 194 F.2d 329, 331 (D.C. Cir. 1952) ("'substantive rules' or 'legislative rules' are those which create law, usually implementary to an existing law; whereas interpretative rules are statements as to what the administrative officer thinks the statute or regulation means."); Spirit of Sage Council v. Norton, 294 F. Supp. 2d 67, 86 (D.D.C. 2003) (noting that a "legislative rule" or "substantive rule" requiring notice and comment procedures is one that does more than

8

simply clarify or explain a regulatory term, or confirm a regulatory requirement, or maintain a consistent agency policy); <u>Sprint Corp. v. F.C.C.</u>, 315 F.3d 369, 374 (D.C. Cir. 2003) (finding a clarification of an existing agency rule may be embodied in an interpretive rule that is exempt from notice and comment requirements, new rules that work substantive changes in prior regulations are subject to the notice and comment procedures of the APA).

While a substantive regulation is subject to the procedural requirements of 5 U.S.C.A. § 553, an interpretive rule is not. <u>See</u> <u>e.g.</u>, <u>Batterton</u>, 648 F.2d at 701. The D.C. Circuit has described the distinction between an interpretive and substantive rule: the "critical" feature of the procedural exception "is that it covers agency actions that do not themselves alter the rights or interests of parties, although it may alter the manner in which the parties present themselves or their viewpoints to the agency ...." The issue, therefore, "is one of degree," and our task is to identify which substantive effects are "sufficiently grave so that notice and comment are needed to safeguard the policies underlying the APA." <u>JEM Broadcasting Co., v. FCC</u>, 22 F.3d 320, 326-27 (D.C Cir. 1994).

In <u>National Family Planning v. Sullivan</u>, 979 F.2d 227 (D.C. Cir. 1992), the D.C. Circuit concluded that a pronouncement seeking to modify the rule against abortion counseling was not an interpretative rule but a legislative rule for which notice and comment procedures were required. The Department of Health and Human Services (HHS) had ruled that a 1988 regulation, previously construed to prohibit abortion counseling or referral of any kind in Title X programs, would be interpreted to permit doctors to counsel on abortion within context of doctor-patient relationship. The Court

found that three characteristics of the HHS pronouncement led to the conclusion that the rule was not interpretative, as the agency had contended. National Family Planning, 979 F.2d at 237-238. First the rule "does more than simply clarify or explain a regulatory term, or confirm a regulatory requirement, or maintain a consistent agency policy". Second the rule was motivated by "a previously unacknowledged concern." Third the rule granted rights, imposed obligations, or produced other significant effects on private interests. Although courts find that a rule is not interpretative where the rule does more than "clarify," they do so for the purpose of determining whether the agency intended the rule to have binding effect. National Family Planning, 979 F.2d 237-240 (D.C. Cir. 1992).

    1.    HUD's new regulation simply clarifies and explains a regulatory term, confirms a regulatory requirement and maintains a consistent agency policy

MAHRA requires debt restructuring, HUD's new regulation clarifies when eligibility for debt restructuring occurs. Title 24 of the Code of Federal Regulations § 401.100(b) is an interpretative rule because it simply clarifies and explains MAHRA regulatory terms, confirms a regulatory requirement and maintains a consistent agency policy.

Congress enacted the MAHRA Act in 1997 to reduce the federal government's cost of rental subsidies and to ensure the continued viability of multifamily rental housing projects. See § 511(b) of the MAHRA Act; H.R. Conf. Rep. No. 297, 105th Cong., 1st Sess. 137-39(1997). MAHRA reduces rents by requiring the Section 8 contract project owners to restructure their debt on the property, i.e., refinancing their mortgages. See § 514 of the MAHRA Act; 24 C.F.R. § 401. MAHRA requires owners

of eligible multifamily housing projects with expiring project-based assistance contracts to enter into mortgage restructuring and rental assistance sufficiency plans. See § 514.

