UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STEINHORST ASSOCIATES,                    )
                                          )
                          Plaintiff,      )
                                          )
          v.                              )    Civil Action No. 07-813 (HHK)
                                          )
ALPHONSO JACKSON, in his capacity as      )
Secretary of the United States Department of   )
Housing and Urban Development,            )
                                          )
                                          )
                                          )
                          Defendant.      )
_____)

## PLAINTIFF'S REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT

For the reasons discussed below, and in Plaintiff's Memorandum of Points and Authorities in support of its Cross-Motion for Summary Judgment, the Court should grant Plaintiff's Cross-Motion for Summary Judgment and deny Defendant's Motion for Summary Judgment.

## ARGUMENT

Defendant made six arguments in his Opposition to Plaintiff's Cross-Motion for Summary Judgment. Each argument is discussed in turn.

## I. PLAINTIFF'S HAP CONTACT WAS NOT PROPERLY EXEMPTED UNDER OPTION FOUR

Defendant asserts that because "(1) The basis on which the Steinhorst project was determined to be exempt from mortgage restructuring at the time of the first renewal is no

longer applicable; and (2) the Steinhorst project now satisfies the definition of 'eligible

multifamily housing project' under Section 512(2) [of MAHRA] and is thus eligible for

mortgage debt restructuring," HUD "correctly determined that the Steinhorst project no

longer qualifies for exemption of debt restructuring under Option Four, because it can

now restructure its loan." Opposition ("Opp.") 5. This assertion is based on 24 C.F.R.

§ 401.100(b) which states,

> Eligibility for a Restructuring Plan under paragraph (a) of this section is
> determined by the status of a project on the earlier of the termination or expiration
> date of the project-based assistance contact, which includes a contract renewed
> under section 524 of MAHRA, or the date of the owner's request to HUD for a
> Restructuring Plan …

*Id*.  Defendant's argument fails because Steinhorst Square Apartments ("Steinhorst

Square") is not an "Eligible Multifamily Housing Project."

Defendant correctly notes that, "Option Four is for owners of multifamily housing

projects that meet the requirements of section 542(b)(2) [sic][1] of MAHRA, i.e. projects

that (1) do not meet the definition of 'eligible multifamily housing project' in section

512(2), or (2) are exempt under section 514(h) from debt-restructuring." Opp. 4. This is

consistent with section 514 of MAHRA which specifies the requirements for the

restructuring of a mortgage loan under MAHRA but is only applicable to an "Eligible

Multifamily Housing Project." However, Defendant's assertion that "the Steinhorst

project now satisfies the definition of 'eligible multifamily housing project'" is incorrect.

Section 512(2) of MAHRA defines an "Eligible Multifamily Housing Project" as

a project that (1) has above market rents, (2) "is covered in whole or in part by a contract

for project-based assistance under – (i) the new construction or substantial rehabilitation

program under section 8(b)(2) of the United States Housing Act of 1937… (as in effect

---

[1] Should probably be 524(b)(2), not 542(b)(2).

before October 1, 1983)," and (3) has a mortgage loan insured or held by HUD. Although Steinhorst Square satisfies criteria 1 and 3, it does not satisfy the second criterion.

Section 8(b)(2) of the United States Housing Act of 1937 authorized HUD, or a public housing agency, to enter into a HAP Contract, including Plaintiff's original HAP Contract, with the owner of a multifamily rental housing project for the provision of project-based assistance under HUD's Section 8 New Construction and Substantial Rehabilitation Programs.[2]  However, from the date of its enactment in 1974 until 1996, no provision of Section 8 authorized the renewal of HAP Contracts executed under the authority of Section 8(b)(2).  Therefore, in 1996, Congress authorized the renewal of expiring New Construction and Substantial Rehabilitation HAP Contracts.  *See* Pub. L. No. 104-99, § 405, 110 Stat. 26, 44 (1996).

Congress later extended this renewal authority.  *See* Pub. L. No. 104-204, § 211, 110 Stat. 2874, 2895-96 (1996).  However, this extension of the authority for renewing an expiring project-based New Construction or Substantial Rehabilitation HAP Contract was limited to contracts that expired in fiscal year 1997, i.e. October 1, 1996 – September 30, 1997.  *Id.*  Therefore, MAHRA was necessary to provide HUD with the authority to renew project-based New Construction and Substantial Rehabilitation HAP Contracts that expired after September 30, 1997.  Without MAHRA, HUD would not have had the

---

[2] As noted below, Section 8(b)(2) was repealed in 1983.  However, at the time of its repeal, in relevant part, Section 8(b)(2) stated:  "[T]he Secretary is authorized to make assistance payments pursuant to contracts with owners or prospective owners who agree to construct or substantially rehabilitate housing in which some or all of the units shall be available for occupancy by lower income families in accordance with the provisions of this section."

authority to renew project-based New Construction and Substantial Rehabilitation HAP Contracts that expired after September 30, 1997.

Accordingly, Section 515(a)(1) of MAHRA authorizes the renewal of an expiring project-based HAP Contract "on an eligible multifamily housing project." HAP Contracts renewed under the authority of Section 515(a) are renewed in accordance with the provisions of Section 514 of MAHRA. Section 524(a)(1) of MAHRA authorizes the renewal of all other expiring project-based HAP Contracts.