The new regulation, 24 C.F.R. 401.100 (b), helps to achieve MAHRA's goals by clarifying when eligibility for mortgage restructuring is determined. It states:

> (b) When is eligibility determined? Eligibility for a Restructuring Plan under paragraph (a) of this section is determined by the status of a project on the earlier of the termination or expiration date of the project-based assistance contract, which includes a contract renewed under section 524 of MAHRA, or the date of the owner's request to HUD for a Restructuring Plan. Eligibility is not affected by a subsequent change in status, such as contract extension under § 401.600 or part 402 of this chapter.

24 C.F.R. § 401.100(b). Section 514 of MAHRA requires that for an 'Initial Renewal,' a housing project will have its mortgage loan restructured to enable the project to meet its financial obligations at reduced Contract Rents. See also 24 C.F.R. 401.100. New regulation 24 C.F.R. 401.100 (b) clarifies that MAHRA requires that a project have its mortgage loan restructured not just at a contract's initial renewal, but at any renewal thereafter. The regulation addresses the odd scenario (such as the Plaintiff's scenario) where a housing project was unable to restructure its loan at the time of the initial renewal of its contract, and thus qualified for an exemption, but is able to restructure at the time of the second contract renewal. Without this regulation, a housing project could ironically avoid the restructuring requirements of MAHRA indefinitely and continue to charge rents above market value. Thus, the regulation is not only consistent with MAHRA, but in fact confirms a regulatory requirement and maintains a consistent agency policy regarding mortgage restructuring.

    2.    <u>24 C.F.R. 401.100 (b) was motivated by a previously acknowledged concern</u>

An ongoing concern for HUD is the affordability of housing for low income

11

families. MAHRA reduces rents by requiring the Section 8 contract project owners to restructure their debt on the property. See § 514 of the MAHRA Act. MAHRA's legislative history addresses the need for and benefits of debt restructuring, generally, and focuses exclusively on debt restructuring at initial renewal. Nothing in the history specifically reflects a Congressional intent to limit the determination of debt-restructuring eligibility to initial renewal. Moreover, the comments convey a Congressional intent and expectation that the Department use its authority under MAHRA "to preserve the existing section 8 project-based portfolio of affordable housing to the greatest extent feasible." 143 Cong. Rec. 22076 (daily ed. Oct. 9, 1997)(statement of Sen. Sarbanes). Therefore, HUD's motivation for issuing 24 C.F.R. 401.100 (b) was the Congressionally acknowledged concern to preserve affordable housing under section 8 and MAHRA's goal of restructuring property debt in order to reduce rents.

    3.    <u>24 C.F.R. 401.100 (b) neither imposes new obligations, nor produces other significant effects on private interests</u>

In essence, MAHRA reduces rents by requiring the Section 8 contract project owners to restructure their debt on the property, i.e., refinancing their mortgages. See § 514 of the MAHRA Act; 24 C.F.R. § 401. If a property owner is faced with an impediment to restructure the debt on a Section 8 contract property, the property may qualify as an "exception project" under Option Four of HUD's Section 8 Renewal Guide--Renewal of Projects Exempted from the Office of Multifamily Housing Assistance Restructuring ("OMHAR"). Section 524(b) of MAHRA defines "exception projects" as "those that may be renewed at rents above market." Section 524(b).

Here, Plaintiff renewed its original twenty year HAP contract in 2001 for five additional years in accordance with Section 524(b)(1) of MAHRA and Option Four of

12

HUD's Section 8 Renewal Guide.  <u>See</u> Cross-Motion, p. 2.  At that time, Plaintiff had an impediment for restructuring its debt and was consequently found to be exempt from the requirement to restructure its debt.  <u>See</u> MSJ, Toon Dec." ¶ 6.  Upon the expiration of the five-year term, plaintiff requested another renewal under Option Four.  <u>See</u> Cross-Motion, p. 2.  Plaintiff no longer faces an impediment to restructuring its debt.  <u>See</u> MSJ, Toon Dec. ¶ 6.  Plaintiff is no longer eligible for Option Four on the basis that it: (1) is no longer subject to primary financing with terms that would make debt restructuring impossible, as described in section 514(h)(1), (2) is not exempt from debt restructuring under another provision of section 514(h), and (3) now satisfies the definition of "eligible multifamily housing project" in section 512(2).  <u>See</u> section 524(b)(2).  The new regulation, 24 C.F.R. 401.100 (b), provides that the Plaintiff will now have to comply with MAHRA because it no longer qualifies for the exemption for which it once qualified.  Thus, Section 401.100 (b) neither imposes new obligations, nor produces other significant effects on the private interests of the Plaintiff other than the directive of MAHRA.