When Plaintiff's original HAP Contract expired in 2001, it was not legally possible to renew Plaintiff's original HAP Contract under Section 8(b)(2) because Section 8(b)(2) was repealed effective October 1, 1983. *See* Pub. L. No. 98-181, § 209, 97 Stat. 1153, 1183 (1983). Moreover, as discussed above, Section 8(b)(2) related to the execution of a project's original HAP Contract, i.e. the contract that was executed in connection with a project's original construction or substantial rehabilitation under Section 8. When those contracts expired at the end of their initial terms, to the extent they were renewed, they were renewed under the authority first granted by Congress in 1996 and continued by Sections 515(a)(1) and 524(a)(1) of MAHRA. Therefore, Plaintiff's original HAP Contract was not renewed under Section 8(b)(2). Rather, it was renewed in accordance with Section 524 of MAHRA.

Clearly, Steinhorst Square "is [not] covered in whole or in part by a contract for project-based assistance under… the new construction or substantial rehabilitation program under section 8(b)(2)…" Therefore, Steinhorst Square is not an "Eligible Multifamily Housing Project", as defined by MAHRA. Since Steinhorst Square is not an "Eligible Multifamily Housing Project," there is no authority to renew Plaintiff's HAP

Contracts in accordance with section 515 and under the restructuring provisions of
Section 514 of MAHRA.  Accordingly, HUD's decision requiring the renewal of
Plaintiff's HAP Contracts pursuant to Sections 514 and 515 of MAHRA is expressly
contrary to MAHRA.

Plaintiff argued this same point, i.e. Steinhorst Square is not an "Eligible
Multifamily Housing Project" because it is not a project that is covered by a HAP
Contract under section 8(b)(2) of the United States Housing Act of 1937, in Plaintiff's
Memorandum of Points and Authorities in support of its Cross-Motion for Summary
Judgment.  Significantly, Defendant offered no opposing argument in his Opposition.
Defendant's silence is deafening.

## II.  HUD's ACTIONS WERE ARBITRARY, CAPRICIOUS OR OTHERWISE NOT IN ACCORDANCE WITH LAW

Defendant asserts that in accordance with 24 C.F.R. § 401.100(b), "Plaintiff's
renewal request was the appropriate time for HUD to determine that the Plaintiff was
eligible for restructuring."  Opp. 6.  Defendant further asserts that "Plaintiff no longer
qualified for an exemption because its impediment to restructuring no longer existed."
*Id.*  Therefore, "because HUD appropriately followed the new regulations, its actions
were neither arbitrary nor capricious."  *Id.*

Plaintiff does not dispute that the lockout provision of its mortgage loan that made
Steinhorst Square an exception project in 2001 has expired.  However, as discussed
above, Steinhorst Square is not an "Eligible Multifamily Housing Project."  Moreover, 24
C.F.R. § 401.100(b) was adopted in violation of the notice and comment requirements of
the Administrative Procedure Act ("APA"),  is contrary to the express provisions of

MAHRA, and departs significantly from HUD's previous policy of once an exception project always an exception project. Therefore, HUD's refusal to renew Plaintiff's HAP Contracts under Option Four is arbitrary, capricious or otherwise not in accordance with law.

### III. 24 C.F.R. § 401.100(b) IS NOT CONSISTENT WITH MAHRA

Defendant asserts that MAHRA was enacted "to reduce the federal government's cost of rental subsidies and to ensure the continued viability of multifamily rental housing projects." Opp. 7. Defendant further asserts that 24 C.F.R. § 401.100(b) "helps to achieve MAHRA goals by defining when eligibility for mortgage restructuring is determined." *Id.* Therefore, according to Defendant, 24 C.F.R. § 401.100(b) "is not only consistent with MAHRA, but in fact provides clarity to MAHRA by determining when eligibility of the necessary mortgage restructuring occurs." *Id.* 7-8.

Defendant's argument ignores the fact that there are nine purposes specified in Section 511(b) of MAHRA. In addition, as discussed above, MAHRA was needed to provide HUD with the authority to renew project-based HAP Contracts initially entered into under HUD's Section 8 New Construction and Substantial Rehabilitation Programs. Moreover, HUD's reliance on 24 C.F.R. § 401.100(b) was adopted in violation of the APA and is arbitrary, capricious or otherwise not in accordance with law. Therefore, 24 C.F.R. § 401.100(b) is not consistent with MAHRA.

### IV. SINCE 24 C.F.R. § 401.100(b) IS NOT AN INTERPRETATIVE RULE IT WAS SUBJECT TO NOTICE AND COMMENT UNDER THE APA

"The dividing line between legislative and interpretative rules has been deemed 'fuzzy' in some cases." *Nat'l Family Planning and Reproductive Health Ass'n v.*

*Sullivan,* 979 F.2d 227, 232 (D.C. Cir. 1992) (citations omitted).  These two categories of

rules establish no general formula.  *Batterton v. Marshall,* 648 F.2d at 694, 702 (D.C. Cir.