**V.     <u>Section 524 (c)(1) is unrelated to the issue of contract renewal</u>**

Plaintiff incorrectly asserts that the renewal of Steinhorst Square's contract is "governed" by Section 524 (c) of MAHRA.  <u>See</u> Cross-Motion, p. 9.  Section 524 (c) lays out the "Rent adjustment after renewal of contract" requirements, while 24 CFR § 401.100 (b) concerns contract renewal eligibility. Section 524 (c) of MAHRA and 24 CFR § 401.100 (b) are not in conflict but rather are unrelated.

Section 524(c) provides that after the initial renewal of a contract for assistance under Section 8 pursuant to subsection (a), (b)(1), or (e)(2), the Secretary shall annually

13

adjust the rents using OCAF, or upon request of the owner and approval of the Secretary, on a budget basis. Thus, Section 524(c) deals with *annual* rent adjustments to *ongoing* contracts, not contract renewal of expired contracts.

The initial renewal of Plaintiff's Section 8 contract on Steinhorst Square occurred in two stages in 2001 and expired on September 6, 2006 and November 11, 2006. See Cross-Motion, p. 3. As the Section 8 contract <u>expired</u> on those dates, more was needed than a simple annual rent adjustment at that time. Because Section 524(c) deals with *annual* rent adjustments to *ongoing* contracts, Section 524(c) is inapplicable and unrelated to the issue of Plaintiff's contract renewal.

Plaintiff contends that because the second sentence of section 524(c)(1) requires HUD to compare a project's current rents with comparable market rents every five years (i.e., in cases where the contract term is ten or more years), section 524(c)(1) somehow governs both initial renewals and subsequent renewals. Cross-Motion, p. 21. Section 524 (c) of MAHRA states:

>    c.    Rent adjustments after renewal of contract.—
>
>    1.    Required.—After the initial renewal of a contract for assistance under section 8 of the United States Housing Act of 1937 pursuant to subsection (a), (b)(1), or (e)(2), the Secretary shall annually adjust the rents using an operating cost adjustment factor established by the Secretary (which shall not result in a negative adjustment) or, upon the request of the owner and subject to approval of the Secretary, on a budget basis. In the case of projects with contracts renewed pursuant to subsection (a) or pursuant to subsection (e)(2) at rent levels equal to comparable market rents for the market area, at the expiration of each 5-year period, the Secretary shall compare existing rents with comparable market rents for the market area and may make any adjustments in the rent necessary to maintain the contract rents at a level not greater than comparable market rents or to increase rents to comparable market rents.

Contrary to Plaintiff's assertions, the second sentence: (1) applies only to

contracts initially renewed under section 524(a) or 524(e)(2) with a term of 10 years or more; and (2) requires HUD, in addition to providing an annual rent adjustment pursuant to the first sentence of section 524(c)(1), to adjust rents upwards or downwards every five years to ensure that project rents throughout the contract term remain in sync with rents for comparable unassisted rental units in the market area.  Thus, the second sentence pertains to within term rent adjustments and not subsequent renewals.