1980) (citation omitted).  However, "An interpretative rule serves an advisory function

explaining the meaning given by the agency to a particular word or phrase in a statute or

rule it administers."  *Id.* at 705.  "A useful articulation of the exemption's critical feature

is it covers agency actions that do not themselves alter the rights or interests of parties,

although it may alter the manner in which the parties present themselves or their

viewpoints to the agency."  *Id.* at 707.

 "Conversely, a legislative or substantive rule is one that does more than simply

clarify or explain a regulatory term, or confirm a regulatory requirement, or maintain a

consistent agency policy."  *Sullivan*, 979 F.2d at 237.  "Courts have explained that a rule

which 'effects a change in existing law **or policy'** is legislative."  *Id.* (*citing Powderly v.

Schweiker*, 704 F.2d 1092, 1098 (9th Cir. 1983) (emphasis added).  Similarly, "[N]ew

rules that work substantive changes in prior regulations are subject to the APA's

Procedures."  *Sprint Corp. v. FCC*, 315 F.2d 369, 374 (D.C. Cir. 2003).   "[W]hen an

agency changes the rules of the game… more than a clarification has occurred."  *Id.*

Moreover, "an agency presumably intends a rule to be legislative if it has the rule

published in the Code of Federal Regulations …"  *Am. Mining Cong. v. Mine Safety &

Health Admin.*, 995 F.2d 1106, 1112 (D.C. Cir. 1993) (*citing Brock v. Cathedral Bluffs

Shale Oil Co.*, 796 F.2d 533, 539 (D.C. Cir. 1986) (Scalia, J.)).

 Defendant's label of 24 C.F.R. § 401.100(b) as interpretative, although relevant,

is not dispositive.  *Sullivan*, 979 F.2d at 237 (citing *General Motors Corp. v.

Ruckelshaus*, 742 F.2d 1561, 1565 (D.C. Cir. 1984) (*en banc*)).  Moreover, a court "must

be wary not to accord this elevated status too easily to agency missives unless it is clear that the rule is merely interpretative and therefore already implicitly part of the statute or regulation." *Id.* at 240.

In his argument that 24 C.F.R. § 401.100(b) is an interpretative rule, not legislative, Defendant discusses *Sullivan* at length and presents three of the criteria utilized by *Sullivan* in holding that the regulation at issue was a legislative rule as though these three criteria are the definitive test for deciding whether a regulation is legislative or interpretative. Opp. 9-13. No such test has been established by the D.C. Circuit. Rather, as noted above, the dividing line between legislative and interpretative rules is fuzzy and there is no general formula in determining whether a regulation is legislative or interpretative. However, even when the examination is limited to applying the three criteria from *Sullivan* discussed by Defendant, 24 C.F.R. § 401.100(b) is clearly a legislative rule.

### a. 24 C.F.R. § 401.100(b) Does Not Simply Clarify and Explain a Regulatory Term, Confirm a Regulatory Requirement and Maintain a Consistent Agency Policy

Defendant asserts that 24 C.F.R. § 401.100(b) "is an interpretative rule because it simply clarifies and explains MAHRA regulatory terms, confirms a regulatory requirement and maintains a consistent agency policy." Opp. 10. However, "Before February 13, 2006, the effective date of 24 C.F.R. § 401.100(b), upon the expiration of a project-based section 8 HAP Contract that had previously been renewed under Option Four of the Renewal Guide, an owner was entitled to renew the contract under Option

Four." Pl. Stat. ¶ 8.[3]  In other words, from the enactment of MAHRA in 1997 to February 13, 2006, HUD's policy and interpretation of MAHRA was once an exception project always an exception project.

In contrast, HUD now asserts that it has the authority under 24 C.F.R. § 401.100(b) to conclusively determine at a subsequent renewal of the HAP Contract of an exception project, whether the HAP Contract must be renewed in accordance with the restructuring provisions of Section 514 of MAHRA.  If HUD determines that the contract must be renewed under the restructuring provisions of MAHRA, the project could be subjected to extensive, complicated and expensive requirements, including rent reductions and a thirty-year contractual obligation.[4]  This is a significant, substantive change in policy.  Therefore, 24 C.F.R. § 401.100(b) does not, as Defendant asserts, maintain a consistent agency policy.  Rather, it fundamentally changes HUD's previous policy.

Defendant has not offered a reasoned explanation for HUD's departure from its previous policy of once an exception project always an exception project that was in effect for over eight years, other than it will enable HUD, which HUD contends is consistent with MAHRA, to require Plaintiff to restructure its mortgage loan and save HUD money.  As discussed herein, 24 C.F.R. § 401.100(b) is contrary to the express provisions of MAHRA.  Moreover, saving HUD money is only one of nine purposes specified in MAHRA.   Therefore, HUD's reliance on 24 C.F.R. § 401.100(b) as its

_____

[3] Pl. St. ¶ refers to "Plaintiff's Statement of Material Facts Not in Dispute" filed in connection with Plaintiff's Cross-Motion for Summary Judgment.  Since Defendant has not disputed any of the facts stated therein, the Court may assume that the facts are admitted.  *See* LCvR 56.1.