Plaintiff also contends that under the plain language of Section 524(c)(1), there is no exception to the mandate to "annually adjust the rents using an operation cost adjustment factor" and no distinction is made between annual adjustments to ongoing contracts after an "Initial Renewal" and adjustments as "Subsequent Renewal."  As a result, plaintiff claims that HUD's attempt to require the plaintiff to restructure its mortgage and reduce contract rents, rather than adjusting said rents with an operating cost adjustment factor is contrary to section 524(c)(1) and not in accordance with law.  See Cross-Motion, p. 21.  However, this "interpretation" overlooks the last sentence of section 524(a)(1), which gives HUD the authority not to renew a HAP contract under section 524 as requested by the owner if the project is eligible under section 512(2) for mortgage debt restructuring and HUD  believes that mortgage debt restructuring is necessary.

> This section shall not require contract renewal for a project that is eligible under this subtitle for a mortgage restructuring and rental sufficiency plan, if there is no approved plan for the project and the Secretary determines that such an approved plan is necessary.

MAHRA section 524(a)(1).  See also 24 C.F.R. § 402.4(a)(2)(iii).

**VI.    HUD's interpretation is entitled to deference**

As stated above, MAHRA is silent on the issue of subsequent renewals, which is

15

the crux of the case at bar. As such, HUD has acted within its lawful discretion in interpreting MAHRA. According to Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-43, (1984):

> If. . . the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute

Courts "have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer." Chevron U.S.A. v. National Res. Defense Council, 467 U.S. 837, 844 (1984). "Administrative implementation of a particular statutory provision qualifies for Chevron deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." U.S. v. Mead Corp., 533 U.S. 218, 226-227 (2001).

Where Chevron is inapplicable, agency interpretations are still entitled to respect. See Skidmore v. Swift & Co., 323 U.S. 134, 139-140 (1944) (agency's interpretation merits some deference regardless of its form, given the "specialized experience and broader investigations and information" available to the agency and the value of uniformity in its administrative and judicial understanding of what a national law requires); Central South Dakota Co-operative Grazing District v. Secretary of Agriculture, 266 F.3d 889, 894-95 (8th Cir. 2001) (When analysis of relevant information "requires a high level of technical expertise, [the court] must defer to the informed discretion of the responsible federal agencies."); Metropolitan Stevedore Co. v. Rambo,

16

521 U.S. 121 (1997) (reasonable agency interpretations carry some added persuasive force where Chevron is inapplicable); see also Martin v. Occupational Safety and Health Review Comm'n, 499 U.S. 144 (1991); Madison v. Res. for Human Dev., Inc., 233 F.3d 175, 186 (3rd Cir. 2000).

Congress' intent in creating and then extending MAHRA was that long-term costs had to be reduced, and that it would be less expensive and more effective to proactively address the physical, financial, and managerial challenges facing HUD's affordable housing portfolio than to wait for the properties to physically decline and financially fail. See 143 Cong. Rec. 22076 (daily ed. Oct. 9, 1997)(statement of Sen. Sarbanes). To that end, HUD's interpretation of the regulations promulgated under 24 C.F.R. 401.100 support that mandate.

HUD's interpretation of MAHRA and the issue of subsequent renewals is reasonable and consistent with the enumerated purposes for MAHRA's enactment, particularly preserving low-income rental housing affordability while reducing the long-term costs of project-based assistance. An agency can resolve ambiguities with respect to an issue of interpretation left by Congress as long as the agency's action is reasonable and consistent in light of the statute and congressional intent. See Gilpin v. West, 155 F.3d 1353, 1355-56 (C.A. Fed. 1998). Therefore, the Court should deny Plaintiff's motion for summary judgment.

## **CONCLUSION**

For the foregoing reasons, the Court should deny Plaintiff's cross-motion for summary judgment and grant summary judgment in favor of the Defendant.

January 14, 2008                              Respectfully submitted,


                                              _____/s/_____
                                              JEFFREY A. TAYLOR, D.C. BAR # 498610
                                              United States Attorney

                                              _____/s/_____
                                              RUDOLPH CONTRERAS, D.C. BAR # 434122
                                              Assistant United States Attorney.


                                              _____/s/_____
                                              ANDREA McBARNETTE, D.C. Bar # 483789
                                              Assistant United States Attorney
                                              555 Fourth Street, N.W.
                                              Washington, D.C. 20530
                                              (202) 514-7153