[4] The HUD Mark-to-Market Program Operating Procedures Guide contains twelve Chapters with approximately 185 pages, supported by Appendices A-R containing approximately 260 more pages and  35 Forms.

reason for refusing to renew Plaintiff's HAP Contracts under Option Four is arbitrary, capricious or otherwise not in accordance with law. *See Graphic Communications Int'l Union v. Salem-Gravure Div. of World Color Press, Inc.,* 843 F.2d 1490, 1493 (D.C. 1988) ("Agency decisions that depart from established precedent without a reasoned explanation will be vacated as arbitrary and capricious.").

### b.   HUD's Motivation for Adopting 24 C.F.R. § 401.100(b) is Irrelevant

Defendant asserts that "Nothing in the [legislative] history specifically reflects a Congressional intent to limit the determination of debt-restructuring eligibility to initial renewal." Opp. 12. Defendant further asserts that the legislative history conveys Congressional intent that HUD use its authority under MAHRA to preserve Section 8 project-based housing to the greatest extent possible and that this intent was the motivation for HUD's adoption of 24 C.F.R. §401.100(b). However, as discussed below, Section 524(c)(1) of MAHRA expressly requires that Plaintiff's HAP Contracts be renewed with rents increased by an operating cost adjustment factor. This is consistent with section 6-4A of HUD's Section 8 Renewal Guide, as in effect before December 12, 2006. *See* Pl. Stat. ¶ 13. Therefore, MAHRA's legislative history is irrelevant. *See Eagle-Picher Industries, Inc. v. EPA*, 759 F.2d 922, 930 (D.C. Cir. 1985) ("It is elementary in the law of statutory construction that, absent ambiguity or unreasonable result, the literal language of a statute controls and resort to legislative history is not only unnecessary but improper.") (citation omitted).[5]

---

[5] The statement of one Senator hardly constitutes a sufficient body of legislative history from which Congressional intent may be inferred.

Restructuring a HAP Contract under the restructuring provisions of MAHRA is a complicated financial transaction that essentially requires an owner to commit its project to the Section 8 Program for at least thirty more years and limits an owner's financial return.  Renewing a HAP Contract under Option Four, in contrast, only commits an owner to the Section 8 Program for the length of the contract, usually one year. Therefore, assuming *arguendo* that the legislative history of MAHRA is relevant and demonstrates, as asserted by Defendant,  Congressional intent that HUD use its authority under MAHRA to preserve project-based Section 8 housing to the greatest extent possible, allowing Plaintiff to renew its HAP Contracts under Option Four is consistent with such intent.  This is because an owner is more likely to renew its HAP Contract if it can renew under Option Four than if the owner is compelled to renew under the restructuring provisions of MAHRA.

### c. 24 C.F.R. § 401.100(b) Imposes New Obligations and Produces Significant Effects on Private Interests

As already discussed, restructuring under MAHRA is a complex financial transaction that would require Plaintiff to commit Steinhorst Square to remain in the Section 8 Program for at least thirty more years.  Restructuring will also place a limit on Plaintiff's financial return.  In contrast, renewing Plaintiff's HAP Contracts under Option Four will only require Plaintiff to remain in the Section 8 Program for the length of the renewal contract, probably one year.  Therefore, Defendant's assertion that, "Section 401.100(b) neither imposes new obligations, nor produces other significant effects on the private interests of the Plaintiff other than the directive of MAHRA", is patently erroneous.  Opp. 13.

11

## V.     SECTION 524(c)(1) OF MAHRA REQUIRES THAT PLAINTIFF'S HAP CONTRACTS BE RENEWED UNDER OPTION FOUR

Section 524(c)(1) of MAHRA states,

(c) Rent adjustments after renewal of contract.—

(1) Required.—After the initial renewal of a contract or assistance under section 8 of the United States Housing Act of 1937 pursuant to subsection (a), (b)(1), or (e)(2), the Secretary shall annually adjust the rents using an operating cost adjustment factor established by the Secretary (which shall not result in a negative adjustment) or, upon the request of the owner and subject to approval of the Secretary, on a budget basis.  In the case of projects with contacts renewed pursuant to subsection (a) or pursuant to subsection (e)(2) at rent levels equal to comparable market rents for the market area, at the expiration of each 5-year period, the Secretary shall compare existing rents with comparable market rents for the market area and may make any adjustments in the rent necessary to maintain the contract rents at a level not greater than comparable market rents or to increase rents to comparable market rents.

It is Plaintiff's contention that the first sentence of Section 524(c)(1), which requires that HUD "shall annually adjust the rents using an operating cost adjustment factor," applies to all HAP Contracts initially renewed under Section 524(a), including the renewals of such contracts after their "Initial Renewal".  As support for this argument, Plaintiff pointed to the second sentence of Section 524(c)(1) which requires for HAP Contracts renewed under Section 524(a) or 524(e)(2) that HUD, every five years, to conduct a market survey of a project's rents and permits HUD, based on the survey, to increase or decrease the project's rents.  Since the second sentence is clearly applicable to the term of both the "Initial Renewal" of a project's HAP Contact and at all subsequent renewals and during the terms thereof, the first sentence of 524(c)(1) must also be construed in the same manner.

Defendant asserts that the second sentence of Section 524(c)(1) only applies to HAP Contracts initially renewed under Section 524(a) or Section 524(e)(2) with a term of

12

ten years or greater.  Opp. 14-15.  Consistent with this interpretation, Defendant asserts

that the second sentence requires HUD to adjust a project's rents every five years during

this ten-year or greater term to keep the rents "in sync with rents for comparable

unassisted units in the market area."  *Id.*  Defendant concludes, therefore, that "the second

sentence pertains to within term rent adjustments and not subsequent renewals."  *Id.*

In 1999, Congress revised section 524 of MAHRA extensively, including the

addition of subsection (c) to section 524.  *See* Pub. L. No. 106-74, § 531, 113 Stat. 1047,

1109-1116 (1999).  To implement these revisions made by the 1999 amendments, HUD

issued Notice H 99-36.  The following statements are from this Notice:

> The Preserving Affordable Housing for Senior Citizens and Families Into
> the 21st Century Act of 1999, Titles II and V of the HUD Fiscal Year 2000
> Appropriations Act, Pub. L. 106-74, enacted on October 29, 1999, made
> some modifications to the previous Section 8 renewal policies, **and
> established specific provisions for rent adjustments in subsequent
> years after an initial renewal under MAHRA.**

Exhibit 1, p. 5 (emphasis added).[6]

> In accordance with 24 CFR 402.2, in FY 1999, MAHRA required Owners
> of contracts that renewed under Section 524(a)(1) to submit a RCS with
> their request for contract renewal.  Future rent increases were to be by
> application of an OCAF, but not to exceed comparable market rents.  The
> regulation reserved to HUD the right to re-determine rents on the budget-
> based method from time to time.  **The FY 2000 Act changed this to
> make automatic OCAF adjustments for four years after initial
> renewal, unless the Owner requests a budget-based rent increase.**  In
> the fifth year, the Owner must submit a new RCS in order to ensure
> contact rents do not exceed market rents.

*Id.*, p. 8 (emphasis added).

> In FY 1999, only contracts that renewed under the "Emergency Initiative"
> (Mark-Up-To-Market) were permitted to enter into contract renewals for
> five year terms.  All other renewals, with the exception of short-term
> renewals under 514(c) (for projects being referred to OMHAR) and short-
> term renewals for the protection of the families (to allow time to issue

---

[6] Exhibit 1 is excerpts from HUD Notice H 99-36.

vouchers in instances of owner opt-outs), were renewed for one-year terms.  In FY 2000, HUD has the authority to enter into section 8 project-based contract renewals for any term.

    A.  Generally, contract terms shall be for one or five years.

        1.  If an owner chooses a contract term of more than one year, the contract will be funded for one year with the balance of years selected by the owner being subject to annual appropriations.

        2.   The effective date of the new contract is the day following the expiration date of the previous contract.

        **Note: HUD will consider terms longer than five years on a case-by case basis.**

    B.  HUD offices should make every effort to align contract renewal terms with the five-year life cycle of the RCS.  For example, if an Owner renewed the contract in FY 99 under section 524(a)(1) for a one year term, and in FY 2000 the Owner wishes to renew the contract for a five year term, the owner has two options:

        1.   They may renew the contract for four years, using the RCS submitted at initial renewal (the 524(a)(1) renewal) and adjusting it by OCAF, or

        2.   They may submit a new RCS and renew the contract for a five year term.

*Id.*, p. 12 (emphasis added)

      Based on these statements, HUD did not believe, except in limited circumstances, it had the authority before the 1999 amendments to MAHRA to execute or approve a HAP Contract with a term greater than one year.  Even after the 1999 amendments, HUD would only consider a HAP Contract with a term greater than five years "on a case by case basis."  *See* Ex. 1, p. 12.

      Clearly, HAP Contracts with a term of ten years or more are uncommon. Therefore, to interpret the second sentence of Section 524(c)(1) as only applying to HAP Contracts initially renewed "with a term of 10 years or more" would, in essence, render

this statutory mandate a nullity.  Therefore, Defendant's interpretation is invalid.  *See Airline Pilot Ass'n Int'l v. Pension Benefit Guaranty Corp.* 193 F. Supp. 2d 209, 218 n.4 (D.D.C. 2002) ("It is a well-established principle that when interpreting statutes… a court should 'absent a clear intent to the contrary… read the statute… so that no word, clause, sentence, or phrase is rendered surplusage, superfluous, meaningless or nugatory.'") (citation omitted).

As asserted by Plaintiff, under the plain language of section 524(c)(1), there is no exception to the mandate to "annually adjust the rents using an operating cost adjustment factor" and no distinction is made by this mandate between adjustments made during the term of an "Initial Renewal" and adjustments made at a subsequent renewal and thereafter.  According to Defendant, Plaintiff's interpretation "overlooks the last sentence of Section 524(a)(1), which gives HUD the authority not to renew a HAP contract under section 524… if the project is eligible under section 512(2) for mortgage debt restructuring and HUD believes that debt restructuring is necessary."  Opp. 15.

As stated by Defendant, the last sentence of section 524(a)(1) is applicable "if the project is eligible under section 512(2)."  Section 512(2) defines the term "Eligible Multifamily Housing Project."  However, as discussed above, Steinhorst Square does not meet the definition of "Eligible Multifamily Housing Project."  Renewals after an "Initial Renewal" are governed by Section 524(c), a fact conceded by HUD in Notice 99-36.  *See* Ex. 1, p. 7 ("Section 524(c) provides general authority to adjust rents at subsequent renewal …").  Therefore, the last sentence of Section 524(a)(1) does not alter the mandate under Section 524(c)(1) to "annually adjust the rents using an operating cost adjustment factor"  after the "Initial Renewal" of project's HAP Contract.

15

## VI.    HUD'S INTERPRETATION IS NOT ENTITLED TO DEFERENCE

A court reviewing an agency action is to apply a two-step framework to issues of statutory construction.  First, the court must ask "whether Congress has directly spoken to the precise question at issue."  If so, the court "must give effect to the unambiguously expressed intent of Congress."  *Arizona v. Thompson*, 281 F.3d 248, 253 (D.C. Cir. 2002) *quoting Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984).  If the statute is silent or ambiguous, the court moves to the second step and defers to the agency's interpretation as long as it is "based on a permissible construction of the statute".  *Id.*

Defendant asserts that since "MAHRA is silent on the issue of subsequent renewals", HUD acted "within its lawful discretion in interpreting MAHRA."  Opp. 15-16.  Defendant's assertion that MAHRA is silent on the issue of subsequent renewals is incorrect.

As discussed above, section 524(c), which is entitled "Rent adjustments after renewal of contract", specifies the manner in which all HAP Contracts that are initially renewed under section 524 are to be renewed after the term of their "Initial Renewal" expires.  Similarly, Section 515(b) of MAHRA requires that HAP Contracts initially renewed under the restructuring provisions of MAHRA be renewed under the same terms agreed to at the "Initial Renewal."  Therefore, since Section 524(c)(1) requires that Plaintiff's HAP Contracts be renewed with rents adjusted by an operating cost adjustment factor, i.e. under Option Four, HUD has not acted "within its lawful discretion in interpreting MAHRA."

Plaintiff does not disagree with Defendant's assertion that when *Chevron* is not applicable, an agency's interpretation is still entitled to respect.  Opp. 16.  However, the weight given to an agency interpretation depends "upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control."  *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).

As discussed above, 24 C.F.R. § 401.100(b) is contrary to the manner in which HUD previously processed the "Subsequent Renewal" of the HAP Contract of an exception project.  HUD's policy for over eight years was once an exception project always an exception project.  Defendant has not provided a reasoned explanation for HUD's departure from its previous policy.  Therefore, HUD's interpretation is not entitled to *Skidmore* respect.  Similarly, Defendant's interpretation is not entitled to any deference under either *Central South Dakota Cooperative Grazing District v. Sec'y of Agriculture*, 266 F.3d 889 (8th Cir. 2001), because this case does not involve "a high level of expertise," or *Metro. Stevedore Co. v. Rambo*, 521 U.S. 121 (1997), because HUD's interpretation is not reasonable.

Defendant also infers that his interpretation is entitled to deference or respect because it supports the objective of MAHRA to reduce long-term costs of the Section 8 Program.  Opp. 17.  However, since Defendant's interpretation is contrary to the express provisions of MAHRA, it cannot stand under *Chevron* and its progeny.  Moreover, the reduction of long-term costs of the Section 8 Program is only one of the many objectives of MAHRA.  *See* MAHRA, Sections 511(b)(1)-(9).  In addition, under MAHRA some projects are allowed to charge above-market rents.  Therefore, meeting only one of

17

MAHRA's objectives, is not an adequate reason for according Defendant's interpretation deference or respect.

## CONCLUSION

Defendant has asserted the boilerplate defense that HUD's decision is entitled to deference, or at least respect.  In addition, Defendant has seized on one of the many purposes of MAHRA, the saving of money and preserving project-based affordable housing, to justify the change in HUD's previous policy, implemented through the adoption of 24 C.F.R. § 401.100(b), of renewing the HAP Contract of an exception project under Option Four when the term of its "Initial Renewal" expires.  Neither of these arguments is persuasive.

§ 24 C.F.R. § 401.100(b) is contrary to the express terms of MAHRA.  Therefore, HUD's decision is not entitled to deference or respect.  In addition, HUD's decision was arbitrary, capricious or otherwise not in accordance with law.

First, and foremost, Steinhorst Square Apartments is not an "Eligible Multifamily Housing Project", as defined in section 512(2) of MAHRA, because it is not covered by a HAP Contract under Section 8(b)(2) of the United States housing Act of 1937, which was repealed in **1983.**  Therefore, Plaintiff may not have its HAP Contracts restructured under MAHRA  because restructuring under MAHRA is expressly limited to an "Eligible Multifamily Housing Project."

Significantly, Plaintiff made this same argument in support of its Cross-Motion for Summary Judgment.  However, Defendant offered no opposing argument in his Opposition.

In addition, section 524(c)(1) provides for an annual adjustment of a project's rents with an operating cost adjustment factor after the project's HAP Contract is initially renewed under section 524. This provision applies to adjustments during the term of an "Initial Renewal" and to subsequent renewals. Therefore, 24 C.F.R. § 401.100(b) is in direct conflict with this statutory provision.

HUD's decision not to renew Plaintiff's HAP Contracts is based on 24 C.F.R. § 401.100(b). However, this regulation was adopted without notice and comment. In addition, 24 C.F.R. § 401.100(b) is a significant departure from HUD's previous policy of once an exception project always an exception project and Defendant has not provided a reasoned explanation for this departure. Therefore, HUD's decision is arbitrary, capricious or otherwise not in accordance with law.

With respect to his policy argument that 24 C.F.R. § 401.100(b) is consistent with the purpose of MAHRA to save HUD money and preserve affordable housing to the greatest extent possible, this is only one of nine purposes specified in MAHRA. Moreover, a policy argument cannot override the express terms of a statute. In addition, retaining the policy of once an exception project always an exception project is consistent with the objective of preserving affordable housing to the greatest extent possible because owners are more likely to remain in the Section 8 Program under this policy than if they are forced to undergo a restructuring.

It should be noted that in his Opposition, Defendant ignored other substantive arguments made by Plaintiff in support of its Cross-Motion for Summary Judgment. First, there are two renewal tracks under MAHRA; one under Section 515 and the other under Section 524. The two tracks are separate and, with one limited exception,

no transfer from one track to the other is permitted.  Therefore, since Plaintiff's HAP Contract was initially renewed under the 524 renewal track, Plaintiff's HAP Contracts may not now be renewed under the 515 track.

Second, in 2001, Section 512(2) of MAHRA was revised to permit a project to be treated as an "Eligible Multifamily Housing Project" at a subsequent renewal of a project's HAP Contract notwithstanding that the project's HAP Contract was initially renewed under Section 524.  This would allow the transfer of a project that had its HAP Contract initially renewed under the 524 track from the 524 track to the 515 track at a subsequent renewal, if the owner consents to the transfer.  There would have been no need for Congress to amend Section 512(2) to permit this if HUD already had, as Defendant asserts, the authority to redetermine a project's status at a subsequent renewal.

Third, Sections 511 through 523 of MAHRA expire on October 1, 2011.  If Defendant is correct that HUD may redetermine an exception project's status at a subsequent renewal and HUD determines after October 1, 2011 that a project is no longer an exception project, HUD will be without the authority to renew the project's HAP Contract.  This is because Section 524 will be the only authority after October 1, 2011 that permits HUD to renew a project-based HAP Contract.  Clearly, this is not a result intended by Congress.

Accordingly, for the reasons discussed herein, and in Plaintiff's Cross-Motion for Summary Judgment, the Court should grant Plaintiff's Cross-Motion.  In addition, the Court should deny Defendant's Motion for Summary Judgment.


Respectfully submitted,


February 8, 2008                      /s/ Carl A.S. Coan, Jr.
                                     Carl A.S. Coan, Jr. (D.C. Bar No. 89466)
                                     Carl A.S. Coan, III (D.C. Bar No. 358034)
                                     Coan & Lyons
                                     1100 Connecticut Ave., N.W.
                                     Suite 1000
                                     Washington, DC 20036
                                     Phone No. 202-728-1070
                                     Fax No. 202-293-2448

                                     Attorneys for Plaintiff

UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA

STEINHORST ASSOCIATES

v.

ALPHONSO JACKSON, in his capacity as
Secretary of the United States
Department of Housing and Urban Development

Civil Action No. 07-813(HHK)

PLAINTIFF'S REPLY TO
DEFENDANT'S OPPOSITION TO
PLAINTIFF'S CROSS-MOTION
FOR SUMMARY JUDGMENT

EXHIBIT 1

Market Option for Owners of projects with expiring Section 8 contracts.

The Preserving Affordable Housing for Senior Citizens and Families Into the 21st Century Act of 1999, Titles II and V of the HUD Fiscal Year 2000 Appropriations Act, Pub. L. 106-74, enacted on October 20, 1999, made some modifications to the previous Section 8 renewal policies, and established specific provisions for rent adjustments in subsequent years after an initial renewal under MAHRA.

This Notice provides instructions for renewing Section 8 contracts expiring in FY 2000.  While Section 8 renewal policy remains substantially similar to the policy already in place, the major changes from FY 1999 renewal policies are highlighted in Section III below.  Because of changes to MAHRA, all references to renewing contracts under Sections 524(a)(1) and 524(a)(2) are no longer accurate.  In FY 2000, six options are available to Owners of projects with expiring contracts.  These options are explained in Section VII of this Notice.

This Notice is the comprehensive policy for Section 8 project-based contract renewals in FY 2000 and incorporates the procedures contained in previous Housing Notices. Therefore, the following Notices are no longer in effect:

- H 98-34 published on October 16, 1998, which provided instructions for renewing Section 8 contracts expiring in FY 1999.

- H 99-08 published on May 27, 1999, which made several modifications to H 98-34.

- H 99-15 published on June 16, 1999, which implemented the Emergency Mark-Up-To-Market Initiative for certain projects with expiring Section 8 contracts.

- H 99-25 published on September 22, 1999, which extended Notices H 98-34 and H 99-08.

- H 99-32 published December 1, 1999, which clarified existing policies.

Mark-Up-To-Market Procedure. *It is generally the same policy as in FY 1999, except that non-profit transfers are now eligible for Mark-Up-To-Market, even if the property does not meet the standard eligibility criteria.* (See Section IX)

2.   Is the authority for renewing other contracts with current rents that are at or below comparable market rents. In general, rents at initial renewal will be determined by applying an OCAF to current rents, or if the Owner requests, a budget-based adjustment. This is a change from last year, when below-market contracts generally were renewed at current rents without an OCAF adjustment. In no case may initial renewal rents under 524(a) exceed comparable market rents. (See Section X)

3.   Permits non-profit Owners to mark rents up to a budget-based level, not to exceed comparable market rent, to perform capital repairs on the project, an option that was not available last year. (See Section XXII)

4.   In general, requires that contracts with current rents above market rents must be referred to OMHAR for processing. (See Section XI)

B.   Section 524(b) now provides the authority to renew projects exempted from OMHAR. The major change, other than the change in Section cite from 524(a)(2) to 524(b), is that in FY 2000, FHA insured properties that are State or locally financed may be eligible for the Mark-To-Market program, and will be referred to OMHAR for processing. (See Section XII)

C.   Section 524(c) provides general authority to adjust rents at subsequent renewal by:

1.   OCAF; or,

2.   Upon the request of the Owner, a budget basis which, in some cases, will be limited to comparable market rents.

(See Sections IX, X and XII)

*NOTE:  There are exceptions to the general rules stated in Section 524 (a) through (c).  Where applicable, these exceptions are noted in this Notice.*

D.   The new law states that OCAFs established by HUD shall not result in a negative rent adjustment.

E.   In accordance with 24 CFR 402.2, in FY 1999, MAHRA required Owners of contracts that renewed under Section 524(a)(1) to submit a RCS with their request for contract renewal.  Future rent increases were to be by application of an OCAF, but not to exceed comparable market rents.  The regulation reserved to HUD the right to re-determine rents on the budget-based method from time to time.  The FY 2000 Act changed this to make automatic OCAF adjustments for four years after initial renewal, unless the Owner requests a budget-based rent increase.  In the fifth year, the Owner must submit a new RCS in order to ensure contract rents do not exceed market rents.

For Owners who wish to combine contracts or request a budget-based increase, the RCS submitted at initial renewal can be used for any contract or stage that expires during the five year term of the RCS, but to do so, the RCS must include all of the Section 8 units in the project (not just the units in the expiring Section 8 contract).  (See Attachments 4 and 6 and Section VIII)

*Note:  The five year cycle for each RCS starts with the initial renewal of the Section 8 project-based contract under MAHRA.  This includes contracts renewed in FY 1999 and Portfolio Reengineering Demonstration contracts.*

The law also gives HUD the right to request one updated RCS at any time during the five year period.

F.   The new law authorizes an "enhanced" voucher instead of a "standard" voucher for an eligible family living in an assisted unit when a Section 8 contract expires.  If the contract is terminated, eligible families will continue to receive a standard voucher. (See Section XV)

G.   The new law allows Preservation projects with contracts expiring to renew under the provisions outlined in the approved Plan of Action (POA), even if these rents

2.  Based on the option selected by the Owner, refer to the table of contents to see how to process the request.

## VI.  CONTRACT TERMS AND EFFECTIVE DATES

In FY 1999, only contracts that renewed under the "Emergency Initiative" (Mark-Up-To-Market) were permitted to enter into contract renewals for five year terms.  All other renewals, with the exception of short-term renewals under 514(c) (for projects being referred to OMHAR) and short-term renewals for the protection of the families (to allow time to issue vouchers in instances of Owner opt-outs), were renewed for one-year terms.  In FY 2000, HUD has the authority to enter into Section 8 project-based contract renewals for any term.

A.  Generally, contract terms shall be for one or five years.

1.  If an Owner chooses a contract term of more than one year, the contract will be funded for one year with the balance of years selected by the Owner being subject to annual appropriations.

2.  The effective date of the new contract is the day following the expiration date of the previous contract.

*Note:  HUD will consider terms longer than five years on a case-by-case basis.*

B.  HUD offices should make every effort to align contract renewal terms with the five-year life cycle of the RCS. For example, if an Owner renewed the contract in FY 99 under section 524(a)(1) for a one year term, and in FY 2000 the Owner wishes to renew the contract for a five year term, the Owner has two options:

1.  They may renew the contract for four years, using the RCS submitted at initial renewal (the 524(a)(1) renewal) and adjusting it by OCAF, or,

2.  They may submit a new RCS and renew the contract for a five year term.

C.  Short term contracts are for less than one year.  The term "short term " refers to the term of the contract, not the "type" of contract.

Short-term renewals may be provided for the following: